Daniel S.  Szalkiewicz, Esq.  (DS2323)
DANIEL SZALKIEWICZ & ASSOCIATES, P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| John Doe<br><br>                    Plaintiff,<br><br>          v.<br><br>Baila Sebrow,<br><br>               Defendant. | **FIRST AMENDED COMPLAINT**<br><br>Case Action No. 2:21-cv-20706 |

Plaintiff John Doe ("Plaintiff" or "Doe"), by his attorneys Daniel Szalkiewicz &

Associates, P.C. and attorneys Borenstein, McConnell & Calpin, P.C., as and for his First

Amended Complaint hereby alleges, upon information and belief, as follows:

**PRELIMINARY STATEMENT**

1.      Following the death of her husband, defendant Baila Sebrow ("Defendant" or

"Sebrow") engaged in a short-term sexual relationship with Plaintiff.  Sebrow was infatuated,

sending him text messages professing her love and lobbing paranoid insults at other women she

perceived to be threats.  After several months of attempting to navigate Sebrow's petulant

displays of love, Plaintiff chose to end the relationship.

1

2.      Sebrow holds an esteemed role in the Orthodox Jewish Community, as a "shadchan" or matchmaker.  In this capacity, she is tasked with finding compatible couples of all ages and arranging marriages in exchange for a fee.

3.      Sebrow's position is considered one of respect and virtue.  It is imperative that her clients feel comfortable telling her their innermost secrets such as their sexual preferences, financial resources, prior relationships, history of sexual abuse and assault, likes and dislikes, and fears – all of which are considered taboo and unspoken about among Orthodox Jewish people.

4.      Either because her ego could not withstand the blow of being rejected by Plaintiff, because she feared her premarital sexual acts would become public so near her husband's death, or because she wanted to turn Plaintiff into a social pariah, Sebrow began a four-year course of conduct to destroy Plaintiff's reputation to his Orthodox Jewish friends, colleagues, and family members as well as anyone who searched for Plaintiff online.

5.      Sebrow started her crusade by privately sending Plaintiff threatening, abusive, and emotionally damaging messages.  When this did not elicit the response she had hoped, she began broadening her abuse, disseminating the same and similar false content to third parties.

6.      Sebrow was aware Plaintiff frequented the same Jewish events she did, having gone on dates with him in the past and previously running into him at these places.  Using her role as shadchan, when Sebrow learned Plaintiff was about to date a new woman, she sent messages or called that individual to disparage Plaintiff.  Sebrow confirmed her ongoing intrusion into Plaintiff's private affairs by taunting him with text messages about dates both real and imagined, sending him derogatory text messages which included "[h]ey, maybe you're gay.

[Woman's Name] looks like a tranny" and "[a]t least [Woman's Name] is not a widow.  Her pussy is well used."

7.    Sebrow's contact was designed to and did actually make Plaintiff feel as though he would never be free to find love in the Orthodox Jewish community as Sebrow would always be using her position as sadchan to interfere with his prospective relationships.

8.    On a near-daily basis, Plaintiff pleaded with Sebrow to leave him alone, but Sebrow persisted, even making efforts to take her crusade online with the creation of social media profiles and a website which furthered her false claims.

9.    With no end in sight, Plaintiff informed Sebrow that he planned to initiate legal action against her.

10.    In a fleeting moment of self-awareness, Sebrow realized that, with litigation comes discovery, and soon her deranged conduct would become public.  To protect herself and with the intention of interfering with the judicial process, Sebrow not only destroyed all her text messages but also created fabricated emails to support her claims that Plaintiff raped her.

11.    Accordingly, Plaintiff brings this action seeking injunctive, declaratory, and monetary relief against Defendant for violations of federal privacy laws, 15 U.S.C. § 6851, [c]ivil action relating to disclosure of intimate images, related New York nonconsensual pornography statutes, intentional infliction of emotional distress, intentional interference with prospective economic advantage, and tortious interference with contract/prospective economic advantage.

**THE PARTIES**

12.    Plaintiff John Doe is a resident of the County of Essex, State of New Jersey.

3

13.     Plaintiff is a parent of four (4) children and grandfather of numerous grandchildren.

14.     Plaintiff practices Orthodox Judaism and is involved in various activities in that social and religious environment.

15.     Defendant Betty Sebrow, sued here as Baila Sebrow, is a resident of the County of Nassau, State of New York.

16.     Upon information and belief, Sebrow is a well-known media personality in Jewish media, and is a professional matchmaker, with her emphasis in Orthodox Jewish dating and relationships.

17.     Sebrow transacted business in the State of New Jersey, contacted multiple people in the State of New Jersey with the intention of interfering with Plaintiff's employment, was aware that her actions would directly affect a New Jersey resident, and is the subject of this court's long-arm jurisdiction statute.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to 28 U.S.C. § 1332(a)(1) based upon Diversity of Citizenship because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and it is between a citizen of New Jersey and a citizen or subject of a different state.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this the Judicial District in which a substantial part of the events forming the basis of the Complaint occurred, where a substantial part of the evidence involved in the subject action is situated, and

where the majority of the witnesses to the events forming the basis of the Complaint reside. Furthermore, Defendant meets the requisite minimum contacts for jurisdiction in this District.

## FACTUAL ALLEGATIONS

**The Parties' Relationship**

20.     Plaintiff and Sebrow's former husband met on several occasions when Plaintiff offered his services as a finance professional.  Upon Sebrow's husband's death in May 2017, Plaintiff donated a tree in his honor.

21.     Several months later, Plaintiff noticed that Sebrow was not only actively throwing events for singles in the Orthodox Jewish community, but also appeared to be searching for new men to date as well.

22.     Plaintiff approached Sebrow and the two began speaking on the telephone.

23.     On or about December 23 2017, the parties met in Manhattan at Bemelmans, a bar located within The Carlyle Hotel.  Plaintiff selected the well-known 1940s-era venue out of deference to their shared religion's traditions and the importance for dates to occur in public places.  As the conversation progressed, Sebrow put her hand on Plaintiff's leg and grabbed his genitals.  Sebrow then led Plaintiff to his car, where she performed a sexual act on Plaintiff.

24.     Plaintiff had planned the date under the impression that the two would be following traditional practices of Jewish Orthodox dating and was shocked by Sebrow's overtly sexual behavior.  At no time did Plaintiff solicit or ask for Sebrow to engage in the conduct.  At the conclusion of their date, Sebrow took an Uber home and repeatedly called Plaintiff over the next 24 hours to tell him what a good time she had.

25.    The parties' relationship continued to develop, with Plaintiff taking Sebrow out on several other dates and introducing her to his friends on New Year's Eve.  As with their previous date, the parties' other dates eventually progressed to consensual physical intimacy.

26.    Sebrow's words and conduct made clear that she believed and planned for their relationship to lead to marriage.  However, as the weeks passed, Sebrow grew increasingly possessive of Plaintiff, demanding more time and more attention and engaging in outrageous behavior when she did not get it or, worse, a woman in their shared community inquired about Plaintiff's romantic availability.

27.    With the intrigue of Sebrow's spontaneity being rapidly overcome by her toxic jealousy and unpredictable demands, Plaintiff realized the relationship was not a sustainable one and started to distance himself.

28.    Passively extricating himself from his relationship with Sebrow proved a difficult task for Plaintiff, as Sebrow was an involved member of their relatively small religious community and the two ran in many of the same circles.

29.    Plaintiff decided to confront the problem head on, notifying Sebrow that he did not see a long-term future in their relationship and wished for it to discontinue.  Plaintiff explained to Sebrow that he intended to remain friendly, but that he could no longer date her in an intimate manner.

30.    Realizing she had engaged in sexual conduct unbecoming of an Orthodox Jewish woman, Sebrow sought out to so devastate Plaintiff's reputation in the community that no one would ever believe him if he dared repeat the details of their many sexual dalliances.

31.    Suddenly, without warning, and for the very first time, Sebrow began accusing Plaintiff of numerous improprieties.

