# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MOTION FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIM.

| | | |
|---|---|---|
| | : | |
| JOHN DOE | | |
| Plaintiff, | : | Civil Action No. 2:21−CV−20706−MEF−ESK |
| | | |
| v. | : | NOTICE OF MOTION |
| BAILA SEBROW | | |
| Defendant. | : | |
| | | |
| | : | |

PLEASE TAKE NOTICE ___DEFENDANT NAMED S BAILA SEBROW___

(Name of Moving Party)

will move before the Honorable ___Michael E. Farbiarz___, U.S.D.J. on

TBD

_____

(Motion days are the 1st and 3rd Monday of each month)

for an Order to amend, pursuant to Rules 15 and 16, to file its counterclaims

(describe type of relief being sought)

In support of my motion, I will rely on the attached Certification, Supporting Law and Exhibits

IRA W. HELLER, ESQ.
_____
Name
IRA HELLER LAW
_____
1317 MORRIS AVENUE
_____
UNION, NJ 07083
_____
Address

Date: ___4/12/2043___

## CERTIFICATION OF SERVICE

I, <u>IRA W. HELLER</u>, certify that a copy of my motion was served
(Name of Moving Party)

by <u>electronic filing on ECF</u> on <u>4/12/24</u> upon:

(Mail, Personal Service, etc.)        (Date)

JOHN DOE
_____
(Name of Opposing Party)

C/O DANIEL SZALKIEWICZ, ESQ.
_____

Daniel Szalkiewicz & Associates, P.C.
23 West 73rd Street, Suite 102
New York, NY 10023
_____
(Address of Opposing Party)

By: _____
Ira W. Heller, Esq.

CC:  Daniel Szalkiewicz, Esq.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | **CASE NUMBER:** |
| ) | **2:21−CV−20706−MEF−ESK** |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **BAILA SEBROW** ) | ***CERTIFICATION OF ATTORNEY*** |
| ) | |
| ) | |
| **Defendant** ) | |
| ) | |

I, Ira W. Heller, being of full age, do hereby certify:

1.      I am the attorney for the Defendant in this matter and I am fully familiar with the facts of this case.

2.      I submit this certification on behalf of the Defendant in support of a motion for leave to amend Answer and file Counter-Claims, pursuant to Fed. R. Civ. P. 15 and 16, as permitted by these Rules.

3.      The Defendant filed her original Answer and Counterclaim on October 3, 2022 (ECF 13).

4.      On March 22, 2023 (ECF 46), the Court ordered that Defendant's original Counterclaims be stricken without prejudice.

5.      On June 1, 2023, Plaintiff filed an Amended Complaint.

6.      On July 7, 2023, Defendant filed her Answer to Plaintiff's Amended Complaint. There were issues with this filing that required remediation.

7.      On September 18, 2023, I filed a Motion for Leave to file Defendant's Answer and Counterclaims out of time.

8.      On October 12, 2023, the Court addressed those issues, and granted Defendant the right to file an appropriate motion to amend its Counterclaims.

9.      On October 27, 2023, I filed an Amended Answer to Complaint without its Counterclaims.

10.     On February 29, 2024, this Court denied Defendant's Motion to Extend Time to file its Amended Answer and struck its Answer but reiterated Defendant's right to file the appropriate motion for this Court to accept its amended Counterclaims.

11.     Fed. R. Civ. P. 15, leave to amend, and for good cause shown as defined in Fed. R. Civ. P. 16.  As explained in the Brief in support of this Motion, in weighing the factors that must be considered in order for the Court to grant the relief sought, we contend that in the interest of fairness and justice, that Defendant's request for the opportunity to have her Counterclaims accepted and considered, in reply to Plaintiff's Amended Complaint, should be granted. The relief requested speaks directly to the Defendant's due process rights, and absent this opportunity, would unfairly tip the scale of Justice in Plaintiff's favor.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date:   April 12, 2024

By:  _____

Ira W. Heller, Esq.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN DOE,** | **CASE NUMBER:** |
| | **2:21−CV−20706−SDW−ESK** |
| **Plaintiff** | **Jury Trial:** *(check one)*    √ Yes  No |
| **v.** | ***MEMORANDUM IN SUPPORT OF*** |
| | ***DEFENDANT'S MOTION TO AMEND*** |
| **BAILA SEBROW** | ***ANSWER TO INCLUDE DEFENDANT'S*** |
| | ***COUNTERCLAIMS*** |
| **Defendant** | |

This Court is already quite familiar with this matter, and is aware of our request for leave to amend the Defendant's pleadings. As the Court noted in its Order granting Defendant the opportunity to amend:

> "And so you're going to have to file a motion to amend under the proper rule, and then give Mr. Szalkiewicz an opportunity to respond. I hope that is clear, Mr. Heller.
>
> MR. HELLER: Yes. Yes, very clear.
>
> THE COURT: All right. All right. … And he'll be given an opportunity, if he wants to file that application, to file an amended counterclaim."

Because Plaintiff's Amended Complaint significantly increased its initial allegations and claims for damages, we contend that this Court should grant leave to the Defendant to amend her Counterclaims in response to the Plaintiff's Amended Complaint, as permitted by both Fed. R. Civ. P. 15 and 16.

## Leave To Amend Is Justified

Under Rule 15, leave to amend is "freely granted," and Rule 16 requires "good cause" for amendments requiring revisions.