32.     On February 19, 2018, Sebrow sent the following email to Plaintiff:

"Did you block my calls? Because if you did, I'm going public with everything you did to me, and the truth about what happened in the past. One of the rabbis in my community did a major search on you. And it seems that [Woman's Name] was quite abused by you. Not only that, but it seems that your daughter [Woman's Name] frequently slept in your bed while she was a teenager. There are plenty of other stories. I was warned to stay away from you. But, I still insisted on dating you, claiming that they are all lies.

Now, I wonder!"

33.     On or about May 17, 2018, Sebrow sent an email to Plaintiff, stating as follows:

"Nope. You tend to bring up [Woman's Name] quite a bit in a positive way. Whether on a date or in bed. She's in your blood. But, you know that if you present her as wife #4 - you will be the laughing stock! She actually makes [Woman's Name]  look good. They're both trash. But, at least [Woman's Name] comes from a good family. [Woman's Name] has faggots and goyim. What a beautiful example for your grandkids, that would be. Lol."

"So, instead you go after a woman who will make you look good."

34.     Plaintiff pleaded with Sebrow to stop contacting him, never stooping to Sebrow's level and instead texting her polite but firm messages such as "[t]his has to stop. My children are coming over . I have to go shopping. Please stop this."  Plaintiff's appeals for peace fell on deaf ears.

35.     The timeline of Sebrow's harassing messages were nearly identical: she would inform Plaintiff of her strong feelings for him and when he did not respond in kind or sometimes at all, she would spread emotionally harmful lies.  Then, after Plaintiff would respond and attempt to calm her, Defendant would apologize for spreading lies.

36.     Knowing Plaintiff is a prominent businessman, Sebrow began to falsely accuse Plaintiff of rape.  For example, on July 8, 2018, Sebrow sent Plaintiff the text message "You're a

very cruel man. You admitted that you didn't love me. So, you said all the right things for pussy! Thank you for raping me."  Plaintiff immediately responded "That's a lie and you know it."

37.    Sebrow continued to accuse Plaintiff of rape, stating "you used me and then needed new Pussy. You've done this for years. Only G-d will stop you with a major health attack."

38.    On July 10, 2018, Sebrow told Plaintiff by text message that:

> You raped me and you will be brought to justice until G-d gives you painful cancer or a stroke…  I curse you...  You will have a financial downfall… And your daughters will get divorced…  Actually [Plaintiff's daughter's name]'s hubby will leave her…  You've got a widows curse.  Only I can remove it…  Widows have special powers. Lawyers can't remove curses… You'll need my forgiveness…And I won't forgive you until you fix what you did…Courts can't force me to remove the curse…But you'll see bad things happening…Hashem gave widows special powers…Go rape your daughter again, you sicko…

39.    The same day, Defendant also wrote that:

> Every Rabbi will spit on you for what you did to Baila Sebrow… I curse you with testicular or prostate cancer and financial downfall. You use your penis and money to abuse women. And those will no longer be useable to you. Only I can remove the curse.  Every Rabbi will curse you. And I'm going to the grave sites to pray for your downfall.

40.    Plaintiff begged Sebrow to stop, but Sebrow was unrelenting and, eventually Plaintiff indicated he would be calling an attorney.   Sebrow then threatened to show up at Plaintiff's office to harass him.  After Plaintiff again said he would call his lawyer, Sebrow wrote:

> Call your attorney. And I will go to the press! Perfect! It's about time people find out
>
> Famous journalist raped by [Plaintiff's Employer] executive.
>
> Just contacted [Woman's Name]. I'll be a character reference for her and I'll bring along other women hurt by you.

You need help. And I want to help you. Don't you see what you're doing to yourself? Remember when you said, if you can't make it work with me, you cant make it work with anyone?

I want to help you. All you're accomplishing by dating other women is a bad reputation. Whether it's [Woman's Name] or someone else. It can't end well with you.

In spite of everything, I still care about you and and want to help you.

41.    When Plaintiff again rejected Sebrow's advances, she started attacking his daughter:

You used your kids to get back at [Woman's Name]. And your daughter couldn't deal with it, so she cut herself. And [Plaintiff's daughter's name] is mentally unstable because of you. Sadly, her hubby will leave her when you stop shtupping them with money. But, don't worry - I'll help him find a shidduch!

But in spite of all that, I care about you. That's the humanitarian side of me. You want to be happy, but don't know how.

You must be desperate to date [Woman's Name]! Now I find the whole thing funny. At first I was angry that you lied to me. Now, I'm amused.

Next you can bang [Woman's Name]. I hear [Woman's Name] is banging. So you can bang her too. I love this!

What have you done to your life? G-d gave you one decent chance and you blew it.

Now you're back in the cesspool dating the rejects.

"[Plaintiff] and The Trash Bags."

You fell back in like an addict. Your therapist is not doing a good enough job. She should've prevented this from happening.

You're gonna be licking and sticking your fingers in a trash bag!!! This is such fun.

42.    Sebrow continued her harassment of Plaintiff into the early morning of July 11, 2018, when she texted him:

Can't wait to tell Moishe, you're dating [Woman's Name]! He's gonna laugh his head off!

I'm asking Corinne to call Rabbi Zwickler. She knows what you did to [woman's name], and she knows how you drag women to bed and dump them.

You opened a can of worms when you got your Rabbi involved.
He believed me, because he knows a woman like me is honest. Plus, I have many witnesses backing me.

I might go to Joey this Shabbos. Gonna entertain them with stories about you!

I'm going to patent a new trademark for a singing group and will write a song:
[Plaintiff's name] AND THE TRASHBAGS

I should tell [Woman's Name] how you made fun of her contorted face, voice, and man hands. Guess you're so horny you'll even fuck something like her. Oh, and she thinks you have money! That's why she wants to date you.
Hahahahahaha
You're getting royally screwed like you deserve!
Hahahahahahahahahah

My advice is for you to move to Israel and change your name. Here, you are known as a rapist!
Your poor son in law sees all those beautiful sexy women at work. Then he goes home to his ugly smelly fat mentally unstable wife. I daven that he iy"H dumps her and has some normalcy.
Another example of a bought man. You got him a job and bought him a house. Their house is cursed because they moved in when you dumped me. That house will bring them sorrow and the breakdown of their marriage.

43.     The next day Sebrow apologized for her conduct, stating:

Thank you for meeting with me.  I appreciate it.  I'm very sorry that I said those things about your daughter.  I'm not making any excuses.  Even though I felt attacked, I should have been more in control of my emotions. I'm an adult and should have been able to do that.  I hope you can forgive me.  I will always love you.  You don't have to love me.  All I ask is to be your friend.

44.     Later, Sebrow wrote "I'm very sorry that I said you raped me. I was upset, and

not thinking clearly. It's not true. I apologize for the grief it caused you.

10

45.    Defendant also messaged Plaintiff to say: "Though I still love you, and always will - as real true love never goes away, I received closure."

46.    On or about July 24, 2018, Sebrow sent the following email to Plaintiff:

As a relationship expert I totally understand what's going on. You felt compelled to break up with me for whatever reason. And you're scared to run into me (no pun intended) or communicate with me because you still have a thing for me! And when we communicate, it slows down your healing process. Otherwise, I would be like any other person to you.
Even if date or sleep with other women, you will always think about me. Gold always shines through!
Deny it all you like, [Plaintiff], baby. I'm in your blood!

47.    In response, Plaintiff sent the following response to Sebrow:

Baila.

I really need to be clear. With the greatest of respect you are way off base. I'm sorry you feel this way as I probably could have done a better job being clearer.

This is not true. I wish you well and you are an amazing person. I'm sure the right person will be coming along.

Wishing you the Best

48.    Plaintiff followed up the sentiment in a text message to Sebrow:

Baila. I can not speak now as I'm going into a meeting shortly and Ill be tied up till very late this evening. I will always consider you a friend but I believe for our own growth and mental health we should limit our contact . Please respect my wishes and know we are still friends I just feel we need space. Good luck in future endeavors and on your upcoming Weekend

49.    On or about July 24, 2018, Sebrow sent the following response to Plaintiff:

I know that I'm an amazing person. At least we finally agree on something!

And that's why I would be amused to see who will be the next woman after me. Will be funnier than laughing-gas."

50.     The following day, Plaintiff accidently sent Sebrow a text message meant for his

son.