1

The Court stated on October 12, 2023:

"THE COURT: All right. So there's a couple of things pending, and I want to address the motion to file a counterclaim or answer a counterclaim out of time. Let me see. That was at ECF Number 92. Let me -- or to set the stage, what I'm guided by is Judge Wigenton's decision on March 22nd, 2023, and in that order, she permitted the defendant to file a amended counterclaim -- I'm sorry -- permitted the defendant to file a -- to amend the counterclaims that were dismissed without prejudice. Count 1 was dismissed without prejudice; that was for defamation. I'm sorry. Fraudulent misrepresentation. Count 2 was dismissed; that was for defamation; Count 2 was also dismissed as a claim for defamation based on statements made during litigation. And Count 3 was dismissed, which is a count for abuse of process. And those were the counterclaims that Judge Wigenton permitted to be amended. What I get from the motion that is now before me and what the attachment is that there are entirely different counterclaims being asserted. One is for false light. And the other is sexual abuse and sexual assault. If you're going to file an entirely different counterclaim, you can't do that as a matter of right under Judge Wigenton's order, Mr. Heller. You would have to file an -- you would have to file a motion to amend, Mr. Heller. Right?

MR. HELLER: Yes, understood, Judge.

THE COURT: Yeah, so this is not the proper way to do it. If you're going to entirely change or add new claims, you are -- if you were to just amend as directed by Judge Wigenton, then I could see you properly filing a motion to extend time to file your answer and counterclaim. But you're doing -- what you're doing is entirely different. And

so you're going to have to file a motion to amend under the proper rule, and then give Mr.

Szalkiewicz an opportunity to respond. I hope that is clear, Mr. Heller.

MR. HELLER: Yes. Yes, very clear."

This Court reiterated that the Defendant is granted the opportunity to re-file a Motion to

Amend its Answer and Counterclaim in its Order dated February 29, 2024 under ECF #107.

Pursuant to the directives of this Court, Defendant hereby requests leave to file its

Counterclaims. Additionally, the Defendant's Amended Answer and Counterclaims attempt

merely to cure the deficiencies addressed in Judge Wigenton's March 22, 2023 Opinion, which

led to the dismissal of three of Defendant's Counterclaims.

The Defendant has accordingly revised her Counterclaim for Fraudulent

Misrepresentation to better comply with Rule 9's pleadings standard, as discussed in Judge

Wigenton's Opinion.

The Defendant has added a Counterclaim for False Light which is also applicable to the

circumstances between the parties in this matter.

The Defendant revised her Counterclaim for Defamation to better comply with Rule 8 as

addressed in Judge Wigenton's Opinion.

The Defendant eliminated her Counter for Abuse of Process as it was premature as per

Judge Wigenton's Opinion.

The Defendant has added a Counterclaim for Sexual Abuse and Sexual Assault as these

are at the heart of the facts and circumstances which occurred between the parties.

Here, we request that this Court conclude that the "freely granted" standard should apply.

The Court "freely granted" Plaintiff the opportunity to file his Amended Complaint

during a status conference without the necessity of filing a motion or opportunity for the

3

Defendant to properly respond. Therefore, Defendant we request that Defendant be afforded the same opportunity when considering Defendant's formal request to amend its Counterclaims. In light of the significant consequences that would result if not granted, we request, in the interest of fairness, that the Defendant be permitted to provide its best defense to Plaintiff's allegations.

Under Rule 16, the Defendant has "good cause" for the request to be permitted to present its Counterclaims, in the interest of fundamental fairness, Defendant should be permitted to counter John Doe's allegations with her related Counterclaims, so at trial the jury is permitted to see the entirety of the conflict and claims between these parties. See *Strategic Prods. & Servs. v. Integrated Media Techs.*, No. 18-694, at \*3-4 (D.N.J. Sep. 30, 2020)

The Defendant has accordingly demonstrated "good cause" as she diligently attempted to file a proper Answer and Counterclaim under her prior motion. This case has mushroomed far beyond any reasonable expectation of Defendant, and despite committing substantial time and effort to prepare her case, she has been outgunned by Plaintiff's barrage of litigation, requiring her to defend against the Plaintiff's claims in three venues in two jurisdictions, thus causing the Defendant significant emotional distress, while overwhelming her legal counsel, who is a sole practitioner facing off against two law firms, and unfunded by the Defendant since February of 2022. The TRO trial has been ongoing now since July of 2021, soon going on 3 years. The Plaintiff has unfortunately misused this noble Federal forum as a means to intimidate, harass and weaponize the legal system against the Defendant as a means of retaliation, and intimidation for some misperceived wrongs for which he seeks to even a score. The Defendant appreciates the flexibility she has been afforded by this Court to properly make her case, and have the opportunity to be heard.

The Court has already explained in the October 12, 2023 conference/hearing that there is no concern of undue delay because procedurally, this issue needs to be resolved in order to address the other pending motions and issues. "Although . . . granting [leave to amend] would extend the litigation, mere inconvenience in defending a suit does not constitute undue prejudice." See *Harrison Beverag Co. v. Dribeck Importers*, *Inc*., 133 F.R.D. 463, 468 (D.N.J. 1990)

The Court has also addressed the fact that the Plaintiff would not suffer any undue prejudice, as the Court made it clear that it will address all of the Plaintiff's outstanding motions and issues once the pleadings have been properly filed. On the other hand, if the amendment requested today goes ungranted, Defendant will face extreme prejudice indeed. There are abundant facts that have come to light since this matter's inception, and many more facts will surely emerge as this matter moves forward. Our assertions in regard to Plaintiff's bad faith are not empty ones, as the more facts that emerge, the more it will become clear that the Plaintiff's premises are entirely contrived, and bear a malevolent and self-serving agenda. Chief among these facts has already been revealed, in that the Plaintiff initiated this proceeding based upon allegations of Defamation against the Defendant. Already evident is the fact that the Plaintiff's two main witnesses have already had to admit that the Defendant had no involvement in the postings about the Plaintiff (apart from one witness stating "Baila made me do it"). If Defendant is not granted the opportunity to defend against these transparently false allegations, she will be highly prejudiced. As the Court states: "[I]ncidental prejudice to the opponent is not a sufficient basis for denial of an amendment; such prejudice becomes 'undue' when the opponent shows it would be unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered." See *Harrison Beverage Co. v. Dribeck Importers*, *Inc*., 133 F.R.D.