51.     In response, Sebrow sent Plaintiff a string of text messages stating:

> I have every right to question this from a man who stuck his penis into me,
> after using such love words with me, and dumped me and then accidentally
> sends a text meant for someone else.
> [Plaintiff], I have the same text from you back in early Dec.
>
> ***
>
> You overstepped boundaries when you stuck your tongue, fingers and penis
> into a new vulnerable widow using similar texts. You dump her then she
> gets a similar accidental text meant for someone else.
> Block me. I'll pass this text around.
>
> You are the [Plaintiff] your reputation is known for. You played me, and I
> now have the proof. I'm definitely over you, but now I have the written
> proof of what you are. Hashem made this happen so I could share this with
> others of how you use women and then dump them when you're done.
> There's a whole string of women, [Plaintiff] who claim you did this.
>
> Sure. You should call your rabbi. He already knows about you anyway.
> Explain that text to him. And then let's get similar texts from other women.
> Difference here is that I have the proof so many women claim.
> You claim love, fuck and dump. It's a cycle for you.
> I swear I have no interest in you. But, this text will be shared and compared.
> Have a lovely day!
>
> Do what ever u want. I have all the Texst's from you as well. I will no longer
> be in contact for a few days.
>
> My texts are normal. Your text proves what so many women have fallen
> your victim. You're a predator and you need to be exposed. You should be
> banned from women.
>
> Gonna post your text on Facebook without your name and we will get
> opinions from women!
> Hashem is great!
>
> FYI: Reputation Saver only helps you so much. Private Investigators get all
> the info. It's only a few thousand dollars.

Reputation Defender is an online reputation management company which specializes in removing negative content from a person or business's search engine results.

52.     Sebrow then again threatened to ruin Plaintiff's reputation, texting him:

> Glad you called me unbalanced yesterday. Works to my benefit.
> "Distraught widow taken sexual advantage of by well know predator."
> Yup. Wonder what the higher-up people at [Plaintiff's Employer] will think.
> I actually have a nice portfolio with _____,
> so I know the big players in the field, sweetheart!

53.     On July 25, 2018, Sebrow threatened to send the following email to Plaintiff at his work email address:

> I'm thinking of settling this situation in a Bais Din [Jewish Ritual Court].
>
> Scenario:
> Defendant: A 3 times divorced wealthy man who has a reputation for wining and dining women telling them he loves them, sleeps with them and dumps them.
>
> Plaintiff: Newly widowed woman who was in a healthy marriage for 28 years, and a known devoted wife. She is an upstanding citizen known for her endless chesed. She is a respected leader in the Jewish community and admired by rabbis.
> She was seeked out by defendant immediately following her husband's death by means of an esteemed rabbi and an organization. Defendant donated money on behalf of her husband's memory to an organization, and also to her personal charity for singles. Defendant persuaded plaintiff to date him. In her fragile vulnerable state, he sends her expensive gifts, wines and dines her, tells her he loves her and wants to marry her. Brings her to a bar. She drinks. He convinces her to sleep with him all the while talking about marrying her and where they will live together. He introduces her to his friends and she believes everything while continuing as a serious couple including intimacy.
> One day, out of the blue, he breaks up with her telling her things that make no sense. Finally, he admits to never loving her, and that in essence she was nothing but a sex toy for him.
>
> Witnesses to the character and behavior of defendant will be in attendance.
>
> Plaintiff seeks compensation for emotional damage, and knowledge made public about the defendant's predatory actions.

What do you think?

54.     On July 27, 2018, Plaintiff and Sebrow were scheduled to attend the same event.

When Plaintiff stated he needed space from Sebrow, she became enraged and threatened to

spread lies about him:

> You initially said yes. But, no problem. I will not even acknowledge you.
> And I will deny that we dated and will say you're delusional.
>
> Your choice to make it hostile.
>
> ***
>
> Now were enemies
>
> ***
>
> I'm not mad. I asked you if you want to sit at the same table. You said no.
> I respect your decision. A woman like me doesn't beg for attention. Leave
> that to the loser gold digging whores who will chase you.  I'm too good
> for this abuse.

55.     In response, Plaintiff pleaded with Defendant, stating: "[l]eave me and my family

alone[,]" "I will never speak again that we went out to anyone[,]" "[p]lease leave me alone[,]"

"I'm sorry we where intimate.  I'm sorry I asked u out.  I'm sorry I ever meet you.  Leave me

and my family alone[,]" "Please.  Leave me alone" and "Respect my wishes[.]"  Defendant then

proceeded to repeatedly beg Plaintiff to attend the event claiming that she "care[d] about [him]"

and "want[ed him] to have a good time."

56.     Sebrow's anger at Plaintiff breaking up with her was evident through her text

messages.  Believing Plaintiff was seeing another woman, on July 28, 2018 she texted Plaintiff

> So glad I convinced you to come. Now you have whom to bang. As long
> as the lights are off, you'll be fine. Or, you can put a paper bag over her
> head!
> Hahahahaha

57.     Plaintiff responded, saying "It's not nice to make fun of people. She sat by me not the other way around. I don't care. I just want to go home to my family . Please leave me alone. I need to go won't be responding[.]"  Plaintiff's message only enraged Sebrow, who wrote the following string of messages:

> Just teasing you! I'm not making fun of her. I'm making fun of what you were stuck with since dumping me!
> It's called karma!
>
>           ***
>
> Not being mean. Telling you the truth based on facts. After dumping me, you will get exactly as you deserve. If you have a problem with that, take it up with G-d
>
>           ***
>
> You will never find love. The next woman will marry you for your money only. And you will be divorced for the 4th time!
>
> It's the truth. G-d you one last chance and you blew it. Now you're going to live with it.
> As I said, I'm getting the popcorn to munch watching you screw your life. This Shabbos was a preview!
>
> And when news of your 4th divorce becomes public, I will proudly tell everyone that you dumped me!
>
> It's actually an honor for me to say that you dumped me!
>
> Your kids will like the Peruvian.
> She's a convert like them and their mother.
> And she's a spic too!
> But, [Plaintiff], how can you actually fuck something so ugly?
>
> There's that other woman from Lakewood you were taking to.
> Now that one bangs good!
> She cheated on her hubby with half the town. Her own family wants nothing to do with her, and she lives in a hotel. She's a charity case.
> [Plaintiff], you're getting what you deserve. Karma is great!
>
> As I said, you will never know from love again!
> Poor [Plaintiff]!

You defiled me in my year of mourning for my holy husband. Now G-d will defile your life.

Anyway, have a fun trip back and thanks for joining and proving how great G-d is!

FYI: [Woman's name] told me she's on lots of dating sites, and can't get a date!

Desperate Horny [Plaintiff] to the rescue
Hahahahaha


Before I forget:
Moishe looked very handsome this Shabbos.  Don't you think?

Oy, just realized......
I was staring in your eyes, and concentrating how you broke my heart.
Wonder if that caused you an ayin hara. If it did, I'm not sure how to remove it from you.
Ask your Rabbi what to do about it 

Do you know what money cannot buy? Forgiveness and curse removal. That's the power you gave me.
I hold power over you.

I already had 28 years of love. So, I'm content to spend the rest of my life cursing you for defiling me. I'm a widow. And my tears and curses are very potent.

And may men do to your granddaughters what you did to me. And if your daughters get divorced, may men do to them, what you did to me.

I hope you get a lawyer against me. So, I can counter sue you and make it a class action.
Imagine how your kids would be embarrassed that their father is a pig who abuses women.
My kids know what you did to me. And my daughter knows [Woman's name] and her purchased hubby!

Just sent an email to my relatives to transfer if they have a portfolio with [Plaintiff's Employer]. Let's see you "bang" your way out of that one!