5

463, 468 (D.N.J. 1990) (citing *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981), *cert. denied sub nom.*

Notwithstanding Plaintiff's claims to the contrary, there has been no demonstrable bad faith attributable to Defendant, who has scant resources in her arsenal to defend herself on multiple fronts. The Defendant had believed from the outset that this is a matter that could have, and should have, been resolved in a religious forum, since both parties are of the Orthodox Jewish faith. Nevertheless, this is not Plaintiff's desire, because his intentions are not to resolve the issues, but rather, to destroy the Defendant.

Finally, an amendment is pointless only it if its "frivolous or advances a claim or defense that is legally insufficient on its face." *Harrison Beverage*, 133 F.R.D. at 468. Here, Defendant's Counterclaims should be actionable under the doctrines pled, and should therefore be deemed acceptable to this Court.

## Conclusion

For at the least the foregoing reasons, Defendant respectfully requests that this Court grant her Motion to Amend for leave to file its Counterclaims.

Dated: April 12, 2024

By: _____
Ira W. Heller, Esq.

6



## IRA HELLER LAW, LLC

IRA W. HELLER, ESQ.
(MEMBER OF BAR - NJ & NY)

1317 Morris Avenue, Union, NJ 07083

Tel: 908-275-8626 / Fax: 908-349-3005
iwhelleresq@gmail.com

October 27, 2023

**VIA EMAIL & ECF FILING**
United States Magistrate Judge Edward S. Kiel
Frank R. Lautenberg U.S. Post Office & Courthouse Building
2 Federal Square
Newark, NJ 07102

   Re: John Doe v. Baila Sebrow
   United States District Court, District of New Jersey
   Case No.: 2:21-cv-20706

Dear Magistrate Judge Kiel,

  As you are aware, I represent the Defendant in the above referenced matter.

  As per the instructions given by Magistrate Judge Kiel in our October 12, 2023, I was to file my client's Answer to the Plaintiff's Amended Complaint by October 20, 2023, and Your Honor's grant of the extra time was greatly appreciated. On October 20, 2023, I made a filing which was intended to include a Motion and the filing of my Answer (Motion for leave to file Counterclaim was under preparation). It was not until I saw that a Motion for Default had been filed that I realized, to my dismay, that the Answer had not been processed. Notwithstanding whatever caused the glitch, I am not going to blame the technology, I take full responsibility. However, in light of the consequences, I respectfully request that Your Honor will accept the filing of Defendant's Answer, as attached.

  Thanking Your Honor for your kind assistance in this matter.

     Respectfully,

     Ira W. Heller, Esq.

cc: Daniel Szalkiewicz, Esq.
  *Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, | **CASE NUMBER:** |
| | 2:21−CV−20706−SDW−ESK |
| **Plaintiff** | |
| | **Jury Trial:** *(check one)*      √ **Yes  No** |
| **v.** | |
| | **AMENDED ANSWER AND** |
| **BAILA SEBROW** | **COUNTERCLAIM** |
| **Defendant** | |

## DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND

## COUNTERCLAIMS

**NOW COMES** Defendant improperly identified, as Baila Sebrow in several documents filed with this Court and Baila Sebrow in several documents filed with this Court, by and through her attorney, for her Answer to the Amended Complaint filed by "John Doe" with this Court on June 1, 2023, (the "Complaint"), responds thereto as follows:

1.      Defendant denies the allegation of paragraph 1, 4, 5, 6, 7, 8, 9, 10, 17, 21,  25-49,  51, 52-85, 87, 89-93, 95-99, 101-125, 140-144,  146-152,  155-162,  164-184,  193, 194, 195, 196, 199, 201, 202, 203,  207, 208, 210, 212-214,  216-224, 226-234 in the Complaint.

2.      Defendant lacks sufficient knowledge to admit or deny the allegation of paragraph 11, 13, 14, 18, 19, 20, 23, 24, 50, 86, 88, 94, 100, 126-139, 145, 153, 154, 163, 185,  197, 198, 200, 204-206,  209, 211, 215 in the Complaint and demands strict proof ther ein.

3.      Defendant admits to the allegation of paragraph 12, 16, 22 in the Complaint.

4.      Defendant neither admits nor denies the allegation of paragraph 2, 3, 15, 186-192, 225 in the Complaint.

1

As and for her affirmative defenses, the Defendant asserts and states as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

5.    The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

6.    Each of the alleged causes of action contained in the Complaint is barred by the equitable

doctrine of unclean hands.

### THIRD AFFIRMATIVE DEFENSE
### (Collateral Estoppel)

7.    Plaintiff is estopped from asserting any of the alleged rights, claims and/or the reliefs it

seeks against Defendant as the same is barred by the doctrine of estoppel.

### FOURTH AFFIRMATIVE DEFENSE
### (Actions of Third Parties)

8.    Plaintiff is barred from asserting any of the alleged rights, claims and/or the reliefs it

seeks against Defendant as they are actions of third parties.

### FIFTH AFFIRMATIVE DEFENSE
### (Lack of Damages)

9.    Plaintiff has not suffered any damages as a result of any of the purported actions taken by

Defendant, and is barred from asserting any cause of action against Defendant.

### SIXTH AFFIRMATIVE DEFENSE
### (Failure to State the Name of a Party)

10.    Plaintiff's Complaint is barred in its entirety as it violates Federal Rule of Civil Procedure

10(a) by failing to state the name of the Plaintiff.

### SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Subject Matter Jurisdiction)

11.    Plaintiff's Complaint is barred in its entirety as it violates the requirements of 28 USC

1331 and Article III of the Constitution. Plaintiff's causes of action do not arise out of a Federal

question, and therefore, the Court lacks subject matter jurisdiction.

## EIGHTH AFFIRMATIVE DEFENSE
### (Lack of Personal Jurisdiction)

12.    Plaintiff's Complaint is barred in its entirety as Defendant was never properly served, and
therefore, the Court lacks personal jurisdiction.