58.     By August 2, 2018, Sebrow was again contacting Plaintiff to ask him if he had

"found anyone else yet" to which he responded "…With the greatest of respect please NO more

tests or emails.  I need this three nexst week." But Defendant could not help herself.  On August 3, 2018, Sebrow continued to send Plaintiff harassing messages, even after he asked her numerous times to stop, even at one point asking telling her "Stop.  Stop stop stop stop stop[.]"  In response, Sebrow wrote:

> I need to speak to you ASAP
>
> I thought you can be civil. But, I see you play dirty.
>
> You broke up with me for no reason other than you got bored with my body.
> Don't twist it around and tell me that you can't go out with me because of what I said 2 months later after huge arguments.
>
> Are you hooking up with [Woman's Name]? She's planning on moving to Florida, as you just said. Makes sense. You got mad when you found out that she dated Moishe. He dumped that reject. I saw the texts!
>
> I remember how mad you were when I told you that Moishe dated [Woman's Name]! And you were dating me at the time!
> You broke up with me for no reason. You tell me you want to marry me and out of the blue you dump me.
>
> ***
>
> It's not fair what you did to me. And you know it.
>
> ***
>
> You dumped me for no reason.
>
> You treated me like the bimbos you slept with before. You pretended to be serious and I trusted you.
>
> I believe you're fucking [Woman's Name] now. You keep going back to her after you break up.
> You deserve that reject. 12 years she's been divorced. Every man laughs at her.
>
> You asked me what I want. I'll tell you. I want you to admit the real reason you broke up with. In person. Not on a noisy street by Starbucks. Not on limited time where you had to run back to the office. Private conversation. No more bullshit.

***

> No. I will not leave you be. You will not treat me the way you've treated all your other bimbos. You will learn the difference when you start in with a woman like me.

59.     Sebrow continued to text Plaintiff harassing and vulgar messages.

60.     On August 20, 2018, Sebrow wrote Plaintiff the following text:

> Do what the hell you want. You're the one who hit on a married woman.
> You used a widow. I have those emails.
> Stay away from me. I want nothing to do with you.
>
> For once in your life, you have no control. Your money can't buy me or tell me what to do. I will make whatever decision I choose.
> Now go do what you're good at. Hunt for new pussy! Who are you banging now? [Redacted]?

61.     On August 29, 2018, Sebrow sent an email to Plaintiff at his work account:

> "Maybe it's time for [Plaintiff's Employer] to know that you're a sociopath.
> Maybe it's time that your predatory activities become public.
> Maybe it's time that the hundreds of your female victims come forward with their stories of sexual abuse.
> As a journalist, I will be happy to publish all firsthand account tales.
> In fact, why don't we publish how when you don't rape women, or stalk them - you abuse trust in emotionally vulnerable women in order to have sex with them?
> What did you do to your own daughter, [Plaintiff]?
> Shouldn't be too difficult to find a large number of many victims. Isn't that correct, [Plaintiff]?

62.     On or about August 29, 2018, Sebrow sent another email to Plaintiff at his work account, this time seemingly conciliatory:

> I'm willing to straighten this out

63.     On or about August 29, 2018, Sebrow sent another email to Plaintiff at his work account, this time in the form of an apology:

> [Plaintiff], I am sorry about both emails on August 29.  None of it was true.  I was upset.  I will not send again.  I am sorry.

Baila Sebrow"

64.     While Sebrow's statement that her previous email was not true is accurate, her

the apology and attempt at reconciliation, were not sincere and were short-lived.

65.     On August 31, 2018, Sebrow sent the following email to Plaintiff:

Not sending by text, in case you're worried about your company seeing it.

When you unfriended me from Facebook, it was a tremendous public attack.
I did nothing to you on Tuesday to deserve that. And you know it.

People check to see whose friends with whom, and who's unfriended. You
publicly attacked me. And then I reacted. Plus, it was on a day that was
traumatic to me, and I didn't feel well.

Why did you do that to me?

Do you know how embarrassing it is to me that you unfriended me?

That's a huge attack, and I can't deal with that.

66.     On or about September 7, 2018, Sebrow sent the following email to Plaintiff:

This is not an "impulse control" email, nor do I have that Issue. You're just
projecting.
However, crap I take from no one!
All that happened this morning is that at 7:49, I texted you "Good luck with
your Dr. appt."
Instead of just saying thank you, you sent me a long email that you cannot
communicate with me.
Would you have responded that way to any of your fuckaroos? No.
So, if you act insane towards me, then I respond in the language you
understand.
I'm sorry about your ex-father in law, and the troubles that are coming along
with it.
Regardless of everything, I was worried about your health and your return
visit to the doctor today. And that's why I texted you. But, you can't help
yourself turning everything into crazy drama.

Shabbat Shalom

67.     On or about September 7, 2018, Plaintiff sent the following response to Sebrow:

Baila.

I need to deal with a lot. I with u a very happy healthy new year.

68.    On or about September 7, 2018, Sebrow sent the following response to Plaintiff:

Thank you. Same to you.
And if you have sex with anyone else, may you contract a highly contagious
incurable lifelong STD!
Amen Amen V'Amen Love and kisses!

69.    On or about September 26, 2018, Sebrow sent the following email to Plaintiff:

My reason for wanting to remain friends is so that I don't feel compelled
to take legal and halachic action against you.
You might think that you can get away with saying that we had a
relationship that didn't work out.
But, everyone knows that it's not true. What you did to to me, you have
done to many others in the last 15 years you decided to join the Frum
world. And only G-d knows what kind of havoc you created in the secular
world that will one day hit the media.

What you did to me (and others) is called sexual coercion. That is a form
of rape. I'm not sure if NY would try you criminally for what you did.
But, a class action civil suit against you will definitely hold up.

I don't want to do that to you. My professional standing and reputation in
coming forward with such charges will only ignite others to come forward.
And the damage it will do to your entire life and all that you worked for
will blow up.

I'm a victim. No different than a survivor of any other devious and sinister
attack.

But, I have a soft spot for you. Maybe it's because I'm still a good person.
Or maybe I am suffering from the Stockholm Syndrome. Not uncommon
in such cases.

The bottom line is that I defended you in public. I didn't need to do that. I
could've just kept quiet. And I shared with you what I did in your defense.

Then I opened Facebook, and saw that your account is very much active,
with me still unfriended, while those who talk about you as a dirty joke are
still your friends. And that was quite hurtful.

[Plaintiff], you have not turned over a new leaf just because Yom Kippur
ended. As long as people still have a heavy heart against you, G-d has not
forgiven you. That's a Torah fact.

I have not forgiven you. Nor will I ever. You used sexual coercion, and then, as your reputation precedes you - you threw me away.

Just so you know, I cry every day, and at every prayer I insert your name for the pain you caused me.

Again. I don't want to go public and cause you irreparable grief and embarrassment.

70.    On or about October 2, 2018, Plaintiff sent the following email to Sebrow: "I've had enough. Do not email me anymore nor contact me."

71.    On or about October 3, 2018, at 3:05am, Sebrow sent the following email to Plaintiff:

> Hey [Plaintiff],
> How could you have not known this?
> You wrote several times by text and email that you want to marry me. That's a halachic contract by intent. You then consummated the union with intercourse.
> That's Kiddushin!!! [marriage].
> According to Torah law, there are three ways to betroth a woman:
> 1. A money transaction. The man gives to the woman money or any object of value.
> 2. A document.  The man gives the woman a document which states his intention to marry her.
> 3.       Sexual Intercourse
> I'm going to keep quiet about this for now. But, if you ever get involved with another woman - you have my promise that I will take you to Bais Din.
> Baila"

72.    On or about October 3, 2018, at 3:16 am, Sebrow sent the following email to Plaintiff:

> It's not fair that you ruined my life. I didn't ask to date you. I was trying to gain some emotional footing after tragically enduring my husband's long illness and death.
> You forcefully pushed your way into my life using money, charm, and false promises. You took my heart and dignity. Then you dumped me.
> Do you think I'm going to sit on my tuches [buttocks] and suffer silently while you're off finding new pussy to bang?
> You are halachically [Jewish law] bound to answer for your actions!"