## NINTH AFFIRMATIVE DEFENSE
### (Laches)

13.    Plaintiff's Complaint is barred in its entirety under the equitable doctrine of Laches.

## TENTH AFFIRMATIVE DEFENSE
### (Res Judicata)

14.    Plaintiff is precluded from asserting any of the alleged rights, claims, causes of action

and/or the reliefs it seeks against Defendant as the same is barred by the principle of Res

Judicata.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Improper Purpose)

15.    Plaintiff's Complaint is barred in its entirety under Federal Rule of Civil Procedure 11

### Additional Defenses and Right to Amend Reserved

Defendant hereby gives notice that she may rely on other defenses if and when such defenses

become known during the course of litigation, and hereby reserves the right to amend her answer

to assert any other defenses as they become known or available.

Date: October 20, 2023

IRA HELLER LAW, LLC

By: _____
          Ira W. Heller, Esq.

3

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **JOHN DOE,**<br><br>**Plaintiff**<br><br>**v.**<br><br>**BAILA SEBROW**<br><br>**Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CASE NUMBER:**
**2:21−CV−20706−SDW−ESK**

**Jury Trial:** *(check one)*        √ Yes  No

*PROPOSED COUNTERCLAIMS*

For its Counterclaims against Plaintiff, John Doe, Defendant alleges as follows:

1.      This is an action for False Light and Sexual Abuse and Sexual Assault sought by Defendant under the Laws of the State of New Jersey.

2.      John Doe is an individual, whose place of residence is confidential in the State of New Jersey.

3.      Baila Sebrow is an individual, residing at 12 Beechwood Drive, in the Township of Lawrence in the State of New York.

4.      This Court has diversity jurisdiction over the claims in this action.

## ALLEGATIONS COMMON TO COUNTERCLAIMS

The Defendant is a singles event organizer, matchmaker and columnist, residing in Long Island New York. In June of 2017, the Defendant was widowed from her husband of 30 years. Very shortly thereafter (and even beforehand, during Defendant's husband's protracted illness), the Plaintiff began pursuing a relationship with the Defendant. The Defendant, diplomatically but categorically, made it clear to the Plaintiff that she was not interested in having a relationship

1

with him. Nevertheless, the Plaintiff approached the Defendant with a "proposal," in which he would create a "scholarship fund" for older single women to attend single's events if they could not afford it. Plaintiff proposed to the Defendant that if she was not interested in a dating relationship, that they could at least work together to provide something worthwhile for the community. Plaintiff proposed that they meet and discuss his "business" proposal, and set a date to meet on December 23, 2017, at the Carlyle Hotel, located at 35 E 76th St in Manhattan. It was a Saturday night, and the Defendant traveled in an Uber from her home in Long Island to meet the Plaintiff. The Defendant called the Plaintiff from the Uber to let him know that there was traffic and she would be delayed. The Plaintiff asked her what she wanted to drink, and Defendant told him to order a diet coke, which was waiting for her when she arrived. When Defendant arrived at the Hotel, Plaintiff handed her the drink, and told her to "drink slowly." Shortly after, Defendant describes her feeling her head become heavy, her vision blurred, and the room began to spin. The next thing Defendant remembers is waking up in the back of Plaintiff's car naked, with her legs spread apart, with semen dripping down her leg and other parts of her body. She then heard Plaintiff's voice telling her to "get dressed."

Upon realizing what had been done to her by the Plaintiff, the Defendant describes her feelings at that moment as being "ashamed, humiliated, violated, and utterly mortified" by what the Plaintiff had done to her. After managing to get herself dressed, still being barely coherent, the Plaintiff called an Uber and put her into the car. The Defendant stated that she remembers seeing the Plaintiff's face, and that he was clearly nervous about the state she was in, probably because he was concerned that he may be held responsible if the Defendant didn't get home safely. Nevertheless, this clearly didn't motivate the Plaintiff sufficiently to offer to drive the Defendant home. The Defendant recalls receiving a call from the Plaintiff in the Uber on the way

2

home, and his asking her if she was alright, however, she states that she was still heavily affected by the drug, and does not recall what was said. The Defendant recalls that the Plaintiff called her again in the morning, and recalls being extremely upset at the Defendant by what he had done to her, and told him so. The Plaintiff, in response, tried to make light of it, stating that he and the Defendant were destined to be in a relationship together anyway, and that she should let it go and not make a big deal over it. The Defendant recalls being very angered by this, and replied to the Plaintiff that he should not make any such presumptions.

The next day, December 24, 2017, the Defendant was due to attend a singles event that she helped to organize in New York City, and notwithstanding the fact that she was still feeling the effects of having been drugged the night before she followed through with her commitment. The Plaintiff also showed up to the event, and made persistent attempts to get the Defendant's attention. The Defendant nevertheless did everything possible to avoid the Plaintiff, and had no desire to speak to him. At one point, the Plaintiff managed to corner the Defendant, and said to her, "I want to show you something." The Plaintiff then pulled a packet of pictures out of his pocket, which depicted the Defendant naked, in various positions and all possible angles. The Plaintiff then put his face close to the Defendant's ear and said "I want you to blow me, if you refuse, I will show these pictures to everyone."

Until approximately September of 2018, the Plaintiff utilized those photographs to coerce the Defendant into an abusive, sexual relationship. The Plaintiff also made frequent declarations to her that they would ultimately be married, and on several occasions, even made declarations to the Defendant using a Hebrew phrase which consecrates a wife to her husband under Jewish Law. When this phrase is uttered under specific circumstances, the couple is considered married under Jewish Law, and would require a Jewish Divorce to undo it. This was particularly

3

frightening to the Defendant, as in order to dissolve the marriage, the Plaintiff would have to give her a "Get" (a Jewish writ of divorce). , What made this all the more alarming for the Defendant was the fact that a Get needs to be given by the husband voluntarily, and if he refuses, the wife remains "chained" and unable to remarry until the husband gives the Get.