73.    On or about October 5, 2018, Sebrow sent an email to Plaintiff stating the following:

> Dear [Plaintiff],
> You have no clue what our relationship did to me.
>
> ***
>
> The brutality of the way you dealt with me... This time, I didn't survive.
> Emotionally, I am finished. The tremendous pain of what happened even
> caused me to say things to you that I otherwise never would. I'm sorry.
> Now, I understand how divorces can turn messy and ugly, even with nice
> people. You were not fair with me.
> I trusted you when everyone begged me to stay away. I never told you this.
> But, at the FD weekend where it was clear we were together, several people
> warned me that you would hurt me. I shut them up. That's how secure I was
> about you.
> At the end, all those who warned me, were accurate.
> I don't want to be enemies with you. I want to be in your life, even as friends.
> Not sure why, but I still care about you. To me, love is eternal. Perhaps, that
> Is the strongest difference between us.
> Love,
> Baila

74.    On or about October 7, 2018, Sebrow sent the following email to Plaintiff:

> You can ignore me all you like. This is a very serious matter. I won't let you
> ruin my life. You got me into bed many times pledging marriage
> throughout. You backed out, not caring that you left me defiled.
> As it Is you've caused damage in that area, because I could never marry a
> kohen [priest].
> We can solve this quietly. No one has to know our last names. A rabbi writes
> up a Get [divorce], and it's done.
> You don't want this dragged into the streets, because it's going to become a
> muddy mess for you. You've worked hard to keep your nose clean from
> your past.
> Unfortunately, you couldn't do that in your dating life. But, this will dredge
> up old stories.
> My life has been clean until I allowed you into my life. The worst thing you
> will find about me is that I called the police on a Muslim cab driver who
> threatened me and where there is footage of him driving like a maniac to
> scare me. You already made a fool of yourself when you stated that I bullied
> him!
> You've hurt me enough. I trust that you will do the right thing.

75.    On or about October 10, 2018, at 7:45am, Sebrow sent the following email to Plaintiff:

> Coming soon to a newsstand near you!
> "63 Year Old 4 times Divorced Bipolar Sex Addict...Meet [Plaintiff]."
> Read a woman's personal account about her nightmarish abusive relationship with this high-powered philanthropic man in finance and politics.
> West Orange will finally be placed on the map when this story makes the headlines!"

76.    On or about October 10, 2018, at 4:06 pm, Sebrow sent the following email to Plaintiff:

> You can block me. But, I will play back [Woman's Name] voice on your work phone.

77.    Plaintiff responded to that email on or about at 5:16pm, stating:

> I will advise them at work that you mentioned this.

78.    Sebrow responded to Plaintiff's email on or about at 5:22pm, stating:

> You really don't want that played back. And I don't want to hurt or embarrass you. I never have.

79.    On or about October 10, 2018, at 6:42pm, Sebrow emailed Plaintiff again, stating:

> Proof that Hashem [God] protects widows is why I found out what you told that ugly jealous fat woman.

80.    On or about October 10, 2018, at 7:30pm, Sebrow sent an email to Plaintiff stating the following:

> May Hashem render your tongue and speech useless. Amen Amen V'amen
> Just remember "People in glass houses should not throw stones."
> I have a very damaging recording about you that could destroy your family.
> I would hate to put it on social media.

81.    On or about October 10, 2018, at 8:16pm, Sebrow sent the following email to Plaintiff:

You will be begging me to forgive you. I will now visit my husband's kever [grave] every day and cry about what you did to me. The earth will absorb my tears, as I will beg Hashem to punish you.

I'm not the first widow to cry about what you did to her.

This time Hashem [God] will stop you. All evil men have fallen. And so will you.

82.    On or about October 10, 2018, at 11:17pm, Sebrow sent the following email to

Plaintiff:

NORPAC will be hosting a pro-Israel fundraiser for Senator Robert Menendez (D-NJ) in Teaneck! October 21st at 12:30 PM.

I have family in Teaneck, and they know what you did to me and other women in NJ. Senator Menendez will be informed about your sick ways. I might forward [Woman's Name] recording about what she witnessed while married to you, along with the testimony of other people."

83.    On or about October 11, 2018, at 4:54am, Sebrow sent the following email to

Plaintiff:

Your new fat friend whom you spoke to about me will find out the truth about who you really are, and what you have done to women.

I'm not obsessed with you, as you want to believe. I'm just not letting you get away with what you did to me and others.

Finally, someone is standing up to you!

84.    On or about October 11, 2018, Sebrow sent the following email to Plaintiff at his

work email address:

[Plaintiff]:

You have threatened me, sent me expensive gifts, and now the truth about how you tortured me has gone public. I was previously nice when you coached me to apologize to you at your work email to save you at your job. As your concern is that everyone is "dispensable."

You are also very clever calling me from various numbers and threatening me - leaving me no choice but to call you back as many times for a taste of your own medicine.

You want to give the impression that I am obsessed with you, or stalking you. But, you know it's not true. I'm just not taking crap from you anymore like everyone else.

Your sexual abuse of women is public knowledge, as well as the allegations about drugging and raping them. And that includes the allegations made by your ex- wives regarding your daughter in bed with you when she was 15.

I also have emails from the early days (when you tried to impress me) how you spoke about [Plaintiff's Employer] and your intentions, as you said "to screw them" and take your clients along in your own company when you make Aliya. Your dream, as you said was to move to Israel and start your own company with the clients you-u acquired from [Plaintiff's Employer] and whom you brought along from [Plaintiff's Former Employer].

Not only that, but you were dumb enough to boast how you go to events where the "rich Jewish people are" and convince them to invest with you. You named various investors and how much they invested with you. I was quite uncomfortable with that information, as I know many of them.

Furthermore, you spoke with incessant anger about your son-in-law, [Man's Name] whom you always bitterly complained about having to support and give him a $100,000 a year job with [Plaintiff's Employer] while his family does nothing. Additionally, you raised concern about his anger management issues where he beat up guys.

Oddly, you too, have anger management issues.

To be sure you understand, [Plaintiff]. I am not threatening, nor blackmailing you in any shape or form.

You have repeatedly offered me money and used the word "remuneration". And I have refused. I want NOTHING from you.

You have targeted me for years while I was married, and more so, when my husband was ill. You then went after me in a big way immediately after his death, asking for the assistance of rabbis and organizational leaders to convince me to date and marry you. You donated money to their causes as well as mine. I tried to push you away, but you persisted.

Your claims about unending love for me while I was in deep grief for my husband, and your incessant calls, texts, and emails were overwhelming.

So, in my vulnerable state I made the poor judgment of relenting. I should have known better, and listened to what other women have claimed about you for years.

And on that Sat. night in Dec. you drugged me too, as you have done to others. When you realized that I was making too much of a big deal you kept begging me saying you love me and want to marry me. Feeling that I stepped into borders I shouldn't have, and believing your claims of love - in my emotional state as it was at the time - I continued my relationship with you.

The relationship became more volatile when you hit me. You apologized each time. Although I am an educated woman and founded an organization for victims of abuse, I should have known better. Yet, I took you back each time. As is common in such cases, the perpetrator eventually gets bored and leaves. But, you weren't content. You were afraid of what I know, my strong connections, and how that will impact your life. So, you made sure to still remain in my life.

Everyone warned me to break up with you. You took major advantage of me, as you have done with other women, including widows before me.

Your abuse of women needs to stop.

My only issue with you at this point is the halachic [Religious Jewish Law] matter that you refuse to address and that will have a huge permanent impact in my life (as well as yours).

I urge you to settle this matter, so that I can move on with my life. As I said, we need to meet with a neutral rabbi and clear the matter ASAP.

You can threaten me with a lawsuit, all you like. Once this story goes public, there will be many people with their own stories of your life-long abuse on them. And your $7,000 payment to Reputation Savers will have gone down the drain. The only advantage will be that it will, at the very least, prevent more victims for you to abuse.

However, I'm not looking to do that to you. I'm also not seeking revenge. Nor, do I want a man with such a dirty record in my family, or in my life.

Please settle the halachic matter, so that I can move on and put this horrific nightmare behind me. That's all I want from you, and as a religious woman I have every right to demand it.

It is my hope that you will settle this matter quietly, swiftly, and most importantly peacefully.

Sincerely, Sebrow

85.     In addition to personal text messages, and unreasonable and excessive phone calls, emails were sent by Sebrow to Plaintiff personally as well as to Plaintiff's work email address at his employer, a major financial institution.