      This abusive relationship continued until approximately October of 2018, when she broke free, and has not had any contact with the Plaintiff since that time. Plaintiff has since produced crazed text messages, allegedly from the Defendant, which falsely characterized her as a deranged, obsessed stalker. The Defendant adamantly claims that those text messages are fraudulent, and has every intention of proving same as the opportunities presents themselves over the course of this proceeding. Plaintiff also claims that Internet postings, proclaiming that the Plaintiff is a "serial date rapist and abuser of women" are attributable to the Defendant. However, this has already been thoroughly debunked, after the Plaintiff located the individual who was responsible for these Internet postings, and it was not the Defendant, but rather, Michael Kogan, a web developer located in Pennsylvania. Furthermore, the Plaintiff brought Michael Kogan as a witness in the ongoing Domestic Violence proceeding in Essex County (in which the Plaintiff sought a Restraining Order against the Defendant), and in that proceeding, Michael Kogan testified that the Defendant, Baila Sebrow, was not the person who solicited him to make the internet postings about the Plaintiff. Not only that, Mr. Kogan said that did not know Baila Sebrow at that time, nor had he ever spoken to her. The person who did solicit Mr. Kogan to make the postings, Ms. Nadia Kiderman, was also produced by the Plaintiff. Ms. Kiderman admitted in her testimony that Baila Sebrow did not participate in soliciting Michael Kogan to make the postings, but stated that in regard to soliciting Mr. Kogan, she stated that "it was Baila

4

that made me do it." When Ms. Kiderman was questioned, her responses were riddled with contradictory statements, sorely lacking credibility.

      After the "relationship" between the Plaintiff and Defendant ended in the fall of 2018, the Plaintiff began an intentional campaign to ruin the Defendant's personal and professional reputation by spreading false statements about her. After they parted ways in October of 2018, the Plaintiff reported receiving crazed text messages in capital letters, which he openly attributed to the Defendant, and claimed as evidence of her ongoing harassment. In fact, shortly after filing the Domestic Violence claim against the Defendant in the NJ Superior Court of Essex County, he immediately used the Docket information to file multiple document subpoenas, notwithstanding the fact that he didn't seek leave of the Court to do so, which is required in summary proceedings, nor did he provide notice of these subpoenas to Defendant's counsel (a Motion was subsequently filed seeking that Plaintiff be sanctioned for this, which was granted). Among the subpoenas served by the Plaintiff went to a company called "Spoofcard," a program that enables one to send out text messages using an anonymous number, so the sender cannot be identified. The documentation provided by Spoofcard revealed that an account was opened using the Defendant's credit card information, and that the use of that account coincided with the messages that the Plaintiff received. However, Defendant has made it clear that the Plaintiff had access to all of her private information, including Passwords, access information, and her credit card information, and has made it clear that she did not open that account, and was not aware of the fact that the company was charging her every month for a membership. Furthermore, credible evidence has already been presented to the Court that the Plaintiff has in fact accessed and tampered with the Defendant's personal accounts and information. Just citing one striking example, in the text of an email the Plaintiff produced at trial, allegedly sent to him by the

Defendant on August 29, 2018, in which the Defendant allegedly apologizes to the Plaintiff for accusing him of rape, and promises never to do it again, as follows:

> "Xxxxx (name redacted) I am sorry about both emails on Aug 29 .None of it was true I was upset .I will not send again . I am sorry

This text presented above precisely replicates the punctuation used by the author of this August 29, 2018 email, fraught with missing commas, and misplaced spaces before and after periods at the beginning and ends of sentences. Under cross-examination, the Plaintiff alleged that the Defendant wrote this email and then sent it to him on August 29, 2018. He was questioned as to whether, to his knowledge, the Defendant, who is a professional writer, habitually punctuates her sentences in that fashion, to which he provided no definitive answer. I then produced approximately a half dozen of the Plaintiff's writing from texts and emails from other places in which he displays precisely these same punctuation quirks (there were many others). I then directly and unequivocally asked the Plaintiff if he had logged into the Defendant's email account, wrote this message, and then sent it to himself. At that moment, he became visibly shaken and upset, and bitterly complained to the Judge that he was not going to sit there and be harassed in that fashion.

It is also known to the Defendant that the Plaintiff has contacted numerous people in his effort to defame and sully her reputation (while falsely accusing Defendant of the same). as Numerous people have informed the Defendant of the fact that the Plaintiff approached them and tried to dissuade them from working with the Defendant, or hiring her.Clearly, the Plaintiff's legal attacks against the Defendant, both in the Essex County Family Division of New Jersey, as well as in this matter, were intended as offensives to stave off any thought of exposing the nefarious behavior of the Plaintiff.

The Defendant was completely shocked when she was served with a Temporary Restraining Order (TRO) from the Plaintiff in July of 2021, as the Defendant had thought that the Plaintiff had already been purged from her life. Nevertheless, the Plaintiff was clearly not willing to do the same, since after someone began a negative internet posting campaign against him, and he needed someone to blame for it. The Plaintiff perfidious intentions were demonstrated right away, when just days after filing his TRO on or about July 15, 2021, he falsely accused the Defendant of violating the TRO, based upon a twitter notice the Plaintiff alleged to have received from the Defendant. This notice, which arrived from the address 'info@twitter.com' (not from the Defendant) was a notice from the Defendant's Twitter site for which the Plaintiff would have had to specifically sign up to receive, and in which the Defendant played no part. In other words, the Plaintiff engineered a phony violation, with the specific intent of getting the Municipal Court to hold the Defendant in contempt of the TRO Order and issue a bench warrant for her arrest, which the Court did. This was nothing less than a deceitful attack by the Plaintiff upon the Defendant, in which the Plaintiff, knowing full well that the Defendant did not violate the TRO, sought to delude the Court into having the Defendant arrested based upon on an entirely false premise.