86.     Plaintiff's employer has an internal policy of scrutinizing both randomized and targeted incoming (and outgoing) emails.

87.     Upon information and belief, Sebrow knew full well that Plaintiff's employer had access to his emails, and she sent the email to that specific address with the purpose that they would, in fact, read it.

88.     Upon information and belief, as a matter of business practice, Plaintiff's employer tracks the various email accounts of their employees.

89.     The email sent to Plaintiff at his work email address, accused Plaintiff of "sexual abuse[,]" claimed that he "drug[s]" and rape[s]" women, made an accusation that Plaintiff molested his daughter when she was a teenager, stated that he broke confidentiality rules by disseminating private client information, claimed that his son-in-law has anger management issues as does Plaintiff, stated that Plaintiff  "drugged" her (Sebrow) "on that Sat. night in Dec." and frequently hit her.  Sebrow further claimed in such email that Plaintiff "took major advantage of [her] as [he has] done with other women, including widows" and generally abuses women.

90.     The email further states that in order for the harassment to stop, "we need to meet with a neutral rabbi" so Plaintiff would sign a "get," i.e., a Jewish Divorce Document.

91.     The demand for a Get was extortion by Sebrow.

92.     Finally, the email directly addressed Sebrow's intention to disseminate her lies about Plaintiff on the internet as she stated "[o]nce this story goes public, there will be many people with their own stories…" "and your $7,000 payment to Reputation Savers will have gone down the drain."

93.     Sebrow's decision to include false assertions about Plaintiff's business practices in an email that she sent to Plaintiff's monitored work email address – including that he planned to leave his employer and steal clients, that he disclosed confidential client information to her, and that he induced his employer to hire his son-in-law who was violent and abusive – was no coincidence.

94.     After Plaintiff's employer became aware of these communications, Plaintiff was compelled to meet with a compliance team to discuss the nature of Sebrow's emails.

95.     In addition to emails and text messages, Sebrow at various times would incessantly call Plaintiff an inappropriate number of times.

96.     Sebrow called Plaintiff on or about October 5, 2018, while he was in Israel, and she called him approximately 131 times in a row.

97.     Sebrow called Plaintiff on or about October 10, 2018, approximately 20 times.

98.     Sebrow finally stopped directly texting Plaintiff from her true number on October 10, 2018.  However, this would not be the last time Defendant communicated with Plaintiff.

**The SpoofCard Messages**

99.     On October 19, 2018 at 2:32 AM Sebrow created a SpoofCard account.

100.    SpoofCard is a web based program and iPhone app that allows users to send text messages from anonymous numbers.

101.    Between October 19, 2018 and December 24, 2020, Sebrow sent 44 messages using the SpoofCard, almost all sent directly to Plaintiff and his family members to harass him.

102.    On October 22, 2018, Plaintiff received the following text message from the phone number (646) 343-9602: "GIVE THE GETT[.]"  Later, the same phone number texted him another message: "ANEMAL[.]"

103.    On November 3, 2018, Plaintiff received the following text message from the phone number (305) 396-8338: "RAPIST[.]"  Later, the same phone number texted him another message: "GET GET GET[.]"

104.    On November 8, 2018, Sebrow sent Plaintiff the anonymous text messages stating "GIVE THE GET" and "UNCHAIN HER FROM YOU."

105.    On October 3, 2019 at 5:41 pm, Plaintiff received a text message from an unknown number stating: "chaim zelig a halachic annulment is being arranged by bais din you raped her but you won't keep her chained[.]"

106.    On December 18, 2019 at 11:23 pm, Plaintiff received a text message from an unknown number: "GETT REFUSER[.]"  On January 27, 2020, the same number texted him stating: "RAPIST MOLESTER SODOMIZER[.]"

107.    On January 24, 2020 at 4:26 pm, Plaintiff received a text message from an unknown number stating: "RAPIST[.]"

108.    On January 29, 2020 at 7:44 am, Plaintiff received a text message from an unknown number stating "The Rape, Abuse & Incest National Network is an American nonprofit anti-sexual assault organization, the largest in the United States[.]"

109.    On February 19, 2020 at 5:18 pm, Plaintiff received a text message from an unknown number stating "[PLAINTIFF] IS A RAPIST[.]"

110.    On March 6, 2020 at 4:45 am, Plaintiff received a text message from an unknown number stating "BUMBLE HELPING YOU FIND MORE RAPE VICTIMS?"

111.    On April 13, 2020 at 7:04 pm, Plaintiff received a text message from an unknown number stating "EVIL RAPIST[.]"

112.    On April 30, 2020 at 12:50 pm, Plaintiff received a text message from an unknown number stating "Still within statute of limitation for Rape Your atrocities will be brought to justice[.]"

113.    On December 23, 2020, at 12:21 am, Plaintiff received a text message from an unknown number stating "Victims never forget the date of their rape[.]" Notably, and mentioned for the sole purpose of tying Sebrow to the anonymous text messages, an earlier email from Sebrow had also referenced a date in December as the alleged date of her alleged rape.

114.    Sebrow also texted Plaintiff's family using the account.

**Defendant's Scheme to Publicly Defame and Harass Plaintiff**

115.    In or about October 2019, Sebrow organized a scheme complained of here (Sebrow Internet Plan) to damage harass and defame Plaintiff on the Internet.

116.    Sebrow manipulated other individuals to effectuate the Sebrow Internet Plan.

117.    Sebrow has maliciously damaged Plaintiff by causing to be posted on various major media outlets the allegation that Plaintiff is a "date rapist," has date raped more than 100 women, has violated his own daughter, and, in general, is a very bad and evil man.

118.    Sebrow has accomplished this by causing postings to the effect described in the above paragraph to be displayed prominently on Google.

119.    Sebrow's malicious actions arise out of a former social relationship between Plaintiff and Sebrow, which, after an attempt by Plaintiff to break off the relationship, Sebrow became threatening, abusive, and legally and emotionally damaging crusade of torment and intimidation of Plaintiff culminating in the Google postings described above.

120.    Plaintiff discovered the Google postings mase under the Sebrow Internet Plan in July 2021, by simply "googling" his own name and seeing them there.

121.    When engaged in the Sebrow Internet Plan, Sebrow has attempted to mask her identity and responsibility for the Sebrow Internet Plan in multiple respects, including through the use of two individuals, who she engaged and encouraged to create defamatory and harassing social media content on sites such as Twitter and at least one website concerning Plaintiff designed to appear on Google under Plaintiff's name.

122.    The two individuals Sebrow engaged for her Sebrow Internet Plan are NK, a resident of Manhattan, New York, and MK, a resident of Langhorne, Pennsylvania.

123.    NK and MK became co-conspirators of Sebrow in her Sebrow Internet Plan to damage Plaintiff.

124.    At all times relevant herein, NK and MK acted on behalf of Sebrow in furtherance of the Sebrow Internet Plan.

125.    In or about July 2019 three websites were created concerning Plaintiff in furtherance of the Sebrow Internet Plan.

126.    The first was a Twitter account entitled "[Plaintiff] and the Issues of Date Rape" and located at the Twitter handle @[Plaintiff]DateRape and url https://twitter.com/[Plaintiff]DateRape (the "Twitter Account").

127.    The second account website was also created in July 2020 and located at the url www.instagram.com/[Plaintiff]_daterape with the account handle "@[Plaintiff]__daterape" (the "Instagram Account").

128.    Both the Twitter Account and Instagram Account directed the readers to the third website, www.real[Plaintiff]_.com (the "Website").

129.    The Twitter Account falsely stated: "[Plaintiff], a 64 year old financial advisor in West Orange, NJ is accused by police of incapacitating 100s of victims by plying them with date rape drugs."

130.    The Twitter Account contained 11 "Tweets," 10 of which directed the viewer to the Website.

131.    Notably, the false statement includes Plaintiff's name, age, job description, and city and state, leaving no question that the man described by the account is, in fact, Plaintiff.

132.    The account also provides that Plaintiff had been "accused by police of incapacitating 100s of victims by plying them with date rape drugs."  This allegation is unequivocally false.

133.    The false and defamatory Twitter account has plagued a Google search of Plaintiff's name, sometimes appearing as the first result, and remained on the first page when searching his name and location as of the time of the filing of this action.