In light of the above stated, the Defendant alleges the following Counterclaims:

<strong><span style="color:red">FIRST COUNT</span></strong><br>
<strong><span style="color:red">(Fraudulent Misrepresentation)</span></strong><br>
<strong><span style="color:red">(REVISED & SUPPLEMENTED)</span></strong>

The Plaintiff made false representations of material facts. The Plaintiff knew the statements were false when making them. The Plaintiff intended for the Defendant and others to rely on the false statements. The Defendant/Counterclaimant suffered damages due to its/their reliance on the Plaintiff's false statements.

As described in detail in the introduction above, on or about December 23, 2017, Plaintiff lured Defendant into his pre-planned plot to drug and have sex with her by misrepresenting his intention to meet her at New York City hotel as a potential business proposition. But for his false representations made to the Defendant of setting up a fund for older Jewish single women, the Defendant would not have agreed to meet with the Plaintiff and put herself in such a vulnerable situation, leading to Plaintiff's seizing the opportunity to drug the Defendant, sequester her in his car where he raped her, and then took lude pictures of her which he used to blackmail and coerce the Defendant into an abusive sexual relationship.

Thereafter, on various dates and times from beginning the summer of 2018, the Defendant created a scenario in which he stated certain Hebrew phrases to lead the Defendant to believe that they were religiously married, which would serve to further trap her into the abusive relationship until they were religiously divorced. The Plaintiff utilized Defendant's belief that she required a religious divorce to force the Defendant to pursue him for many months to secure a a religious divorce from him, which he flatly refused in order to perpetuate the Defendant's anguish while pursuing the Plaintiff for the Get. Notwithstanding the fact that reputable Rabbis affirmed the fact that there was a genuine question that needed to be addressed, the Plaintiff gave no credence to it and callously ignored the Defendant's pleas. After the Defendant's consulting with numerous Rabbis and authorities in this area of Jewish Law, the Rabbinical Court were eventually able to find a way of resolving her situation under the rubric of Jewish Law, but with absolutely no cooperation from the Plaintiff, . But for to the Defendant's perverse use of Jewish Law, which he abused as a method of coercing the Defendant into satisfying his sick sexual appetite, Defendant would not have been vulnerable to the Plaintiff's repeated sexual assaults

upon her, and subjected to the humiliation and shame the Plaintiff imposed upon her in the process.

Since January of 2019 to the present day, the Plaintiff has intentionally made false statements about the Defendant to Defendant's friends, clients and professional associates designed to malign her character and damage her professional reputation. Some of these third parties, as a result of Plaintiff's false statements, no longer wanted to associate with Defendant. For example, the Defendant was hired to promote and participate in a singles program. In order to sabotage the Defenant's job prospect, the Plaintiff personally drove Brooklyn, New York to meet with the organizer and persuade him not to hire her. Plaintiff told him his false tales about the Defendant, and showed him filthy text messages which he alleged were crafted by the Defendant, to support his false claims. A month later, Plaintiff contacted the organizer of a Passover program, at which Defendant was scheduled to appear, and again spun his false tales about the Defendant in order to cast her character and professional competence in a false light, so as to dissuade him from hiring the Defendant for that and future programs.

Thereafter, on other various dates and times over the next two years, Plaintiff systematically followed the Defendant's professional appearances and engaged in the same conduct, frequently leading to Defendant being dropped from events and/or programs due to the Plaintiff's illicit actions. The Plaintiff knew that the statements he was making were false, but nevertheless persisted in repeatedly making them. Plaintiff stated, for example, that the Defendant was crazy. He stated that theDefendant had sexual fetishes unbecoming an Orthodox Jewish women. He stated that the Defendant's professional persona was fake, and did not match her private actions (specifically, that the Defendant was a "slut") and could therefore not be trusted to serve as an Orthodox Jewish matchmaker and event organizer.

On July 15, 2021, Plaintiff filed for a Temporary Restraining Order in Essex County, New Jersey, in which he made false statements that Defendant had harassed him by creating social media posts about him (as explained in the introduction). The Plaintiff knew these statements were false and had no proof of her involvement in, or creation of these posts. The Court, relying on these false statements presented by the Plaintiff issued a TRO, which remains in full force until the present. Even after finding out via testimony in Court, from Plaintiff's own witnesses, that the creater of the internet posts himself was not hired by the Defendant, and had no connection to the Defendant whatsoever, he continued to pursue the obtaining of the FRO based on his demonstrably false representations.

As explained in the introduction, on or about August 3, 2022, the Plaintiff filed a police report alleging that the Defendant violated the TRO after he received a social media notification of an event posted on the Defendant's Twitter site. The Plaintiff deceived the Court, claiming that the Defendant sent him an email, when in fact, what he received was a notification from the Defendant's site which he received only because he signed up to receive it and thus received it automatically. The email address was from Twitter, and did not even belong to the Defendant. This led to a warrant being issued for Defendant's arrest, based upon the Plaintiff's intentionally false representations regarding the Defendant..

On September 1, 2022, Plaintiff filed a lawsuit in Nassau County New York against the people who were discovered to have actually created the internet posts about the Plaintiff, but nevertheless, persisted in falsely accusing the Defendant of having hired them to create these social media posts. Plaintiff knew that these allegations were false, and had no proof of Defendant's involvement in their creation. The creator of these posts informed the Plaintiff and his attorneys that the Defendant, Balia Sebrow was not responsible for the creation of these

posts. In fact, the creator clearly informed them that he never heard of Baila Sebrow, nor had he ever had any contact with her. Furthermore, he informed them that was never hired by the Defendant, was never paid by the Defendant for his services, and had no connection to his internet and social media postings about the Plaintiff.