134.    The Website was registered to Wild West Domains.  Following receipt of a subpoena seeking account information, Wild West Domains identified to Plaintiff several individuals responsible for creating the website.

135.    The first person listed was Mr. Solomon of 20 E. Sunrise Highway Valley Stream, NY 11581 with a work phone listed as (908) 420-6530.  The email provided for Mr. Solomon

was mike@yidefender.com; the response indicates that the individual had been "Verified by Fraud Dept – Customer OK[.]"

136.   Mr. Solomon is Facebook friends with Sebrow.

137.   The second person listed was MK, who is identified as the Registrant Contact, Technical Contact, Administrative Contact, and Billing Contact.

138.   On July 14, 2021 a Visa card ending in 2452 in MK's wife's name paid $24.16 for domain name renewal and privacy and protection and on July 13, 2021 an American Express ending in -1090 which was also in MK's wife's name paid the same amount for the registration and one year of privacy and protection.

139.   MK is also named in the document provided by Wild West Domains by way of his email address – mike@yidefender.com, which is listed under Shopper Info, Shipping Information, and Billing Information for the domain.

140.   At all relevant times, Sebrow knew of, encouraged and fomented the Sebrow Internet Plan and was aware of the repercussions of posting falsities online.

141.   Sebrow nevertheless engaged NK and MK to implement the Sebrow Internet Plan in an effort to hide her true identity while she posted and/or caused to be posted false and defamatory statements concerning Plaintiff with impunity.

142.   NK and MK, working in concert and for Sebrow, created the three websites at the same time and posted on a continuing basis in an effort to ensure their postings would be highly ranked in Google search results.

143.   To facilitate the Sebrow Internet Plan, Sebrow encouraged NK and MK to use a method which is called "search engine optimization" or "SEO" to have the benefit of publishing the false statements across multiple platforms using specific keywords to promote her lies.

144.     Sebrow implemented, encouraged and fomented NK and MK to create the Sebrow Internet Plan with the knowledge of the falsity of the statements in the Sebrow Internet Plan and the implications therefrom, with the reckless disregard for the truth, and/or with malicious intent, both presumed and actual, in knowingly publishing, posting, and widely disseminating such false statements to third parties.

145.     Plaintiff did not learn of the Sebrow Internet Plan until July 2021.

146.     The social media accounts and website created at the behest of Sebrow via the Sebrow Internet Plan have appeared highly in Plaintiff's Google Search results, often above his own work and personal accounts and, as a result, Sebrow's false claims that Plaintiff was under investigation for raping hundreds of women was visible to third parties before Plaintiff's own true professional accomplishments.

147.     Sebrow's sole purpose of implementing the Sebrow Internet Plan was to harass and/or embarrass Plaintiff and publish for the whole world to see falsities about Plaintiff.

148.     Sebrow has undertaken implementing the Sebrow Internet Plan for the sole purpose of harming Plaintiff, a task which she has accomplished.

149.     Sebrow's statements in the Sebrow Internet Plan have caused immense friction with Plaintiff and members of his family, including his children, who discovered the false statements about their father and, upon information and belief, confronted him about it.

150.     Sebrow's statements in the Sebrow Internet Plan have also affected Plaintiff's work life and, upon information and belief, have caused Plaintiff to lose at least one client.

151.     Sebrow's statements in the Sebrow Internet Plan have affected Plaintiff's romantic life as they led to the end of a long-term relationship between Plaintiff and another woman.

152.    These known impacts of the Sebrow Internet Plan, as well as knowing these false and defamatory statements were online and being disseminated to the world at large have caused Plaintiff to experience immense and severe emotional distress.

153.    Plaintiff has spent numerous sleepless nights tortured by feelings of humiliation and embarrassment that third parties who Sebrow knows and as well as those who found the product of the Sebrow Internet Plan online read Defendants' statements and believe them to be true.

**The Destruction and Concealment of Evidence**

154.    Plaintiff was desperate to have Sebrow stop her conduct.  After weeks and months of pleading, he contacted an attorney and threatened legal action if she continued to harass him.

155.    Knowing that she was about to be sued, Sebrow began altering and destroying key pieces of evidence that would show her guilt.

156.    For example, upon information and belief, Sebrow destroyed all text messages between her and Plaintiff.  Sebrow also destroyed all ESI contained on her devices and refused to turn over her devices for examination.

157.    Sebrow also destroyed emails between her and Plaintiff, altering saved versions of them in a fashion to make it appear Plaintiff was threatening her.

**Defendant Files False Police Reports**

158.    On or about November 2019 Sebrow filed a false police report accusing Plaintiff of rape.

159.    On or about May 17, 2023, Sebrow filed a false police report accusing Plaintiff of violating an order of protection.

160.     Both reports were false and actions were not taken by the police.

## **FIRST CAUSE OF ACTION**

161.     Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

162.     The numerous emails and text communications from Sebrow to Plaintiff which include WhatsApp and standard text messages, as well as Facebook messages, in addition to engendering civil liability, are harassment which violate N.J. Stat. § 2C:33-4 and § 2C:33-4 1343, 18 USCS § 1343 and violates New York Penal Law § 240.21 - 240.32, which give rise to a civil cause of action by Plaintiff against Sebrow.

163.     That by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, but not less than $10,000,000.00

## **SECOND CAUSE OF ACTION**

164.     Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

165.     The information Sebrow caused to be posted, disseminated, or caused to have disseminated on the internet in furtherance of the Sebrow Internet Plan knowing that such publication about Plaintiff is false and defamatory, not the subject of any privilege, and is viewable by many third parties.

166.     Sebrow had actual knowledge that the information they published, or caused to be published, by means of the Sebrow Internet Plan about Plaintiff was false and knew or should have known that the information published about Plaintiff was false and defamatory.

167. Sebrow acted with knowledge of the falsity of these statements and the implications therefrom, reckless disregard for the truth, and/or with malicious intent, both presumed and actual, in knowingly implementing, encouraging and fomenting the Sebrow Internet Plan using NK and Mk for the purpose, thereby publishing, posting, and widely disseminating such false statements to third parties.

168. These statements defame and otherwise impugn Plaintiff's character, integrity and reputation.

169. The statements go on to charge Plaintiff with serious crimes and ethical violations, and Defendant disparages the Plaintiff in his profession, trade and/or business. Such actions are libelous per se.

170. The statements are libelous per se, so that general damages may be presumed as a matter of law.

171. The published false comments were made with the intent to harm Plaintiff and with actual malice.

172. The Defendant's unlawful conduct has caused and will continue to cause Plaintiff imminent, irreparable injuries for which there are no adequate legal remedies. Accordingly, Plaintiff is entitled to permanent injunctive relief.

173. Because Defendant has placed Plaintiff's personal character and reputation publicly at issue, Plaintiff is entitled to a declaratory judgment that Defendant's statements are false.

174. As a consequence of the Defendant's conduct, Plaintiff's reputation has been injured, and the Plaintiff has suffered economic loss.

175.    That by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, but not less than $10,000,000.00.

**THIRD CAUSE OF ACTION**

176.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

177.    Sebrow engaged in the intentional, extreme and outrageous conduct of cyber harassing via the Sebrow Internet Plan in an effort to destroy Plaintiff's good name.

178.    Sebrow engaged in and undertook all actions knowing the statements they were making about Plaintiff were false and knowing that Plaintiff was not the one publishing the statements about date rape in his own name.

179.    Sebrow' conduct has been so extreme in degree and so outrageous in character that it goes beyond all possible bounds of decency.

180.    Sebrow intended to cause severe, emotional distress or recklessly disregarded the likelihood that such conduct would tend to cause severe emotional distress.

181.    Such outrageous behavior is beyond the limits of decency and intolerable in a civilized society.

182.    As a direct and proximate result of Sebrow's conduct, Plaintiff suffered severe emotional distress.

183.    Sebrow acted with the intent to cause severe emotional distress, or alternatively, disregarded the substantial probability that their actions would cause severe emotional distress.