Despite having full and unequivocal knowledge that Defendant had no involvement with the creation of the social media posts about the Plaintiff, The Plaintiff nevertheless filed this action in the Federal Court on December 23, 2023, based on the same false representations he made to the Essex County Family Court in New Jersey in his quest for an FRO, also matching the same false allegataion he made in Nassau County Supreme Court in New York.

Since January of 2019 to the present, Plaintiff has been on a campaign to ruin the Defendant's personal reputation and professional career. Plaintiff has spewed falsehoods about the Defendant to those he associated with the Defendant. Furthermore, he has utilized his false filings, in three different legal venues and jurisdictions, as a method of legitimizing his false claims, and to convince third parties of their truth so as to convince these parties to disassociate themselves personally and/or professionally from the Defendant.

**SECOND COUNT**
**(False Light)**
**(ADDED COUNT)**

Defendant/Counterclaimant repeats and realleges the allegations stated above as if fully set forth herein.

Since January of 2019 to the present day, the Plaintiff has intentionally made false statements about the Defendant to third parties designed to malign her character and damage her professional reputation. Plaintiff has contacted many of Defendant's friends and acquaintances, members of her community, clients, professional associates, professional employers, program

11

organizers, advertisers, promoters and others, to tell them that the Defendant has committed despicable immoral acts (sexual and otherwise). The Plaintiff told people that the Defendant was crazy, showed them vulgar and outlandish text messages which he alleged to be sent to him from the Defendant, citing this as evidence of behavior "unbecoming an Orthodox Jewish women and professional Jewish matchmaker." Amongs the multiple malicious acts intentionally perpetrated by the Plaintiff, was one in which in January of 2019, the Plaintiff contacted an event's program organizer at which Defendant was scheduled to appear, and told the organizer not to hire her for the President's Day weekend program. They based their demand upon highly offensive false tales about her intended to cast her in a false light by impugning her character and demeaning her professional competence. In this way, the Plaintiff hoped to convince the event organizer to desist from retaining the Defendant's services in the future.

In January of 2019, the Defendant was hired to promote and participate in a singles program. Plaintiff personally drove to Brooklyn, New York, to meet with the event organizer and asked him not to hire the Defendant. The Plaintiff told the event organizer false tales about the Defendant, and showed him filthy text messages purportedly crafted by the Defendant as alleged evidence in support of his claims. A month later, Plaintiff contacted the organizer of a Passover program, at which Defendant was scheduled to appear, and again spun false tales in order to cast the Defendant in a false by lightimpugning her character and demeaning her professional competence. In this way, the Plaintiff hoped to dissuade the event organizer from hiring the Defendant for that and future programs.

On other various dates and times over the next two years, Plaintiff did systematically follow Defendant's professional appearances and continued his efforts against the Defendant, frequently leading to Defendant being dropped from events and/or programs due to Plaintiff's

nefarious efforts. The Plaintiff knew the statements were false when he made them, and he intended for the third parties to rely on these false statements. The Defendant/Counterclaimant suffered damages due to Plaintiff's targets having relied upon the Plaintiff's false statements, and acting upon them.

Since January of 2019, the Plaintiff has intentionally made false statements about the Defendant to Defendant's friends, intended to malign the Defendant's character and demean the Defendant's professional reputation. Many of these third parties, as a result of Plaintiff's actions, no longer wanted to associate with Defendant. These third parties, upon Plaintiff's instructions, proceeded to spread these tales to others in the Defendant's broader community, again causing many of her friends and community members to disassociate themselves from her. The Plaintiff knew the statements were false when making them. The Plaintiff intended for the third parties to rely on the false statements. The Defendant/Counterclaimant suffered damages due to its reliance on the Plaintiff's false statements.

Since January 2019 to the present day, Plaintiff has been on a campaign to ruin the Defendant's personal reputation and professional career. Upon information and belief, Plaintiff hired a publicist to purposely spread false statements and cast false light upon Defendant's character and professional fitness. Upon information and belief, Plaintiff directed his counsel to hire a publicist to ruin the Defendant's good name and standing as a professional matchmaker, speaker, columnist and author by spreading these false statements about her. The Plaintiff knew the statements were false when making them. The Plaintiff intended for the third parties to rely on these false statements. The Defendant/Counterclaimant suffered damages caused by people having believed and relied upon the Plaintiff's false statements.

**THIRD COUNT**
**(Defamation)**

13

<strong>(REVISED & SUPPLEMENTED)</strong>

Defendant/Counterclaimant repeats and realleges the allegations stated above as if fully set forth herein.

The Plaintiff made false and defamatory statements about the Defendant, both written and oral, in public and in front of third parties. The Plaintiff acted with malice, with intent to cause injury, or via negligence of the consequences of his behavior. The Defendant/Counterclaimant suffered damages due to the defamatory statements made against her by the Plaintiff.

Since January of 2019 to the present day, Plaintiff has been on a campaign to ruin the Defendant's personal reputation and damage her professional career. The Plaintiff has spewed his falsehoods and defamatory statements about the Defendant, using his alleged "relationship" with the Defendant to fashion falsehoods about her, and demean her to anyone associated with her personally and/or professionally. Additionally, the Plaintiff has used his knowingly false filings in three different legal venues and jurisdictions in an attempt to legitimize his false claims and convince third parties they are true, so as to persuade these parties to disassociate themselves from the Defendant, personally and/or professionally. Many of these third parties, as a result of Plaintiff's false and defamatory statements, no longer want to associate with Defendant, personally and/or professionally.

Detailed above in the First and Second Count are examples of the efforts made by Plaintiff to defame Defendant. The Defendant includes and incorporates herein each and every example of Plaintiff's intentionally malicious and negligent actions as specific allegations of defamation per se.

Plaintiff is solely responsible for his knowingly having perpetrated the initial acts of defamation, while continuing to defame Defendant despite the knowledge from the creator of the

14

social media posts that the Defendant did not initiate the posts for which he persists in blaming the Defendant.