184.   Here, the acts of Sebrow were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that their actions would harm Plaintiff's reputation and mental wellbeing, that, in addition to all the damages inflicted upon Plaintiff and in addition to all the measure of relief to which Plaintiff may properly be entitled herein, Sebrow should also be required to pay punitive damages to punish them for their reckless conduct in the further amount greater than the jurisdictional limit of all lower courts to be determined by the trier of fact, in order to deter them and others similarly situated from engaging in such conduct in the future.

185.   Plaintiff demands judgment against Sebrow in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for his severe injuries as well as an amount sufficient to punish Sebrow for her willful, wanton, reckless and unlawful conduct constituting a complete and reckless disregard for Plaintiff, together with interest, attorneys' fees, costs and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction, but not less than $10,000,000.00.

**FOURTH CAUSE OF ACTION**

186.   Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

187.   On or about August 12, 2021, in a Certification signed by Sebrow (Called herein the "Sebrow Certification") in connection with an ongoing New Jersey Domestic Violence claim pending in the New Jersey Superior Court, Chancery Division, Family Part, Essex County, Docket # FV-07-487-22. Sebrow certified as follows:

188.   "I have seen the internet postings which are the subject of Plaintiff's TRO Complaint, and I have absolutely no knowledge whatsoever as to who might be responsible for posting them."

189.   "For whatever reason, Plaintiff seems either to be convinced that I am responsible for the postings, or he is trying to use me as a scapegoat so he can have someone to blame."

190.   "However, I am hereby unequivocally asserting in this Certification, under penalty of perjury, that I have nothing to do with those internet posts, nor do I have any idea who might be responsible for them."

191.   The foregoing statements in the Sebrow Certification are false, and each statement is an act of perjury.

192.   The Sebrow Certification was filed in the Superior Court of New Jersey electronically, over the wire system in New Jersey, New York, and the United States.

193.   This electronic filing violates N.J. Stat. § 2C:28-1 and N.J. Stat. § 2C:28-2.

194.   The Sebrow Certification was knowingly false when made and when submitted to the New Jersey Superior Court.

## FIFTH CAUSE OF ACTION

195.   Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

196.   Sebrow is guilty of tortious interference because she has interfered with Plaintiff's business relationship with his employer.

197.   As alleged above, Plaintiff asserts a claim for interference with his contractual relationship with his employer because:

198.    Plaintiff has a valid agreement between at least two parties;

199.    Sebrow had knowledge of the agreement;

200.    The interference alleged herein caused employment stress and loss of reputation;

201.    Sebrow's interference was intentional; and

202.    Sebrow's, interference caused Plaintiff to suffer damages.

203.    Upon information and belief, Sebrow had unequivocal knowledge that Plaintiff is a prominent financial advisor, that his reputation has a long-lasting effect with regard to his professional success, and that if they were to damage his reputation, that could cause Plaintiff irreparable damages to his professional career and personal life.

204.    More particularly, Plaintiff has a valid business agreement with his employer, in which he produces a certain amount of gross production for his employer on an annual basis, through his investing and financial planning with his numerous clients.

205.    In order to maintain his standing with his employer, Plaintiff must retain all of his current clients, and given that this may not always be possible, then through bringing new clientele into his business with his employer.

206.    In order for Plaintiff to continue to retain his current client base, and bring in new clientele, his clients and prospective clients must trust him to let him manage their financial assets.

207.    Upon information and belief, by intentionally and/or grossly negligently sending the emails to Plaintiff at Plaintiff's work email account and publishing real[Plaintiff].com, Sebrow knew that they were potentially irreparably harming Plaintiff with regard to his business relationships not just with clients, but also with his employer.

208.    Sebrow has engaged in tortious interference against Plaintiff.

209.    That, by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter, but not less than $10,000,000.00.

## SIXTH CAUSE OF ACTION

210.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

211.    Plaintiff relies on his good reputation online to obtain new business and clients.

212.     Sebrow knew of the importance of Plaintiff's reputation online and that creating a sustained campaign to place false information online would prevent Plaintiff from obtaining new clients.

213.    Using this knowledge, Sebrow created a web of lies and websites to interfere with Plaintiff's ability to be retained by new clients.

214.    As a result of Sebrow's actions, Plaintiff has been damaged.

215.    That, by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter, but not less than $10,000,000.00.

## SEVENTH CAUSE OF ACTION

216.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

217.    Because Sebrow's conduct is malicious and oppressive, Plaintiff is entitled to be awarded punitive damages to punish Defendant for her wrongful conduct.

218.    That by reason of the foregoing, Plaintiff has sustained damages, both general and special.

## EIGHTH CAUSE OF ACTION

219.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

220.    Plaintiff in this Complaint asserts a valid claim for defamation because Sebrow has made:

A false statement;

Published to a third party without privilege of authorization;

With fault amounting to at least negligence; and

221.    That caused special harm or "defamation per se."

## NINTH CAUSE OF ACTION

222.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

223.    Sebrow knew she was going to be sued by Plaintiff for her harassing, defamatory, and fraudulent conduct.

224.    Sebrow had a legal obligation to engage in ESI discovery and turn over electronically stored information relating to the current litigation and her lies about Plaintiff.

225.    The ESI discovery, including the text messages and emails were material to the case.  Sebrow is alleging that her phone was "spoofed" and therefore is in sole possession of the information.

226.    Defendant has also concealed the fake police report she filed, and Plaintiff is unable to access the report.

227.    Defendant has refused to turn over a single text message or email between her and third parties, including her named witnesses, concerning Plaintiff.

228.    Plaintiff cannot reasonably have access to the evidence from another source.

229.    Defendant intentionally withheld, altered, and destroyed the evidence with the purpose to disrupt the litigation.

230.    Plaintiff is damaged by the concealment of information.  The information would show that Sebrow committed perjury, created the SpoofCard account, and engaged in harassing, defamatory conduct towards Plaintiff.

231.     That by reason of the foregoing, Plaintiff has sustained damages, both general and special.


## TENTH CAUSE OF ACTION

232.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

233.    By filing false police reports regarding Plaintiff, Sebrow has engaged in abuse of process.

234.     That by reason of the foregoing, Plaintiff has sustained damages, both general and special.

## PRAYER FOR RELIEF
WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:
A. injunctive relief against Sebrow in the form of a restraining order from this court against her preliminarily and permanently restraining Sebrow from:
   a.  Maintaining the Sebrow Internet Plan;

     b.   sending emails, text messages, WhatsApp messages, or any communication via electronic, fax, telephone or any other means, to Plaintiff, his children, his employer, or colleagues;

     c.   posting or disseminating information relating to Plaintiff via the media or any form of social media, or print media, or electronic or air media, including but not limited to Facebook, Instagram, google apps, The Jewish Press, or Sebrow's blog(s);

B.  Damages for acts of harassment, defamation, and tortious interference committed by Sebrow; compensatory damages for acts of harassment, defamation, and tortious interference committed by Sebrow, in an amount to be determined at trial, in the amount of $10,000,000; compensatory damage in an appropriate amount, for injury resulting from loss of current and prospective income, emotional distress, and loss of reputation from Sebrow; punitive damages in an appropriate amount, for the intentional, reckless, and negligent nature of Sebrow's conduct, to deter her from further such conduct; interest, costs, and reasonable attorneys' fees incurred by Plaintiff in commencement of this action from Sebrow; any other such further relief as the court deems just and proper.

Dated: New York, New York
      June 1, 2023

                      Respectfully submitted,

                      **Daniel Szalkiewicz & Associates, P.C.**

                      */s/ Daniel Szalkiewicz*
                      By:    Daniel S. Szalkiewicz, Esq.
                                Cali P. Madia, Esq.
                      23 West 73rd Street, Suite 102
                      New York, NY 10023
                      Telephone: (212) 706-1007
                      Facsimile: (646) 849-0033
                      daniel@lawdss.com

                      *Attorneys for Plaintiff*

Of Counsel:
BORENSTEIN, MCCONNELL & CALPIN, P.C.
155 MORRIS AVENUE
SUITE 201
SPRINGFIELD, NJ 07081
TEL: (973) 379-2444
FAX: (973) 788-8600
*Counsel for Plaintiff*
Abraham Borenstein, Esq.: NJ ID # 019651979