Plaintiff is solely responsible for knowingly perpetrating the initial acts of defamation and then continuing to impugn Defendant's character by falsely accusing Defendant of despicable immoral acts, and accusing her of being fake and insincere about her religious beliefs.

**FOURTH COUNT**
**(Sexual Abuse and Sexual Assault)**
**(ADDED COUNT)**

Defendant/Counterclaimant repeats and realleges the allegations stated above as if fully set forth herein.

On or about December 23, 2017, the Plaintiff in this matter asked the Defendant to meet him a New York City hotel to discuss a potential "business proposition," in which he would create a fund to assist older Jewish singles to attend singles events if they did not have the financial ability to do so. When Defendant arrived at the Hotel, Plaintiff handed her a drink, and told her to "drink slowly." Shortly thereafter, Defendant describes her felt her her head become heavy, her vision blurred, and the room beginning to spin. The next thing Defendant remembers is waking up in the back of Plaintiff's car naked, with her legs spread apart, with semen dripping down her leg and other parts of her body. She then heard Plaintiff's voice telling her to "get dressed."

Upon realizing what had been done to her by the Plaintiff, the Defendant describes her feelings at that moment as being "ashamed, humiliated, violated, and utterly mortified" by what the Plaintiff had done to her. After managing to get herself dressed, still being barely coherent, the Plaintiff called an Uber and put her into the car. The Defendant stated that she remembers seeing the Plaintiff's face, and that he was clearly nervous about the state she was in, probably because he was concerned that he may be held responsible if the Defendant didn't get home

safely. Nevertheless, this clearly didn't motivate the Plaintiff sufficiently to offer to drive the Defendant home. The Defendant recalls receiving a call from the Plaintiff in the Uber on the way home, and his asking her if she was alright, however, she states that she was still heavily affected by the drug, and does not recall what was said. The Defendant recalls that the Plaintiff called her again in the morning, and recalls being extremely upset at the Defendant by what he had done to her, and told him so. The Plaintiff, in response, tried to make light of it, stating that he and the Defendant were destined to be in a relationship together anyway, and that she should let it go and not make a big deal over it. The Defendant recalls being very angered by this, and replied to the Plaintiff that he should not make any such presumptions.

The next day, December 24, 2017, the Defendant was due to attend a singles event that she helped to organize in New York City, and notwithstanding the fact that she was still feeling the effects of having been drugged the night before she followed through with her commitment. The Plaintiff also showed up to the event, and made persistent attempts to get the Defendant's attention. The Defendant nevertheless did everything possible to avoid the Plaintiff, and had no desire to speak to him. At one point, the Plaintiff managed to corner the Defendant, and said to her, "I want to show you something." The Plaintiff then pulled a packet of pictures out of his pocket, which depicted the Defendant naked, in various positions and all possible angles. The Plaintiff then put his face close to the Defendant's ear and said "I want you to blow me, if you refuse, I will show these pictures to everyone."

Until approximately September of 2018, the Plaintiff utilized those photographs to coerce the Defendant into an abusive, sexual relationship. The Plaintiff also made frequent declarations to her that they would ultimately be married, and on several occasions, even made declarations to the Defendant using a Hebrew phrase which consecrates a wife to her husband under Jewish

16

Law. When this phrase is uttered under specific circumstances, the couple is considered married under Jewish Law, and would require a Jewish Divorce to undo it. This was particularly frightening to the Defendant, as in order to dissolve the marriage, the Plaintiff would have to give her a "Get" (a Jewish writ of divorce). What made this all the more alarming for the Defendant was the fact that a Get needs to be given by the husband voluntarily, and if he refuses, the wife remains "chained" and unable to remarry until the husband gives the Get.

This abusive relationship continued until approximately October of 2018, during which time the Plaintiff inflicted severe emotional, mental and physical harm upon Defendant/Counterclaimant, who suffered significant damages due to Plaintiff's malevolent actions.

## ~~FIFTH COUNT~~
### ~~(Abuse of Process)~~
### (COUNT REMOVED)

~~Defendant/Counterclaimant repeats and realleges the allegations stated above as if fully set forth herein.~~

~~In retaliation for some perceived wrong Defendant committed against him, the Plaintiff purposely and maliciously filed police reports against the Defendant knowingly riddled with false allegations of social media postings about the Plaintiff and violating a Temporary Restraining Order. The Defendant/Counterclaimant suffered damages due to Plaintiff's abuse of the legal process.~~

**WHEREFORE**, Defendant/Counterclaimant respectfully requests that this Court enter judgment in its favor for the sum of ten million dollars ($10,000,000), dismiss Plaintiff's Complaint with prejudice, award Defendant/Counterclaimant its costs (including reasonable attorney fees and disbursements with interest), and grant Defendant/

Counterclaimant such other relief as the law, equity, and justice require.

Date: April 11, 2024

                                        IRA HELLER LAW, LLC


                                        By: _____
                                              Ira W. Heller, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JOHN DOE,**         ) | **CASE NUMBER:** |
|         ) | **2:21−CV−20706−MEF−ESK** |
| **Plaintiff**         ) | |
|         ) | |
| **v.**         ) | |
|         ) | |
| **BAILE SEBROW**         ) | *[PROPOSED] ORDER GRANTING* |
|         ) | *LEAVE TO AMEND* |
| **Defendant**         ) | |
|         ) | |

THIS MATTER having been opened to the Court on the Motion of

Defendant Baila Sebrow requesting leave to amend her Answer to file its Amended Answer and

Counterclaims pursuant to Federal <u>Rule</u> of Civil Procedure 15-16, and the Court having

considered the submissions of the parties in support of, and in opposition to, and the Court

having heard such argument of counsel as the record may show, and for good cause shown,

IT IS on this _____ day of _____, 2024, ORDERED that the Court accept

and file Defendant's Amended Answer and Counterclaims upon entry of this Order.

 

 

 

                                       _____

                                            United States District Judge