Page 1 of 4

## State of New Jersey
## Prevention of Domestic Violence Act

**ESSEX    County, Superior Court, Chancery Division, Family Part**

[✓] **Final Restraining Order (FRO)**    [ ] **Amended Final Restraining Order**

| | |
|---|---|
| Docket Number **FV-07-000265-22** | of Birth ▓▓▓▓▓ |
| Defendant's Social Security Number | |

| Hispanic or Latino? | Defendant's Race |
|---|---|
| [ ] Yes  [ ] No  [✓] Unknown | WHITE |

**Defendant**
**SEBROW BETTY**

| Defendant's Sex | Eye Color | Hair Color |
|---|---|---|
| F | HAZEL | |

Home Phone Number
**(516)849-5863**

Work Phone Number

| Date of Birth | Height | Weight |
|---|---|---|
| 02/01/1964 | 5    02 | |

Home Address
**ADDRESS UNKNOWN  UNKNOWN NY**

Distinguishing Features (Scars, Facial Hair, Etc.)

Work Address
**NJ**

Driver's License Number

State    Driver's License Expiration Date

The Court having considered plaintiff's Complaint dated    07/15/2021    seeking an ORDER under the Prevention of Domestic Violence Act, having established jurisdiction over the subject matter and the parties pursuant to *N.J.S.A.* 2C:25-17 et seq., and having found that defendant has committed an act of domestic violence, and all other statutory requirements having been satisfied:

It is on this    04    day of    June    2025    , ORDERED that:

**Sought    Granted**                    **Part I - Relief**

**DEFENDANT:**

1. [✓] [✓]  You are prohibited against future acts of domestic violence.
2. [✓] [✓]  You are barred from the following locations:
   [✓] **Residence(s) of Plaintiff**    [✓] **Place(s) of employment of Plaintiff**
   [ ] Other

3.  You are prohibited from having **any** oral, written, personal, electronic, or other form of contact or communication with:
   [✓] [✓]  Plaintiff
   [✓] [✓]  Other(s) (List names & relationship to Plaintiff): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4.  You are prohibited from making or causing anyone else to make harassing communications to:
   [✓] [✓]  Plaintiff
   [✓] [✓]  Other(s) (Same as above or list names & relationship to Plaintiff): ▓▓▓▓▓▓▓▓▓▓▓

5.  You are prohibited from stalking, following, or threatening to harm, to stalk or to follow:
   [✓] [✓]  Plaintiff
   [✓] [✓]  Other(s) (Same as above or list names & relationship to Plaintiff): ▓▓▓▓▓▓▓▓▓▓▓

6. [ ] [ ]  You must pay emergent monetary relief (describe amount and method):
   [ ] [ ]  Plaintiff: $                    Effective:
   [ ] [ ]  Dependents: $                    Effective:
7. [ ] [ ]  Other appropriate relief:
   Defendant (including substance abuse, mental health or other evaluations and subsequent treatment):

8. [ ] [ ]  Psychiatric evaluation:

9. [ ] [ ]  Intake monitoring of conditions and restraints (specify):

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Revised: 09/2024, CN: 10211 (DVFRO)

Prevention of Domestic Violence Act

| ☑ | **Final Restraining Order (FRO)** | ☐ | **Amended Final Restraining Order** | **FV-07-000265-22** |
|---|---|---|---|---|

| **Sought** | **Granted** | **Part I - Relief** continued |
|---|---|---|

| 10. ☑ | ☑ | **DEFENDANT:**<br><br>**PROHIBITIONS AGAINST POSSESSION OF WEAPONS**: You are prohibited from possessing **any and all fire-arms or other weapons** and must immediately surrender these firearms, weapons, permits to carry, applications to purchase firearms and firearms purchaser ID card to the officer serving this court Order. Failure to do so can result in your arrest and incarceration.<br><br>Other Weapon(s) (describe)    ANY AND ALL WEAPONS |
|---|---|---|

| 11. ☐ | ☐ | **PLAINTIFF:**<br>You are granted exclusive possession of (residence or alternate housing, list address only if specifically known to defendant): |
|---|---|---|
| 12. ☐ | ☐ | Plaintiff is granted temporary custody of (specify name(s)): |
| 13. ☐ | ☐ | Other appropriate relief:<br>Plaintiff (describe)<br><br><br>Child(ren) (describe) |

**LAW ENFORCEMENT OFFICER**

You are to accompany to scene, residence, shared place of business, other (indicate address, time, duration & purpose):

| ☐ | ☐ | Plaintiff: |
|---|---|---|
| ☐ | ☐ | Defendant: |

**WARRANT TO SEARCH FOR AND TO SEIZE WEAPONS FOR SAFEKEEPING**

☐ **To any law enforcement officer having jurisdiction -** this Order shall serve as a warrant to search for and seize any issued permit to carry a firearm, application to purchase a firearm and firearms purchaser identification card issued to the defendant and the following firearm(s) or weapon(s).

1. **You are hereby commanded to** search the premises for the above described weapons and/or permits to carry a firearm, application to purchase a firearm and firearms purchaser ID card and to serve a copy of this Order upon the person at the premises or location described as:

2. **You are hereby ordered** in the event you seize any of the above described weapons, to give a receipt for the property so seized to the person from whom they were taken or in whose possession they were found, or in the absence of such person to have a copy of this Order together with such receipt in or upon the said structure from which the property was taken.

3. **You are** to execute this Order immediately or as soon thereafter as is practicable.
   ☐ Anytime    ☐ Other: _____

4. **You are further ordered,** after the execution of this Order, to promptly provide the Court with a written inventory of the property seized per this Order.

---

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Prevention of Domestic Violence Act

Page 3 of 4

| ☑ | **Final Restraining Order (FRO)** | ☐ **Amended Final Restraining Order** | **FV-07-000265-22** |
|---|---|---|---|

| Sought | Granted | **Part II - Relief** |
|---|---|---|

**DEFENDANT:**

| # | Sought | Granted | |
|---|---|---|---|
| 1. | ☐ | ☐ | You acknowledge parentage of: _____ |
| 2. | ☐ | ☐ | You must submit to genetic testing: _____ |
| 3. | ☐ | ☐ | No parenting time (visitation) until further order; _____ |
| 4. | ☐ | ☐ | Parenting time (visitation) pursuant to (prior FV, FM, or FD Order) # --- _____ is suspended, a hearing is scheduled for: |
| 5. | ☐ | ☐ | Parenting time (visitation) is ordered as follows: (specify drop-off and pick-up times and locations, participation of or supervision by designated third party): |
| 6. | ☐ | ☐ | Risk assessment ordered (specify by whom): _____ Return Date: _____ |
| 7. | ☐ | ☐ | You must provide compensation as follows: (Appropriate notices have been attached as part of this Order): |
| | ☐ | ☐ | Emergent support - Plaintiff: $ _____ |
| | ☐ | ☐ | Emergent support - Dependent(s): $ _____ |
| | ☐ | ☐ | Interim support - Plaintiff: $ _____ |
| | ☐ | ☐ | Interim support - Dependent(s): $ _____ |
| | ☐ | ☐ | Ongoing Plaintiff support: $ _____ Effective: _____ |
| | | | Paid via income withholding through the: _____ Probation Div. |
| | ☐ | ☐ | Other: _____ |
| | ☐ | ☐ | Ongoing child support: $ _____ Effective: _____ |
| | | | Paid via income withholding through the: _____ Probation Div. |
| | ☐ | ☐ | Other: _____ |
| 8. | ☐ | ☐ | Medical coverage for plaintiff: _____ |
| 9. | ☐ | ☐ | Medical coverage for dependent(s): _____ |
| 10. | ☐ | ☐ | Compensatory damages to plaintiff: $ _____ |
| 11. | ☐ | ☐ | Punitive damages (describe): $ _____ |
| 12. | ☐ | ☐ | You must pay compensation to (specify third party and/or VCCO, and describe): |
| 13. | ☐ | ☐ | You must participate in a batterers' intervention program (specify): |
| 14. | ☐ | ☐ | You must make ☐ rent ☐ mortgage payments (specify amount(s) due date(s) and payment manner): |
| 15. | ☐ | ☐ | Defendant is granted temporary possession of the following personal property (describe): |
| 16. | ☐ | ☐ | Defendant is granted temporary custody of (specify name(s)): |

---

☑ **You must submit to fingerprinting and other identification procedures as required by law pursuant to *N.J.S.A.* 53:1-15.**

☑ You must pay a civil penalty of $ 250 ($50.00 to $500.00 per *N.J.S.A.* 2C:25-29) to: PAY THROUGH PROBATION within 30 days. You will be charged a $2.00 transaction fee for each payment or partial payment that you make.

☐ Waived due to extreme financial hardship because: _____

---

| Sought | Granted | |
|---|---|---|

**PLAINTIFF:**

| 17. | ☐ | ☐ | Plaintiff is granted temporary possession of the following personal property (describe): |
|---|---|---|---|

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. Only a court can modify any of the terms or conditions of this court order.

Prevention of Domestic Violence Act

Page 4 of 4

| ☑ Final Restraining Order (FRO) | ☐ Amended Final Restraining Order | FV-07-000265-22 |

**Comments:**
06/04/25- FRO GRANTED ON THE GROUNDS OF HARASSMENT AND CYBER HARASSMENT. DEFT. B. S. IS RESTRAINED AND MUST STAY AT LEAST 1000 FEET AWAY FROM PLTF ☒ DEFT. B.S. IS ORDERED TO BE FINGERPRINTED WITHIN 14 DAYS OF BEING SERVED WITH THIS ORDER. REPORT 212 WASHINGTON ST. NWK, NJ. DEFT. B. S. IS ORDERED TO PAY CIVIL PENALTY $250.00. REPORT TO SAME LOCATION 9TH FL. #951. DEFT B.S. HAS 45 DAYS TO FILE AN APPEAL OF THIS DECISION. ALL RESTRAINTS REMAIN IN FULL FORCE AND EFFECT.

**Addendum:**
6/4/25- DEFT. B.S. B.S MUST COMPLETE ANGER MANAGEMENT INDEPENDENTLY AND PROVIDE REPORT TO THE COURT.

**This Order is to become effective immediately and shall remain in effect until further Order of the Superior Court, Chancery Division, Family Part.**

| 06/04/2025 | 03:00 PM | s/ JOSHUA SANDERS |
| Date | | Honorable |

# All Law Enforcement Officers Will Serve and Fully Enforce This Order.
# The Plaintiff Shall Not Be Arrested for a Violation of This Restraining Order.

- **This Final Restraining Order Was Issued After Defendant Was Provided with Notice and the Opportunity to Be Heard and Should Be Given Full Faith and Credit Pursuant to the Violence Against Women Act of 1991, Sec. 40221, Codified at 18 U.S.C.A. S2265(A) and S2266.**

- **If Ordered, Sufficient Grounds Have Been Found By This Court for the Search and Seizure of Firearms and Other Weapons as Indicated in This Court Order.**

- **Defendant Shall Not Be Permitted to Possess any Weapon, ID Card or Purchase Permit While This Order Is in Effect, or for Two Years, Whichever Is Greater.**

## Notice to Plaintiff and Defendant

**IMPORTANT:** The parties cannot themselves change the terms of this Order on their own. This Order may only be changed or dismissed by the Family Court. The named defendant **cannot** have any contact with the plaintiff without permission of the court. If you wish to change the terms of this Order and/or you resume living together, you **must** appear before this court for a rehearing.

## Notice to Defendant

A violation of any of the provisions listed in this Order or a failure to comply with the directive to surrender all weapons, firearm permits, application or identification cards may constitute criminal contempt pursuant to *N.J.S.A.* 2C:29-9(b), and may also constitute violations of other state and federal laws which can result in your arrest and/or criminal prosecution. This may result in a jail sentence.

## Return of Service

| ☑ Plaintiff was given a copy of the Order by: | | |
| SERVED IN COURT EMAIL | 12:52 PM  06/06/2025 | ESSEX COUNTY SUPERIOR COURT |
| Print Name | Time and Date | Signature / Badge Number / Department |

| ☑ I hereby certify that I served the within Order by delivering a copy to the defendant personally: | | |
| SERVED IN COURT EMAIL | 12:03 PM  06/05/2025 | ESSEX COUNTY SUPERIOR COURT |
| Print Name | Time and Date | Signature / Badge Number / Department |

☐ I hereby certify that I served the within Order by use of substituted service as follows:

| Print Name | Time and Date | Signature / Badge Number / Department |

☐ Defendant could not be served (explain):

| Print Name | Time and Date | Signature / Badge Number / Department |

**The Courthouse is accessible to those with disabilities.  Please notify the Court if you require assistance.**

Distribution:   Family Part,    Plaintiff,    Defendant,    Sheriff,    Other

**Superior Court of New Jersey**
**Chancery Division - Family Part**
**ESSEX County**
**Docket Number:** FV-07-000487-22

BETTY    SEBROW
**Plaintiff,**

vs.

# Order of Dismissal

## Temporary Restraining Order

XXXXXXXXX
Defendant.

**THE COURT** having considered the testimony and/or certification at this hearing and the Court having determined that:

1. The Plaintiff having requested dismissal of the matter; and

   - ☐ Having read "What Dissolving a Restraining Order Means"
   - ☐ Having read and signed "Certification for Dissolution of Restraining Order"
   - ☐ Having not been coerced or placed under duress to withdraw the complaint and dissolve the Order;
   - ☐ Having been advised of the cycle of domestic violence, and of the protective resources available through the Court and the local domestic violence program(s), especially with regard to housing and Court-ordered emergency custody and support;
   - ☐ Understanding that withdrawal of the complaint and dismissal of the Restraining Order will eliminate the protection that had been issued under this Order;
   - ☐ Being aware that such withdrawals are not prejudicial and if (s)he may need protection in the future, (s)he may apply for a new restraining order;
   - ☐ Understanding that if criminal charges were filed by me or the police, dismissal of the restraining order does not dismiss the criminal charges.

2. The Plaintiff failing to appear for Final Hearing; and

   - ☐ The Court having been unable to contact the plaintiff via telephone numbers/address given; OR
   - ☐ The Court having determined that plaintiff was contacted by the court and/or law enforcement and that coercion or duress did not cause the plaintiff's non-appearance; OR

3. ☑ The Court having determined that the plaintiff's allegation of domestic violence has not been substantiated.

4. ☐ The Municipal Court having denied the TRO application.

5. ☐ The Court having determined on appeal of the Temporary Restraining Order that the required burden of proof has not been met.

6. ☐ The defendant's motion to dismiss is hereby granted.

7. ☐ The Appellate Division entered a decision on _____ stating that the Final Restraining order dated _____ be vacated and case is Dismissed.

**IT IS HEREBY ORDERED** on this 4th day of June, 2025, that the Domestic Violence Complaint, dated 08/05/2021 is **DISMISSED** and the  ☑ **TEMPORARY RESTRAINING ORDER**    **OR**  ☐ **FINAL RESTRAINING ORDER** dated 03/27/2025 is/are vacated, and

**IT IS FURTHER ORDERED THAT:**

- ☐ The complaint is dismissed and present support order under this docket is terminated and any arrears are vacated. Probation to terminate their interest and close case.
- ☐ The complaint is dismissed.  Continue present support order and/or arrears to be:
  - ☐ transferred to docket _____ **and**  ☐ paid through **Probation IV-D**
  - or    ☐ paid directly to **Plaintiff (obligee).**
- ☑  Other: DOMESTIC VIOLENCE COMPLAINT IS HEREBY DISMISSED AND TRO IS VACATED AFTER TRIAL.

### s/JOSHUA SANDERS
**Honorable**

## Return of Service

☑  **Defendant** was given a copy of the Order by:

**EMAIL  SERVED IN COURT**
print name

12:44 PM    06/06/2025
time and date

ESSEX COUNTY SUPERIOR COURT
signature / badge number / dept

☑  **Plaintiff** was given a copy of the Order by:

**EMAIL  SERVED IN COURT**
print name

12:44 PM    06/06/2025
time and date

ESSEX COUNTY SUPERIOR COURT
signature / badge number / dept

**NOT TO BE PUBLISHED WITHOUT
THE APPROVAL OF THE COMMITTEE ON OPINIONS**

SUPERIOR COURT OF NEW JERSEY
ESSEX VICINAGE
CHANCERY DIVISION, FAMILY PART
DOCKET NO. FV-07-265-22

 Plaintiff,

v.                                          **OPINION**

B.S.,
　　　Defendant.

SUPERIOR COURT OF NEW JERSEY
ESSEX VICINAGE
CHANCERY DIVISION, FAMILY PART
DOCKET NO. FV-07-487-22

B.S,
　　　Plaintiff,

v.                                          **OPINION**

 Defendant.

Decided: June 4, 2025

Abraham Borenstein, Esq., attorney for Plaintiff/Cross-Defendant ,
(Borenstein, McConnell, & Calpin, P.C.)

Ira W. Heller, Esq., attorney for Defendant/Cross-Plaintiff B.S. (Ira Heller Law, LLC)

SANDERS, J.S.C.

---

[1] The Court uses initials to identify the parties to protect the identity of the victim. See R. 1:38-3(d)(10).

**I**

These matters came before the Court by way of a temporary restraining order, under docket number FV-07-265-22, filed by ◼◼ against B.S. for predicate acts including harassment and, in the amended application, contempt of a domestic violence order. The cross-complaint, FV-07-487-22, filed by B.S. against ◼◼, alleges predicate acts of criminal coercion, sexual assault, criminal sexual contact, and harassment. Trial in this domestic violence matter commenced in earnest on March 15, 2022, and concluded on March 27, 2025.

The court notes that the trial in this matter was conducted over more than 50 trial days, with hundreds of individual pieces of evidence, including thousands of message transcripts, email chains, call logs, Apple device data, screenshots, and other evidence. The court heard from numerous fact and multiple expert witnesses. The court has also incorporated into this trial record, with the consent of the parties, the testimony adduced during several pre-trial R. 104 hearings.

With the exception of B.S., the court considered all testimony and evidence through both direct and cross-examination. However, in light of the court's prior ruling curtailing cross-examination, the court has refrained from considering any evidence offered by B.S. during cross-examination in light of the fact that she was denied redirect examination. As such, the court has only considered her testimony offered in direct examination.

After the conclusion of the trial on March 26, 2025, the parties submitted written summations, which have been reviewed by this court.

For the reasons that follow, the court hereby GRANTS the final restraining order in favor of ██, and DENIES the final restraining order in favor of B.S.

## II

In ██'s application, it is alleged that, in the fall of 2018, he began a dating relationship with B.S. After approximately six to eight weeks of dating, ██, advised B.S. that he wished to end the relationship. Shortly afterwards, B.S. began to send numerous text messages, which contained vulgar and sexually explicit language. ██, informed B.S, that he no longer desired to have any further communication between the two.

Since 2018, on numerous occasions, B.S. has sent text messages and emails that purportedly falsely accuse ██, of being a rapist with multiple female victims. B.S. then threatened to inform ██'s employer of these false allegations. B.S. contacted ██'s female friends and associates, in an attempt to gather information regarding his past sexual history. All of these messages have been entered into evidence. ██, has seen B.S. present at the same religious events he attends. ██ states that B.S. would typically not take part in these gatherings but believes she does so because she is aware he will be in attendance.

██. states that contact with B.S. has been sparse and infrequent since that time, but he has received text messages from unknown phone numbers, containing similar content to the messages left by B.S. He believes B.S. is using these unknown phone numbers to continue the harassing communication. At a pre-trial R. 104 hearing, it was determined that B.S.'s credit card was used to pay for the Spoofcard account which funded the anonymization of those messages.

██. also often searches his name on Google to see if anything has been written about him. Through Google's search engine, ██. discovered a Twitter account titled "[██] and the issues of date rape" with the twitter handle named "@h*****daterape". In the description of the account, the following is written: "[██], a 64-year-old financial advisor in [omitted] is accused by police of incapacitating 100s of victims by plying them with date rape drugs." ██ is fearful that his reputation is being slandered due to these constant false allegations.

██. amended his complaint to include contempt of domestic violence order that, on August 2, 2021, at 9:25:54 AM, B.S. "tweeted" ██

██, in the middle of trial, further amended his application to include the following allegations:

> IN THE FALL OF 2017, ██], THE VICTIM OF DOMESTIC VIOLENCE, BEGAN A DATING RELATIONSHIP UNDER N.J.S.A. § 2C:25-19(d) WITH [B.S.]. AFTER [██] ADVISED [B.S.] THAT HE WISHED TO END THE RELATIONSHIP, FROM FEBRUARY THROUGH OCTOBER 2018, [B.S.]

BEGAN TO REPEATEDLY SEND [████] NUMEROUS THREATENING, LEWD, HARASSING, VULGER, DISPARAGING TEXT MESSAGES TO [████] IN THE FORM OF WHATS APP AND IMESSAGES (APPLE), WHICH WERE HARRASSING AND THREATENING, AND WERE DESIGNED TO ANNOY AND PUT [████] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [████]'S REASONABLE EXPECTATION OF PRIVACY. THESE WERE FOR THE PURPOSE OF HARASSING AND THREATENING [████]. [████] ADVISED [B.S.] OVER AND OVER TO CEASE, BUT SHE CONTINUED TO DO SO. SUCH MESSAGES CONSTITUTE CYBER HARASSMENT AS DEFINED IN 2C:334.1. SUCH MESSAGES CONTAINED VULGAR AND SEXUALLY EXPLICIT AND COARSE LANGUAGE. THE MESSAGES DISPARAGED [████] DIRECTLY AND THIRD PARTIES, AND [████]'S FAMILY MEMBERS, ALL WITH THE INTENT OF HARASSING AND THREATENING [████]. [████] STATES HE REPEATEDLY INFORMED [B.S.] THAT HE NO LONGER DESIRED TO HAVE ANY FURTHER COMMUNICATION BETWEEN THE TWO, THAT HE REGARDED THE MESSAGES AS HARASSMENT AND THREATENING. [B.S.] IN SUCH MESSAGES ALSO THREATENED [████]'S STANDING IN THE JEWISH COMMUNITY, AND JEWISH SINGLES WORLD. [B.S.] THREATENED [████]'S FINANCIAL STATE. [B.S.] DISPARAGED [████]'S SON-IN-LAW, DAUGHTER AND OTHERS REPEATEDLY ALL WITH THE INTENT TO HARASS AND THREATEN [████]. [B.S.] ACCUSED [████] OF RAPE AND ABUSE ALL WITH THE INTENT TO HARASS AND THREATEN [████]. [B.S.] THREATENED TO DESTROY [████]'S LIFE AND REPUTATION ORALLY AND IN SUCH MESSAGES ALL WITH THE INTENT TO HARASS AND THREATEN [████] AND WERE DESIGNED TO ANNOY AND PUT [████] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED

WITH [████]'S REASONABLE EXPECTATION OF
PRIVACY. [B.S.], A MEDIA PERSONALITY,
THREATENED TO EXPOSE [████] PUBLICLY,
THEREBY TO RUIN HIM AND HIS LIFE ALL WITH
THE INTENT TO HARASS AND THREATEN [████].
[B.S.] ACCUSED [████] OF VIOLATING HIS
TEENAGED DAUGHTER. [B.S.] PRESSURED [████]
TO GIVE HER A JEWISH DIVORCE DOCUMENT
CALLED A "GET." IN THAT REGARD, [B.S.]
CONTACTED VARIOUS RABBINIC AUTHORITIES,
AND COMMUNITY LEADERS, ALL TO HARASS
AND THREATEN [████]. [B.S.] ALSO TELEPHONED
[████] REPEATEDLY AND EXCESSIVELY FOR
HARASSMENT PURPOSES AND WERE DESIGNED
TO ANNOY AND PUT [████] IN FEAR FOR HIS
SAFETY AND SECURITY AND INTOLERABLY
INTERFERED WITH [████].'S REASONABLE
EXPECTATION OF PRIVACY. SINCE 2018, [████]
STATES THAT ON NUMEROUS OCCASIONS, [B.S.]
HAS CONTINUED TO SEND TEXT MESSAGES AND
EMAILS IN WHICH SHE FALSELY ACCUSES [████]
AS BEING A RAPIST WITH MULTIPLE FEMALE
VICTIMS AND SUCH ACTS WERE DESIGNED TO
ANNOY AND PUT [████] IN FEAR FOR HIS SAFETY
AND SECURITY AND INTOLERABLY INTERFERED
WITH [████]'S REASONABLE EXPECTATION OF
PRIVACY. [B.S.] HAS THREATENED TO INFORM
[████]'S EMPLOYER OF THESE FALSE
ALLEGATIONS AND HAS SENT ABUSIVE EMAILS
TO [████]] AT WORK, KNOWING HIS EMPLOYER
WOULD LEARN OF THE EMAILS ALL WITH THE
INTENT TO HARASS AND THREATEN [████]
STATES [B.S.] HAS CONTACTED HIS FEMALE
FRIENDS AND ASSOCIATES, IN AN ATTEMPT TO
GATHER INFORMATION REGARDING HIS PAST
SEXUAL HISTORY. [████] ALSO STATES THAT HE
HAS SEEN [B.S.] PRESENT AT THE SAME
RELIGIOUS EVENTS HE ATTENDS. HE STATES
THAT [B.S.] WOULD TYPICALLY NOT TAKE PART
IN THESE GATHERINGS, BUT BELIEVES SHE

DOES SO BECAUSE SHE IS AWARE HE WILL BE IN ATTENDANCE. [B.S.] ACCOSTED ▨ AT VARIOUS PUBLIC EVENTS INCLUDING AIPAC, ZOA, SHABBAT NACHAMU AND OTHERS. RECENTLY, [▮]'S IN PERSON CONTACT WITH [B.S.] HAS BEEN SPARSE AND INFREQUENT. BUT THE HARASSMENT CONTINUES AS HE HAS RECEIVED TEXT MESSAGES FROM UNKNOWN PHONE NUMBERS, CONTAINING SIMILAR CONTENT TO THE MESSAGES LEFT BY [B.S.]. ▮ BELIEVES [B.S.] IS USING THESE UNKNOWN PHONE NUMBERS TO CONTINUE HARASSING COMMUNICATION. [▮]'S EMPLOYMENT REQUIRES HIM TO CONSTANTLY SEARCH SOCIAL MEDIA AND GOOGLE. [▮] THUS OFTEN SEARCHES HIS NAME ON GOOGLE TO SEE IF ANYTHING HAS BEEN WRITTEN ABOUT HIM. RECENTLY THROUGH GOOGLE'S SEARCH ENGINE, [▮] DISCOVERED A TWITTER ACCOUNT TITLED "[▮] AND THE ISSUES OF DATE RAPE" WITH THE TWITTER HANDLE NAMED "@▮ DATERAPE". IN THE DESCRIPTION OF THE ACCOUNT, THE FOLLOWING IS WRITTEN: "[▮], A 64 YEAR OLD FINANCIAL ADVISOR IN [OMITTED], NJ IS ACCUSED BY POLICE OF INCAPACITATING 100+ VICTIMS OF RAPE BY PLYING THEM WITH DATE RAPE DRUGS" AND THIS WAS KNOWN BY THE POLICE. [▮.] WAS ACCUSED IN THOSE POSTINGS OF BEING A PEDOPHILE, ALL POSTED AT THE BEHEST OF [B.S.], TO HARASS, THREATEN AND DAMAGE [▮] AND WERE DESIGNED TO ANNOY AND PUT [▮] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [▮]'S REASONABLE EXPECTATION OF PRIVACY. THOSE POSTINGS WERE BEING READIED OVER A TWO YEAR PERIOD, FROM 2019, UNTIL DISCOVERED BY [▮.] IN JULY 2021. [▮] HAS A CONSIDERED AND REALISTIC FEAR AND CONCERN THAT [B.S.] WILL CONTINUE TO

ENGAGE IN SUCH CONDUCT IN THAT SHE HAS THE WILL, WHEREWITHAL, COMMUNITY STANDING, MOTIVATION AND EVIL INTENT TO DO SO. JUST AS SHE PLANNED AND SUCCEEDED IN FILING THE MEDIA NOTICES FROM 2019 TO 2021, SHE COULD EASILY DO SO AGAIN. BECAUSE OF ALL OF THIS, [██]'S LIFE HAS BEEN SINCE 2018, CONTINUING TO DATE, AN EXISTENCE OF FEAR, HARASSMENT, THREATS, FINANCIAL DISRUPTION, AND SOCIAL DISRUPTION. ██ HAS BECOME MORE INTROVERTED, RECLUSIVE, STAYS HOME, PARTICIPATES IN FEWER EVENTS OR EVEN PRAYER SESSIONS. IN GENERAL HIS LIFE HAS BEEN IRREPARABLY DISRUPTED DUE TO SUCH HARASSMENT AN ONGOING THREAT OF HARASSMENT BY [B.S.]. [██] IS FEARFUL THAT HIS REPUTATION IS BEING SLANDERED DUE TO THESE CONSTANT FALSE ALLEGATIONS.

In B.S.'s application, it is alleged that ██. falsely accused plaintiff of sending a Twitter message to him. B.S. stated that she obtained the above information due to ██. monitoring her on twitter. She alleges that the parties had a dating relationship that ended some time prior to the filing of the restraining orders. ██ has been sending unwanted messages to B.S. in an attempt to rekindle the relationship. B.S. alleges that the ██ showed up places the plaintiff was located without invitation and unannounced.

B.S.'s application was amended to include predicate acts of criminal coercion, sexual assault, and criminal sexual contact. On a prior date, B.S. visited the ██. at a hotel. Upon arrival, ██ gave B.S. a drink. After B.S. consumed the drink, she

became unconscious. She alleges that ◆◆ then took lewd photographs of her. ◆◆ then used the lewd photographs to coerce her into performing sex acts with him. ◆◆ forced B.S. to perform vaginal and oral sex acts.

## III

In deciding what testimony to believe, the court must determine the credibility of witnesses who testify before it.  The court may consider: (1) the witness' interest, if any in the outcome of this case; (2) the accuracy of the witness' recollection; (3) the witness' ability to know what he/she is talking about; (4) the reasonableness of the testimony; (5) the witness' demeanor on the stand; (6) the witness' candor or evasion; (7) the witness' willingness or reluctance to answer; (8) the inherent believability of the testimony; (9) the presence of any inconsistent or contradictory statements.  Model Jury Charge (Civil), 1.12K, "Credibility" (approved Nov. 1998). The court is further guided by the Model Jury Charge entitled "False In One – False In All," wherein factfinders are instructed that, "[i]f you believe that any witness or party willfully or knowingly testified falsely to any material facts in the case, with intent to deceive you, you may give such weight to his or her testimony as you may deem it is entitled.  You may believe some of it, or you may, in your discretion, disregard all of it."  Model Jury Charge (Criminal), "False in One – False in All" (rev. Jan. 14, 2013).

Throughout this hearing, the court had the opportunity to consider and watch the witnesses' demeanor as they testified. Further, the court had the opportunity to assess their credibility, their truthfulness, and the manner in which they comported themselves. Overall, the court finds that the testimony of ▨ was credible and truthful. His testimony was consistent and forthright. His recollection was candid, reasonable, and he was not evasive in any way. His testimony was believable.

Moreover, his testimony was largely corroborated by the evidence adduced during this trial. The court notes that it is well established a party is not limited to offering direct evidence and may prove its case in whole or in part through circumstantial evidence, provided that evidence "is so clear and strong" as to demonstrate guilt by the requisite standard. State v. Donohue, 2 N.J. 381, 389 (1949); see also State v. Phelps, 96 N.J. 500, 511 (1984). Indeed, circumstantial evidence is often "more certain, satisfying and persuasive than direct evidence." State v. O'Connor, 134 N.J.L. 536, 539 (Sup. Ct. 1946); see also State v. Dancyger, 29 N.J. 76, 84 (1959). Here, the court need look only to the exhibits entered into evidence as circumstantially supporting ▨'s contentions. For example, given the message chains as between the parties, the court notes that B.S. denied authorship, in part and or in whole, of many of the messages. However, the messages themselves have a continuity of thought and conversation which repudiates B.S.'s position that some messages were wholesale fabricated by ▨ at the time that they were sent. In

looking to the content of these messages, they largely corroborate ▨'s testimony at trial. Therefore, the court finds ▨ to be entirely credible as to his testimony in this trial.

By comparison, the court finds B.S. to be less credible, if not wholly incredible in some regards, than ▨ particularly in light of the court's ability to view and interpret the evidence of the subject incident and how it comported with her testimony.

By way of example, B.S. testified that various messages were fabricated in content, chronology, or both. However, she offers only her testimony in contrast to that of the three experts who testified about the accuracy and reliability of the Cellebrite extraction process. Their expert opinions, which the court adopts as unrebutted, provides that the messages entered into evidence in this trial were authentic and reliable. B.S. argues that, despite the use of the Cellebrite extractions, that these messages are somehow fraudulent.

Here, the court pauses to comment on the accuracy and reliability of Cellebrite extractions. Distilling the experts' testimony, Cellebrite UFED tool is a software program which, when the Cellebrite UFED tool is connected to a device such as a cellular telephone, creates a copy of the data located on that device and transfers that data to another medium for storage and examination. Based upon the unrebutted testimony of the experts, the court finds that the Cellebrite reports were properly

authenticated under N.J.R.E. 702 and 901. The defendant was able to, but did not, challenge the testimony of ███ 's experts in this regard. This court has no basis, other than B.S.'s testimony, to conclude that the messages are indeed fraudulent.

For example, assuming as the court must given the state of the record through the lens of the experts, the messages extracted from ███ 's phone, are authentic as to being from his phone. These messages are combinations of iMessages, WhatsApp messages, and emails. B.S.'s position is that these messages have been altered to insert language that she herself did not draft, to alter the dates and times when certain message had been sent, and to otherwise modify those messages. Based upon the unrebutted testimony of the experts, there does not appear to be any modality upon which these types of modifications could occur pre- or post-extraction, or, at least, B.S. has not proffered by compelling theory as to <u>how</u> these messages were purportedly modified. As such, the court accepts that the exhibits in the record are accurate insofar as they were removed from ███ 's telephone.

That does not end the inquiry as B.S. alleged that ███ both had her passwords and access to her cellular telephone. As such, to find B.S.'s allegations credible in that ███, or some other person, authored the challenged messages, the court would have start with the fact that the messages were sent in "real time" as reflected in the time and date stamps on those messages given the experts' testimony. The court again pauses to note that this does not corroborate B.S.'s testimony that she authored

some messages, but that they were sent at times in contravention of the time and date stamps on those messages. This further impairs the credibility of B.S.

Continuing, the court cannot find as credible B.S.'s implied testimony that ██ himself sent the offensive messages to himself in real time. Preliminarily, the court accepts as credible ██'s testimony that any questionable emails received by him at his workplace email address must be reported to human resources. Emails attributed to B.S. were sent to ██ at his work email accusing him of rape and abuse of his daughter. By virtue of ██'s testimony that these emails must be reported to human resources, to accept B.S.'s implied testimony that these messages were sent at the behest of ██████ would have chosen to send emails that specifically endangered his employment. The court cannot find any basis to accept this as the ground truth reality. Given ██'s position with his employer, the court is hard pressed to find it more likely than not that ██ at the time that the messages were sent, elected to have messages sent to his employment accusing him of molesting his daughter. The court cannot discern a plausible reason for ██ to engage in an electronic version of reputational Russian roulette to frame B.S. The court simply cannot find that this is credible given the totality of the circumstances as ██ had less professionally dangerous modalities to frame B.S. rather than those that imperiled his employment.

As such, the court finds that B.S.'s denials as to the drafting and sending of the emails are wholly incredible. In evaluating this factual conclusion through the lens of "False In One – False In All," the court finds that B.S. is generally incredible on this basis in light of her fabricated testimony as to the authorship of the messages.

Independently, the court also finds that B.S. is incredible on other bases. Moving past the unsupported allegations that others modified the various messages, the court also notes the demeanor of B.S. on the stand. While the court again focuses only upon her direct examination, the court finds that her testimony about the alleged sexual assault and her conduct thereafter likewise strains credulity. Her testimony vacillated and was both internally and externally inconsistent.

Her testimony about Kiderman's and Kogan's unsolicited conspiracy to post the offensive statements about ███, in light of their entirely credibly testimony is simply not reasonable. She alleges that Kiderman and Kogan, unsolicited by B.S., created and posted the various internet content in relation to ███. However, the court has no basis to find either Kiderman or Kogan incredible as to the central issues surrounding the internet postings. The court cannot credit B.S.'s testimony that Kiderman and Kogan perpetrated these internet postings of their own volition in the absence of B.S.'s involvement. B.S.'s testimony in this regard simply does not ring true even before the court assigns substantial credibility to both Kiderman and Kogan. Combining the implausible nature of B.S.'s allegations with the credibility

findings as to Kogan and Kiderman is yet another death knell to B.S.'s credibility. As such, independent of other bases, this serves to substantially undermine B.S.'s credibility.

Further, B.S.'s demeanor on the stand on direct examination further independently erodes any confidence that the court has in relation to the accuracy and reliability of her testimony. Her facial expressions on direct and her reactions to various evidence causes the court to question her veracity. Her body language and reactions were such as to render silent any ring of truth that could be associated with the words contained in her testimony. Simply put, B.S.'s testimony lacked objective indications associated with candor and honesty by failing to demonstrate a modicum of understanding as to the severity and solemnity of the proceedings. This is in stark contrast to ▨▨who answered all of the questions carefully, thoughtfully, and deliberately, unlike B.S. even during direct. There was no indication that ▨▨. was exaggerating or embellishing his answers, again unlike B.S.

Damning is the issue of her Chase Credit card that was used to pay for the electronic communications made via Spoofcard. The court held a pre-trial R. 104 hearing as to this issue relegated, inter alia, as to the subpoenas for her banking information. At trial, B.S. expressly and impliedly denied that she intentionally used her credit card, instead proclaiming that ▨▨. had access to all of her accounts and devices. Yet, again, it remains illogical and unreasonable that ▨▨. would create

these electronic communications, at that time, for a purpose that cannot be readily

gleaned by the court other than to frame B.S. for some undetermined goal. Where

this breaks down for the court is, if the goal is framing B.S., ▨ possesses

substantially greater financial resources than B.S. as the court understands. As such,

there is no readily apparent financial motive fo ▨ to frame B.S. No other motive

has been proffered or established. The court, considering all of the evidence in this

matter, simply cannot find B.S.'s denials and explanations as to the reason that her

credit card was used to pay for some of the electronic communications as credible.

Moreover, B.S.'s testimony as to the Verizon telephone records was also

incredible. Her denials as to making repeated telephone calls to ▨ simply fall flat.

The records are in evidence and were properly authenticated, despite B.S.'s

vehement objections as to the source of these records being unrelated litigation.

There is no evidence to challenge the accuracy and reliability of these records. The

locations of the outgoing caller when the calls were made are accepted by this court

as accurate and reliable. B.S.'s denials as to making these telephone calls are neither

accurate nor reliable in the face of this compelling evidence that a supermajority of

these calls were made to ▨ near his home from near B.S.'s home. As such, this is

yet another independent basis for the court to find B.S. incredible.

Overall, and combining all of the aforementioned issues, the court believes

that B.S. cumulatively willfully or knowingly testified falsely to many material facts

in the case, with intent to deceive the court, and, as such, the court disregards the supermajority of her testimony as being incredible.

Given that the standard of proof in domestic violence cases is by a preponderance of the evidence, and based upon the entirety of this record, the court finds that it is more likely than not that B.S. did, in fact, author all of the disputed communications, including the Spoofcard calls, made all of the related telephone calls to █████, and was responsible for the various internet postings.

## IV

New Jersey's Prevention of Domestic Violence statute is found in N.J.S.A. 2C:25-17 to -35 ("the Act"). The Legislature intended to provide emergency and long-term protection to domestic violence victims whose criminal complaints had traditionally been treated cavalierly by law enforcement because they arose in a domestic violence context. Corrente v. Corrente, 281 N.J. Super 254 (App. Div. 1985). The Act is intended to assure victims of domestic violence the maximum protection from abuse that the law can provide. New Jersey law has a strong policy against domestic violence. Because the Act is remedial in nature, it is to be construed liberally to achieve its salutary purpose. Cesare v. Cesare, 154 N.J. 394 (1998). The Legislature encourages broad application of the act to confront the problem of domestic violence. State v. Harris, 211 NJ 566, 579 (2012).

There is no such thing as an act of domestic violence that is not serious. Brennan v. Orlan, 145 N.J. 282, 298 (1996). The fears of a domestic violence victim and the turmoil he/she has experienced should not be trivialized. State v. Hoffman, 149 N.J. 564 (1997). Accordingly, the New Jersey Legislature has expressly found and declared that domestic violence is a serious crime against society. N.J.S.A. 2C:25-18.

However, the Act is not a primer for social etiquette and should not be used as a sword to wield against every unpleasant encounter or annoying interaction that occurs between household members, or former household members. Besocnik v. Gallegos, 367 N.J. Super. 253 (App. Div. 2004). There are inherent dangers in overextending the criminal definitions of the predicate acts. Even when one's conduct is less than model, it is not automatically in every case, domestic violence. Peranio v. Peranio, 280 N.J. Super. 47 (App. Div. 1995).

The Domestic Violence Act was intended to address matters of consequence as relating to violence, not ordinary domestic contretemps. Corrente, 281 N.J. Super at 243. Applying the Act to ordinary domestic contretemps can trivialize the plight of true victims of domestic violence and potentially misuses the legislative vehicle designed to protect them. The Act should not be distorted or trivialized by misuse. N.B. V. T.B., 297 N.J. Super 35 (App. Div. 1997). The Supreme Court has emphasized the care a trial court must exercise to distinguish between ordinary

disputes and disagreements and those acts that cross the line into domestic violence. J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). A plaintiff's assertion he or she felt harassed is insufficient to satisfy the statutory element. Id. at 484. As the Court held, a "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487.

To secure a final restraining order ("FRO") under the Prevention of Domestic Violence Act, a party must establish that the other party committed a predicate act of domestic violence, as defined in N.J.S.A. 2C:25-19(a), and that a restraining order is required to protect her from further acts of domestic violence. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Here, the predicate acts alleged are:

- Harassment under N.J.S.A. 2C:33-4;

- Cyber Harassment under N.J.S.A. 2C:33-4.1;

- Contempt under  N.J.S.A. 2C:29-9(b);

- Sexual assault under N.J.S.A. N.J.S.2C:14-2;

- Criminal sexual contact under N.J.S.2C:14-3; and

- Criminal coercion N.J.S.2C:13-5.

By way of jurisdiction, the court finds that the parties have satisfied the jurisdictional requirements of the Act as the incidents (the receipt of the messages) occurred in Essex County and ▨, resides in Essex County. Additionally, the court finds that both ▨, and B.S. have satisfied the definition of, and qualifies as,

Page 19 of 57

a victim for domestic violence purposes, as they both alleged she has been subjected to domestic violence by a person with whom they had a dating relationship.

**A**

The court starts with B.S.'s allegations of harassment, criminal coercion, criminal sexual contact, and sexual assault. Importantly, the court does not find B.S.'s allegations of prior domestic violence, to wit the alleged incidents including threats to kill and to publicly humiliate B.S. to be credible.

Criminal coercion is defined as follows:

> A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to:
>
> **(1)** Inflict bodily injury on anyone or commit any other offense, regardless of the immediacy of the threat;
>
> **(2)** Accuse anyone of an offense;
>
> **(3)** Expose any secret which would tend to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;
>
> **(4)** Take or withhold action as an official, or cause an official to take or withhold action;
>
> **(5)** Bring about or continue a strike, boycott or other collective action, except that such a threat shall not be deemed coercive when the restriction compelled is demanded in the course of negotiation for the benefit of the group in whose interest the actor acts;

**(6)** Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

**(7)** Perform any other act which would not in itself substantially benefit the actor but which is calculated to substantially harm another person with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

N.J.S.A. 2C:13-5a.

At core, B.S. alleged that

THE PARTIES HAVE AN ACTIVE TRO WITHIN FV-07-000265-22 IN WHICH THIS PLAINTIFF ([B.S.]) IS THE LISTED DEFENDANT. WITHIN THIS TRO, PLAINTIFF ALLEGES THAT THE DEFENDANT FALSELY ACCUSED PLAINTIFF OF SENDING A TWITTER MESSAGE TO DEFENDANT. PLAINTIFF STATED THAT OBTAINED THE ABOVE INFORMATION DUE TO DEFENDANT MONITORS PLAINTIFF ON TWITTER. PLAINTIFF ALLEGES THAT THE PARTIES HAD A DATING RELATIONSHIP THAT ENDED SOMETIME AGO. DEFENDANT HAS BEEN SENDING UNWANTED MESSAGES TO PLAINTIFF IN AN ATTEMPT TO REKINDLE THE RELATIONSHIP. PLAINTIFF ALLEGES THAT THE DEFENDANT SHOWED UP PLACES THE PLAINTIFF WAS LOCATED WITHOUT INVITATION AND UNANNOUNCED.

ORDER AMENDED ON 8/6/2021 TO INCLUDE PREDICATE ACTS OF CRIMINAL COERCION, SEXUAL ASSAULT, AND CRIMINAL SEXUAL CONTACT. THE FOLLOWING IS ALSO INCLUDED:

ON A PRIOR DATE, PLAINTIFF VISITED THE DEFENDANT AT A HOTEL. UPON ARRIVAL,

> DEFENDANT GAVE PLAINTIFF A DRINK. AFTER PLAINTIFF CONSUMED THE DRINK, PLAINTIFF BECAME UNCONSCIOUS. PLAINTIFF ALLEGES THAT THE DEFENDANT THEN TOOK LUDE PHOTOGRAPHS OF PLAINTIFF. DEFENDANT THEN USED THE LUDE PHOTOGRAPHS OF PLAINTIFF TO COERCE PLAINTIFF INTO PERFORMING SEX ACTS WITH DEFENDANT. DEFENDANT FORCED PLAINTIFF TO PERFORM VAGINAL AND ORAL SEX ACTS. DEFENDANT SEXUALLY ASSAULTED PLAINTIFF.

Thus, the court evaluates her allegations under N.J.S.A. 2C:13-5a(3).

Based upon the court's credibility findings supra, the court cannot find by a preponderance of the evidence that ███ threatened to expose any secret which would tend to subject B.S. to hatred, contempt or ridicule, or to impair her credit or business repute. The court cannot find any credible evidence in the record supporting B.S.'s allegations tha ███ took photographs of her whilst she was unconscious and then coerced her into maintaining a sexual relationship with him thereafter. Therefore, the court dismisses her application for a final restraining order alleging criminal coercion.

Next, the court moves to B.S.'s allegation of criminal sexual contact. Under N.J.S.A. 2C:14-3, in pertinent part,

> **a.** An actor is guilty of aggravated criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in 2C:14-2 a.(2) through (7).

**b.** An actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2 c.(1) through (5).

Here, the court again need not pause long to resolve this issue. Similar to the court's findings as to criminal coercion, there is simply no credible evidence in this record to establish that ▨ committed any act of criminal sexual contact as against B.S. The court cannot find B.S.'s allegations to have any credibility considering the totality of the circumstances. Therefore, the court dismisses that part of her application for a final restraining order alleging criminal sexual contact.

As for sexual assault, under N.J.S.A. 2C:14-2c,

An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:

(1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury;

(2) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status;

(3) The victim is at least 16 but less than 18 years old and:

(a) The actor is related to the victim by blood or affinity to the third degree; or

(b) The actor has supervisory or disciplinary power of any nature or in any capacity over the victim; or

(c) The actor is a resource family parent, a guardian, or stands in loco parentis within the household;

(4) The victim is at least 13 but less than 16 years old and the actor is at least four years older than the victim;

(5) The victim is a pupil at least 18 but less than 22 years old and has not received a high school diploma and the actor is a teaching staff member or substitute teacher, school bus driver, other school employee, contracted service provider, or volunteer and the actor has supervisory or disciplinary power of any nature or in any capacity over the victim. As used in this paragraph, "teaching staff member" has the meaning set forth in N.J.S.18A:1-1.

Here, again, the court incorporates its prior findings and denies the application for a final restraining order on the basis of sexual assault as there is no credible evidence in support of B.S.'s allegations.

As for B.S.'s final allegation of harassment, "[h]arassment is the most frequently reported predicate offense among those statutorily recognized in N.J.S.A. 2C:25-19 as a basis for a finding of domestic violence." L.M.F. v. J.A.F.,

Jr., 421 N.J. Super. 523, 533-34 (App. Div. 2011) (citing J.D., 207 N.J. at 476). The

Supreme Court has emphasized the care a trial court must exercise to distinguish

between ordinary disputes and disagreements between family members and those

acts that cross the line into domestic violence. J.D., 207 N.J. at 475-76. A plaintiff's

assertion he or she felt harassed is insufficient to satisfy the statutory element. Id. As

the Court held, a "victim's subjective reaction alone will not suffice; there must be

evidence of the improper purpose." Id. at 487. Vulgar name-calling alone is not

domestic violence. E.M.B. v. R.F.B., 419 N.J. Super. 177, 182-83 (App. Div. 2011).

A fundamental element making a communication criminal harassment is the

purpose to harass. "'[P]urpose to harass' is critical to the constitutionality of the

harassment offense." State v. Castagna, 387 N.J. Super. 598 (App. Div.), certif.

denied, 188 N.J. 577 (2006); see also State v. L.C., 283 N.J. Super. 441, 450 (App.

Div. 1995) (holding the harassment statute was not enacted to "proscribe mere

speech, use of language, or other forms of expression"), certif. denied, 143 N.J. 325

(1996). Because direct proof of intent is often absent, "purpose may and often must

be inferred from what is said and done and the surrounding circumstances[,]" and

"[p]rior conduct and statements may be relevant to and support an inference of

purpose." Castagna, supra, 387 N.J. Super. at 606 (citations omitted); see also H.E.S.

v. J.C.S., 175 N.J. 309, 327 (2003) (the purpose to harass may be inferred from

"common sense and experience."). However, "mere awareness that someone might

be alarmed or annoyed is insufficient." J.D., supra, 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). That is, a plaintiff's subjective reaction to the conduct, standing alone, is insufficient to establish a defendant acted with improper purpose. Ibid.

The petty disorderly persons offense of harassment requires a person,

if, with purpose to harass another, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

N.J.S.A. 2C:33-4.

The Court pauses briefly to address subsection (a) as to the non-anonymous messages. As for these messages, sent at various hours as between the parties, that appears to have been the modality of the parties' communications with each other. Setting aside the numerosity of B.S.'s communications, which shall be addressed infra, the court finds no harassment insofar as ██'s communications as to B.S. under (a). Given the factual backdrop, the court cannot conclude that ██.'s

communications were made at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm.

Moving to subsection (b), the court, again incorporating the prior findings of fact and conclusions of law, cannot find that there is a preponderance of credible evidence that ▨, while intending to harass S.B., subjected her to striking, kicking, shoving, or other offensive touching, or threatened to do so. As such, there is no basis to find a predicate act of harassment under subsection (b).

As to subsection (c), there is no dispute that ▨, authored and sent the various messages to B.S. However, a review of the record reveals no evidence to support that these messages were sent with the intent to harass as required by N.J.S.A. 2C:33-4. Cesare, 154 N.J. at 412. Even if some of ▨'s communications could be considered "off color," isolating these comments in a vacuum to establish harassment, without reviewing the surrounding context, including B.S.'s preceding communications, would not provide the full picture and serves to distort the ground truth reality. See L.M.F., supra, 421 N.J. Super. at 534 ("Our ability to instantaneously and effortlessly send electronic messages has created a gateway unfettered by reflection and open to rash, emotionally driven decisions."). The same applies to the number of messages sent by the ▨.

In this matter, there is simply no evidence of an intent to harass by ▨. The Act "is not designed to interdict all forms of unpleasant exchanges between

parties." <u>Bresocnik</u>, 367 N.J. Super. at 181. A mere expression of anger or frustration between persons in a requisite relationship is not an act of harassment. The court must "[d]raw[] the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of 'ordinary domestic contretemps.'" <u>See</u> <u>J.D.</u>, <u>supra</u>, 207 N.J. at 475 (quoting <u>Corrente</u>, <u>supra</u>, 281 N.J. Super. at 249-50).

The context of ◼'s statements matters. Excising portions of his statements without weighing the entirety of the comments, as well as whether they are responsive to an ongoing dispute or conversation, leads to an unsupportable result. The Court concludes the evidence in the record is insufficient to show ◼ acted with a purpose to harass plaintiff. N.J.S.A. 2C:33-4(c). A finding of harassment cannot be sustained as the Court cannot find, by a preponderance of the credible evidence that a predicate act of domestic violence occurred.

As such, and given the foregoing, the court cannot find that any of the alleged predicate acts by ◼ are supported by a preponderance of credible evidence. Therefore, the court hereby dismisses her application for a final restraining order and the temporary restraining order previously issued is hereby vacated.

The opposite result is compelled in relation to ◼'s allegations as against B.S.

## B

First, the court shall address the internet postings made at the behest of B.S. For the reasons that follow, the court cannot make a finding of harassment as to B.S.'s public postings in relation to ▰▰.

Under N.J.S.A. 2C:33-4(c), a person who, with the purpose to seriously annoy another, does seriously annoy or alarm another is guilty of harassment. Speech, however, cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt. The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and, in the long run, leads to a more enlightened society best prepared for the Locke-ian social contract upon which our constitutional republic is predicated. Outside of the category of obscenity, courts should not play the role of censor by engaging in a weighing of an expression's value or relative social costs and benefits. Speech cannot be criminalized merely because others see no value in it.

Nonetheless, neither the First Amendment of the United States Constitution nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. The First Amendment also

does not bar states from enacting laws that punish expressive activity when substantial privacy interests are being invaded in an essentially intolerable manner.

This constitutional dichotomy as between harassment and protected speech was addressed by the New Jersey Supreme Court in State v. Burkert, 231 N.J. 257 (2017). The Court juxtaposed a citizen's right to free speech with the Legislature's right to proscribe unprotected speech by limiting the harassment statute. First, the Court recognized that

> [l]aws may "not transgress the boundaries fixed by the Constitution for freedom of expression." Winters v. New York, 333 U.S. 507, 515 (1948). Accordingly, "the scrutiny to be accorded legislation that trenches upon first amendment liberties must be especially scrupulous." State v. Cameron, 100 N.J. 586, 592 (1985). The constitutional guarantee of free speech, moreover, imposes higher "standards of certainty" on criminal laws than civil laws. Winters, 333 U.S. at 515. "Penal laws . . . are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments." Cameron, 100 N.J. at 592.

Burkert, 231 N.J. at 275-76. The Court then taught that

> neither the First Amendment nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. See United States v. Alvarez, 567 U.S. 709, 717 (2012); cf. Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264 (1998).

Id. at 281-82.

As detailed supra, N.J.S.A. 2C:33-4 provides: "[A] person commits a petty disorderly person offense if, with purpose to harass another, he: . . . (c) [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." The Court held that, "[i]n cases based on pure expressive activity, the amorphous terms 'alarming conduct' and 'acts with purpose to alarm or seriously annoy' must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions." Burkert, 231 N.J. at 284-85. The Court clarified that "[n]arrowly reading the terms alarm and annoy—as we have done in past cases involving subsection (a) of N.J.S.A. 2C:33-4—will save the statute from constitutional infirmity." Id. (citing Cesare, 154 N.J. at 404).

Therefore, for constitutional reasons, the meaning of the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person must reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy. To be clear, this standard applies only in those cases where the alleged harassing conduct is based on pure expressive activity. Under that standard, repeated threats or menacing communications that reasonably place a person in fear for his safety or security are not protected expressive activities.

Likewise, a person who repeatedly makes unwanted communications to a subject, thereby intolerably interfering with his reasonable expectation of privacy, will not find shelter behind the First Amendment. Thus, a person who every day, over the course of a week, either repeatedly yells outside an ex-partner's house during the night or repeatedly follows closely next to a woman importuning her for a date or making other unwanted comments, despite constant demands to stop, would violate subsection (c). However, subsection (c) was never intended to protect against the common stresses, shocks, and insults of life that come from exposure to crude remarks and offensive expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners. The mere venting of frustration or irritation at a situation is insufficient by itself to constitute harassment under the statute. State v. Duncan, 376 N.J. Super. 253, 264 (App. Div. 2005).

In S.B.B. v. L.B.B., 476 N.J. Super. 575, 584 (App. Div. 2023), certif. denied, 256 N.J. 434 (2024), the Appellate Division recently held as follows:

> [d]efendant L.B.B. appeal[ed] from the entry of a final
> restraining order (FRO) entered against her in favor of her
> estranged husband, plaintiff S.B.B., pursuant to
> the Prevention of Domestic Violence Act (PDVA),
> N.J.S.A. 2C:25-17 to - 35.3 The FRO was based on the
> predicate act of harassment. The communication
> underlying the trial judge's finding of harassment was
> defendant's creation and dissemination of a video accusing
> her estranged husband of improperly withholding a get, a

Jewish bill of divorce, and asking community members to "press" her husband to deliver the get. Because defendant's communication constituted constitutionally protected free speech, we reverse.

Id. at 584. Thus, even if a communication is objectively harassing, that communication, if made in the public milieu, may find constitutional protection as expressive conduct.

Here, the statements made at B.S.'s behest were publicly posted on the internet. These statements include:

- "██████] and The Issues of Date Rape" with the twitter handle named "@h*****daterape";

- "[██.], a 64 year old financial advisor in [omitted], NJ is accused by police of incapacitating 100+ victims of rape by plying them with date rape drugs" and this was known by the police;

- ██. was also accused in those postings of being a pedophile;

- Similar posting was made on an Instagram account utilizing the username "h********_daterape" and the name "[██.] and Date Rape" and added the website "realh********.com" into its profile; and

- [██.], a 64-year-old financial advisor who lives in [omitted], New Jersey has been accused by police of incapacitating hundreds of victims by plying them with date rape drugs before raping and filming them. Through a score of accusations [██] has stayed one step ahead of a rape conviction by blackmailing his victims that he will release their naked photos. He was

also accused of child molestation including that of his
daughter when he singled her out for custody."

As detailed <u>supra</u>, the court finds that these postings were done at the behest of
B.S. and involved Kiderman and Kogan, who actually posted this material on the
internet.

Ultimately, the court finds that these messages and postings are
constitutionally protected <u>despite</u> their harassing nature under N.J.S.A. 2C:33-4(c).
Even when the court evaluates all of the messages in conjunction through the lens
of the unequivocal finding of <u>S.B.B.</u> and that case's similarity to this matter, the
court cannot find that there was a violation of subsection (c) uncovered by the
umbrella of the right to free speech. For all intents and purposes, B.S. was making
factual allegations against ███. There is nothing in these statements that the court
can find that establishes that these messages objectively physically threatened or
terrorized ███, or that B.S.'s speech that was intended to incite imminent unlawful
conduct as against ███. as required by <u>Burkert</u> and <u>S.B.B.</u> under the harassment
statute at N.J.S.A. 2C:33-4(c)

To be certain, the ███, may have other civil remedies in tort for slander, libel,
or defamation and the Court offers no opinion on the resolution of those potential
causes of action. It is the court's understanding that there are already matters pending
in Nassau County, New York, and the District of New Jersey as between these

Page 34 of 57

parties on this very issue. This court must adhere to the delicate balance between the First Amendment and Article I, Paragraph 6 of our State Constitution and conduct which constitutes harassment under N.J.S.A. 2C:33-4(c) as domestic violence. Because the posts by the B.S. were publicly made, the Court is constrained to find that this was purely expressive conduct under <u>Burkert</u> and <u>S.B.B.</u> Under the exacting standard enunciated in those cases, the court cannot find by a preponderance of the credible evidence that the B.S. committed harassment under N.J.S.A. 2C:33-4.

Additionally, the court must decline ▨.'s invitation to find, under the facts and circumstances of this matter, that B.S.'s public internet postings constituted an unreasonable invasion of privacy. To be clear, ▨ firmly and forcefully denied the substance of the allegations made by B.S. Moreover, there was no public broadcasting of any <u>accurate</u> personal information that would normally be kept private given ▨.'s vehement denials. There is no legal basis for this court to extend the metes and bounds of the standard definitions to which this court must hew. Here, to avoid double counting as to these communications, the court must separate the public communications making allegations about ▨ from the private communications as between B.S. and ▨ Under <u>Burkert</u> and <u>S.B.B.</u>, the court

cannot make the legal finding that those public communications run afoul of the First Amendment.[2]

Continuing, given that none of these public messages were sent to ⊠, and there is no evidence in this record that they were directed to ⊠., the court cannot find that they are harassing under N.J.S.A. 2C:33-4. As such, for the <u>public</u> postings, the court cannot find by a preponderance of the evidence that B.S. engaged in harassing conduct.

Next, the court moves to the allegation of contempt. Contempt, pursuant to N.J.S.A. 2C:29-9b(1), provides that

> Except as provided in paragraph (2) of this subsection, a person is guilty of a crime of the fourth degree if that person purposely or knowingly violates any provision in an order entered under the provisions of the "Prevention of Domestic Violence Act of 1991," P.L.1991, c.261 (C.2C:25-17 et al.)

Here, while there was a "tweet" to ⊠. from B.S., after the entry of the temporary restraining order, the court cannot find, by a preponderance of the credible evidence, that B.S. intended to "tweet" ⊠ As such, in the absence of any purposeful conduct by B.S., the court cannot find that B.S. engaged in contumacious conduct in violation of N.J.S.A. 2C:29-9b(1). Therefore, this aspect of the application for a final restraining order is hereby dismissed.

---

[2] The private communications shall be addressed <u>infra</u>.

The court now moves to the other allegations of harassment made by ██████.

The text messages between B.S. and ████ as detailed in Exhibit P20, contain 198 printed pages of messages. The WhatsApp messages in Exhibit P21, contain 140 printed pages of messages. The Verizon telephone records are equally voluminous. The messages sent via Spoofcard contain similar content but are less voluminous. For purposes of brevity, rather than restate them all herein, the court incorporates all of these messages by reference, and highlights the following categories of conduct and messages contained therein:

- Numerous messages alleging that ████ raped his daughter;

- Messages sent to ████s work email alleging that he raped his daughter;

- B.S threatened get revenge as to ████;

- B.S. threatened to publicly humiliate ██████;

- B.S. made false allegations that she was pregnant with ████'s child;

- October 5, 2018, B.S., using WhatsApp, made 78 consecutive calls followed by an additional 51 more calls, totaling 129 calls;

- On October 10, 2018, B.S. called ████, 46 times, admitting at trial she did so to induce [████ to give her a get;

As detailed *supra*, the court finds that this conduct and these messages were authored by B.S.

In looking at this compendium of messages and conduct, the court is convinced by more than a preponderance of the evidence that B.S. engaged in a long, continued campaign of harassment as against ▅▅. Here, we have hundreds of calls and other messages to ▅▅, multiple times after ▅▅ had requested B.S. to cease her unrelenting conduct. This is not <u>L.M.F. v J.A.F.</u>, 421 N.J. Super. 523 (App Div. 2011). In that case, the Appellate Division reversed a finding of harassment when the trial court failed to find that the defendant's former spouse had a purpose to harass. <u>Id.</u> at 534-36. He repeatedly sent text messages to his former wife in order to obtain information about their daughter's welfare and academic performance. <u>Ibid.</u> In this case, given the content of the messages and the numerosity of those communications, B.S.'s purpose was to harass under subsections (a) and (c).

For example, there is no legitimate reason for B.S to send an alarming email to ▅▅.'s work email knowing that he would have to report the receipt of that email to human resources. B.S. knew ▅▅.'s personal email address but chose to send that message to his work address. The court can only conclude, based upon the lack B.S.'s credibility, that her intent was harass by causing alarm or seriously annoyance to ▅▅ by virtue of sending this email to his work email address.

Relatedly, the court finds that other content of the messages, including the anonymous Spoofcard messages, as sent to ▅▅ was intended to cause him alarm and/or serious annoyance. Under subsection (a), which generally focuses on the

mode of speech employed, and not a statement's content, <u>State v. Hoffman</u>, 149 N.J.

564, 583-84 (1997), the court is satisfied that B.S. engaged in harassing behavior by

virtue of the anonymized messages sent via Spoofcard. The court finds no credibility

to B.S.'s allegations that ▨, did, in fact, sexually assault his daughter. There has

been no credible evidence offered into this record to substantiate any reasonable

basis for B.S.'s allegation that ▨ did assault his daughter. The intent to harass is

readily gleaned from the totality of the circumstances and the content of those

message is such to cause annoyance or alarm. As such, the court finds by a

preponderance of the credible evidence that B.S. engaged in the predicate act of

harassment under subsection (a) as well as section (c).

Continuing, it is even more clear that B.S.'s threat get revenge as to ▨ was

also intended to harass him. Similarly, B.S.'s threats to publicly humiliate ▨ were

also intended to be a mechanism of harassment. The same is true as to the either

false allegation or "gaslighting" manner in which she communicated about her

alleged pregnancy. Given these findings, there can be no non-harassing purpose in

the multiple communications to ▨, perpetuating this allegation. Therefore, this is

yet another example of harassing conduct by B.S.

The court has carefully engaged in the task of "[d]rawing the line between acts

that constitute harassment for purposes of issuing a domestic violence restraining

order and those that fall instead into the category of 'ordinary domestic

contretemps.'" J.D., supra, 207 N.J. at 475 (quoting Corrente, 281 N.J. Super. at 249-50). While some of the other communications, outside of those categories identified supra, may reasonably be found to be part of the communication styles as between the parties, the categories identified supra cannot be reasonably found by this court to be domestic contretemps.

As such, the court finds by more than a preponderance of the evidence that B.S. engaged in the predicate act of harassment as against ▨ in relation to her campaign of harassing communications as detailed supra.

Next the court moves to the final alleged predicate act of cyber-harassment. N.J.S.A. 2C:33-4.1(a) establishes the elements of cyber-harassment:

> A person commits the crime of cyber-harassment if, while making a communication in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, the person:
>
> 1. threatens to inflict injury or physical harm to any person or the property of any person;
>
> 2. knowingly sends, posts, comments, requests, suggests, or proposes any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person; or
>
> 3. to commit any crime against the person or the person's property.

"The cyber-harassment statute limits the [regulation] of speech mostly to those communications that threaten to cause physical or emotional harm or damage." Burkert, 231 N.J. at 274.

In order to determine whether a communication constitutes harassment, a court does "not measure the effect of the speech upon the victim; [it] look[s] to the purpose of the actor in making the communication," even if the communication was "understandably upsetting to [the recipient]." E.M.B. v. R.F.B., 419 N.J. Super. 177, 182 (App. Div. 2011). A finding of purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). A fact finder's common sense and experience may also color the analysis. Hoffman, 149 N.J. at 577.

Here, it is clear that, notwithstanding the harassing nature of her electronic communications, there are no communications where she "threaten[ed] to inflict injury or physical harm to any person or the property of any person." Therefore, the court cannot find a violation of N.J.S.A. 2C:33-4.1(a)(1). Likewise, as there was no threat "to commit any crime against the person or the person's property," subsection (3) similarly cannot be the basis for a predicate act. That leaves subsection (2).

Page 41 of 57

Under subsection (2), it is prohibited to "knowingly send[], post[], comment[], request[], suggest[], or propose[] any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person." Breaking this into the requisite parts, there are three essential elements: the content, the publication, and intent. Assuming <u>arguendo</u>, that the posts, tweets, texts, and emails, fall under the umbrella of lewd, indecent, or obscene material, the next question is as to intent. As there is no evidence in this record that B.S. acted with the intent to place a reasonable person in fear of physical harm to his person, the court assumes <u>arguendo</u> that the intent was to cause emotional harm. The record establishes that the public postings made at B.S.'s behest were purposefully geared towards threatening and inflicting fear and pain on ██'s personal and professional reputation. Accordingly, the record from the trial establishes, by a preponderance of the credible evidence, cyber harassment as an additional predicate act under N.J.S.A. 2C:33-4.1(a)(1).

That does not end the inquiry. This court must still harmonize the constitutional rights of expression with the need to protect individuals from speech-related injury. Critically, "[l]aws may 'not transgress the boundaries fixed by the Constitution for freedom of expression.' " <u>Burkert</u>, 231 N.J. at 275 (quoting <u>Winters v. New York</u>, 333 U.S. 507, 515 (1948)). Thus, as with any speech-regulating

Page 42 of 57

statute, the reach of N.J.S.A. 2C:33-4.1 is cabined by the federal and state constitutions. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." Similarly, Article I, Paragraph 6, of the New Jersey Constitution proclaims in part that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press."

> So greatly do we in New Jersey cherish our rights of free speech that our Constitution provides even broader protections than the familiar ones found in its federal counterpart. In preserving and advancing those broad constitutional commands, we have been vigilant, jealously guarding the rights of the people to exercise their right to "freely speak," although their message may be one that is offensive to some, or even to many, of us.

Borough of Sayreville v. 35 Club L.L.C., 208 N.J. 491, 494 (2012) (citation omitted) (quoting N.J. Const. art. I, par. 6).

As such, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." Burkert, 231 N.J. at 281 (quoting Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001)). "Speech . . . cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt." Ibid. "The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and in the

long run leads to a more enlightened society." Ibid. To that end, the right to free

speech also includes the right to exhort others to take action upon that speech. "It

extends to more than abstract discussion, unrelated to action." Thomas v. Collins,

323 U.S. 516, 537 (1945) ("'Free trade in ideas' means free trade in the opportunity

to persuade to action, not merely to describe facts."). In fact, "[t]he First Amendment

protects the right to coerce action by 'threats of vilification or social ostracism.' "

State v. Carroll, 456 N.J. Super. 520, 537 (App. Div. 2018) (quoting NAACP v.

Claiborne Hardware Co., 458 U.S. 886, 926 (1982)).

In Claiborne Hardware Co., black activists in Claiborne County, Mississippi,

organized a boycott of white-owned businesses when local civic and business

leaders refused to assent to demands for equality and racial justice. 458 U.S. at 899-

900. "The boycott was supported by speeches and nonviolent picketing." Id. at 907.

Additionally, "store watchers" stood outside the targeted businesses and took down

the names of those who violated the boycott. Id. at 903-04. Those names were then

"read at meetings of the Claiborne County NAACP and published in a

mimeographed paper entitled the 'Black Times.' . . . [T]hose persons were branded

as traitors to the [B]lack cause, called demeaning names, and socially ostracized."

Ibid. In very public speeches, an organizer stated that violators would be

"disciplined," and warned: "If we catch any of you going in any of them racist stores,

we're gonna break your damn neck." Id. at 902. The boycott went on for years, during

which several decentralized acts of violence occurred, including shots fired into the homes of boycott violators, beatings, property damage, and threatening phone calls. Id. at 904-06.

The Supreme Court ruled that the speech, both identifying and castigating boycott violators and promising retribution, was protected by the First Amendment. Id. at 915, 929. The Court explained that even speech designed to prompt others to act through "social pressure and the 'threat' of social ostracism . . . does not lose its protected character . . . simply because it may embarrass others or coerce them into action." Id. at 910. Even the organizer's speech, which invoked the spectre of violence and "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence," was protected because "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." Id. at 927-29. The Court noted that no actual violence occurred directly following the statements, and there was "no evidence—apart from the speeches themselves—that [the organizer] authorized, ratified, or directly threatened acts of violence." Id. at 929. The Court cautioned that if such acts of violence did occur, there might be a question of whether the organizer was derivatively liable, but until then, the speech retained its protected status. Id. at 928-29.

Similarly, in Organization for a Better Austin v. Keefe, 402 U.S. 415, 415-16 (1971), the Court addressed "a racially-integrated community organization['s]" actions "to 'stabilize' the racial ratio in the . . . area" by influencing a real estate broker who allegedly engaged in "blockbusting" or "panic peddling" tactics to scare white owners out of Chicago's Austin neighborhood. Id. at 415-16. The broker acted as the fleeing sellers' agent to profit from the transactions. Ibid. In an effort to curtail the practice, the organization began a campaign against the broker. Id. at 417. The organization traveled to the broker's hometown, some seven miles from Austin, and began distributing leaflets that were critical of the broker's practices. Id. at 415-17. Some leaflets "requested recipients to call [the broker] at his home phone number and urge him" to sign an agreement to stop his real estate practices. Id. at 417. One leaflet promised to stop the campaign once he signed the agreement. Ibid. The organization distributed the leaflets at a shopping center, passed them to parishioners on their way home from the broker's church, and left them at the homes of the broker's neighbors. Ibid.

Finding that the organization's activities were an "invasion of privacy," the state courts enjoined the organization from distributing the leaflets or picketing in the broker's hometown. Ibid. The appellate court reasoned that the activities were "coercive and intimidating, rather than informative and therefore . . . not entitled to First Amendment protection." Id. at 418. The Supreme Court reversed, concluding

that the organization's activities were protected by the First Amendment. Id. at 419-20. The Court emphasized that the fact that the organization's intent was "to exercise a coercive impact on [the broker] does not remove" the First Amendment's protections. Id. at 419. Additionally, since the injunction was "not attempting to stop the flow of information into [the broker's] household, but to the public," the invocation of the broker's right to privacy was unavailing. Id. at 419-20.

In general, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." Ashcroft v. Free Speech Coal., 535 U.S. 234, 253 (2002). "The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' " Ibid. (quoting Hess v. Indiana, 414 U.S. 105, 108 (1973)). Thus, "[w]here a call to others to act neither conveys a plan to act nor is likely to produce imminent danger, it may not be criminalized, despite its unsettling message." Carroll, 456 N.J. Super. at 543. Although there is a narrow exception for speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action," Brandenburg v. Ohio, 395 U.S. 444, 447 (1969), the Appellate Division has acknowledged that "[e]ven urging others to violence is shielded unless the statement is designed and likely to produce immediate action." Carroll, 456 N.J. Super. at 545.

In Brandenburg, the Supreme Court reversed the conviction of a Ku Klux Klan leader for statements made at a rally. 395 U.S. at 444-45. At the rally, a group

of hooded Klansmen, several carrying firearms, gathered around a burning cross. Id.
at 445-47. Following a series of anti-Black and antisemitic remarks and slurs from
the group, a single individual began to speak. Id. at 446. Among other things, he
said: "[I]f our President, our Congress, our Supreme Court, continues to suppress the
white, Caucasian race, it's possible that there might have to be some revengeance
[sic] taken." Ibid. He promised to march on Congress and elsewhere on July Fourth.
Ibid.

The speaker was convicted of violating a statute which proscribed
"advocat[ing] . . . the duty, necessity, or propriety of crime, sabotage, violence, or
unlawful methods of terrorism as a means of accomplishing industrial or political
reform." Id. at 445 (alteration in original). The Supreme Court summarily
invalidated the statute, explaining that the "constitutional guarantees of free speech
and free press do not permit a State to forbid or proscribe advocacy of the use of
force or of law violation except where such advocacy is directed to inciting or
producing imminent lawless action and is likely to incite or produce such action."
Id. at 447. "[C]onviction for mere advocacy, unrelated to its tendency to produce
forcible action," is unconstitutional because it "intrudes upon the freedoms
guaranteed by the First and Fourteenth Amendments." Id. at 447 n.2.

In United States v. Carmichael, 326 F. Supp. 2d 1267, 1285 (M.D. Ala. 2004),
the court explained that even a "general history" of violence was insufficient to

vitiate First Amendment protections. In that case, a criminal defendant facing drug distribution charges published a website with the putative goal of spreading awareness of his case and seeking information about individuals involved. Id. at 1271-72. The website displayed names and photographs of individuals labeled as "Agents" and "Informants" beneath a caption reading, "Wanted," in large, red letters. Id. at 1272. The government sought a protective order requiring the defendant to remove the website from the internet on the ground that the website constituted harassment of the government's witnesses or served to intimidate or threaten the witnesses. Id. at 1274. At an evidentiary hearing, a witness called by the government testified that the terms "wanted" and "informant" were "threatening" because the term "informant" had a "bad connotation among criminals and is equivalent to 'snitch.' " Id. at 1275. The witness also suggested that "the website [was] meant to encourage others to inflict harm" on informants and agents. Id. at 1286.

Specifically citing four cases decided by federal circuit courts in the prior two years for context, the court acknowledged "numerous cases involving the murder of informants in drug-conspiracy cases." Id. at 1284. Nevertheless, the court explained that the proper focus of the inquiry was defendant's website itself, "not whether the site calls to mind other cases in which harm has come." Id. at 1285. Thus, while the court acknowledged that the "broad social context ma[de] the case closer," the "background facts" relied upon by the government were too "general" to rob the

website of its First Amendment protections, particularly since the court could not find that the website served "no legitimate purpose" or "cross[ed] the line separating insults from 'true threats.' " Id. at 1278, 1282.

As to the latter, the court acknowledged that " 'true threats' are not protected by the First Amendment." Id. at 1280 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)); see also Watts v. United States, 394 U.S. 705, 707 (1969) (originating the true threats doctrine). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. "The 'prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.' " Carmichael, 326 F. Supp. 2d at 1280 (quoting Black, 538 U.S. at 360). However, "evidence of an atmosphere of general intimidation is not enough to find . . . a 'true threat.' " Id. at 1285.

Applying these principles, the court is convinced that the public internet postings and tweets, whether viewed on their own or in the context in which they were disseminated, does not fall outside the First Amendment's protection. There was not a proverbial "call to arms" in relation to ██████There was not active intent to incite. The only geographical information provided was for "[omitted], New Jersey." One could view this akin to a "public service announcement" warning others of the

alleged predilections of ███. Again, the court must underscore that ███ has remedies for these false allegations outside the realm of domestic violence. These were not true threats or an imminent danger to satisfy the incitement requirement.

Critically, the First Amendment "does not prohibit name[-]calling" and "protects 'vehement, caustic, and sometimes unpleasantly sharp attacks' as well as language that is 'vituperative, abusive, and inexact.' " Carmichael, 326 F. Supp. 2d at 1282 (quoting Watts, 394 U.S. at 708). Similarly, "threats of vilification or social ostracism" do not lose their protected status. Claiborne Hardware Co., 458 U.S. at 910. If the literal threat "to break . . . necks" in Claiborne, against a backdrop of actual acts of retaliation and violence committed by boycott supporters against boycott violators, was not outside the First Amendment's protection, it is hard to see how B.S.'s public postings could be unprotected. Id. at 902.

The court quickly adds that even the acts of identifying an individual, encouraging others to call them and urge them to change their behavior, and picketing in their hometown are protected activities under Keefe, 402 U.S. at 417.

While the public postings have constitutional refuge, the private messages do not. Therefore, as the private messages clearly constitute cyber harassment, the court is convinced by more than a preponderance of the evidence that B.S. committed the predicate act of cyber harassment.

In sum, the court finds that ▨ has carried his burden of proof, production, and persuasion as to the private communications identified <u>supra</u> and the court is satisfied that B.S. committed the predicate acts of harassment and cyber harassment.

C

Next, the court must determine whether there is a need for a final restraining order considering all of the credible evidence in this record.  See <u>Silver</u>, 387 N.J. Super. at 125-27.  If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." <u>Silver</u>, 387 N.J. Super. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to - 29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." <u>Id.</u> at 127.

The court shall now address the statutory factors under <u>N.J.S.A.</u> 2C:25-29(a) <u>seriatim</u>.

As for any previous history of domestic violence between ▨ and B.S., including threats, harassment and physical abuse, there is no evidence of such in this record.  The parties dated for a very brief period of time.  This factor weighs against the entry of a final restraining order.

Page 52 of 57

Next, the court looks to the existence of immediate danger to person or property. Here, B.S. engaged the services of confederates to post the information on the internet. While not a predicate act, this conduct speaks directly to the fact that B.S. continues to harbor ill feelings toward ██████, feelings that certainly will be exacerbated upon the finding that she committed a predicate act. Moreover, B.S. was willing to not only take her revenge as to ██████ publicly, but she employed proxies to accomplish her goal, despite the fact that the relationship had already ended. Additionally, B.S. maintained her attacks on ██████ for months. She refused to honor ██████'s request that she cease her conduct as is clear from even a cursory review of the written communications. Simply put, she was undeterred until the entry of the temporary restraining order. Based on the totality of this record, and the incessant campaign of harassment engaged in by B.S., this court is convinced that B.S. represents a continuing and ongoing danger to ██████'s person and property. This factor weighs in favor of granting of a final restraining order.

The court only briefly pauses to address the financial circumstances of ██████ and B.S. While there is evidence in this case as to a large disparity as between ██████'s resources and B.S.'s resources, there is not in this case the type of intertwined and interconnected finances that would cause the court to find that ██████ needs a final restraining order to equalize any imbalance. There is simply insufficient evidence in this record for this factor to support the entry of a final restraining order.

With regard to the best interests of the victim and any child, the court notes that there are no children born of the social relationship as between ██ and B.S. The court also notes the short nature of the parties' relationship, however, that short duration is eclipsed by the saga that followed based upon B.S.'s conduct.  It is clear to this court that, for whatever reason, B.S. is vindictive as exemplified by her reaction to ██ 's termination of the relationship. Moreover, as a published author and advice columnist, B.S. remains armed with the power of her pen to exact future revenge upon ██, as was seen through her barrage of communications. Therefore, this factor favors the entry of a final restraining order.

The court need not address any evidence as to determining custody and parenting time and the protection of the victim's safety, given the factual underpinnings of this case.  Therefore, the court cannot find that this factor favors the entry of a final restraining order.

Finally, there is no evidence as to the existence of a verifiable order of protection from any another jurisdiction.  This likewise does not favor the entry of a final restraining order.

Given the totality of these findings under the second prong of Silver, the court finds that ██ has met his burden of proof as to a continuing need for a restraining order.

V

As the court has found that both prongs of <u>Silver</u> have been proven by a

preponderance of the evidence as to ████'s application for a final restraining order,

until further order of the court, a final restraining order is hereby GRANTED and

B.S. is hereby enjoined and restrained as follows:

- B.S. is prohibited from returning to the scene of violence;

- B.S. is prohibited from future acts of domestic violence;

- B.S. is barred from the residence(s) and place(s)
  employment o ████;

- B.S. is prohibited from having any oral, written, personal,
  electronic, or other form of contact or communication with
  ████████████████████████████;

- B.S. is prohibited from making or causing anyone else to
  make harassing communications to ████████████████
  ████████████████;

- B.S. is prohibited from stalking, following or threatening
  to harm, stalk or follow ████████████████
  ████████████;

- B.S. is prohibited from possessing any and all firearms or
  other weapons and must immediately surrender these
  firearms, weapons, permit(s) to carry, application(s) to

purchase firearms and firearms purchaser ID card to the officer serving this Court Order. Failure to do so may result in your arrest and incarceration.

Pursuant to N.J.S.A. 2C:25-29.1, the court enters a civil penalty against B.S. of $250.00, to be paid within 30 days.

B.S. is restrained and must stay at least 1,000 feet away from ██ o contact means no calling, personal visit, text, email, social media by you or someone on her behalf. B.S. must be fingerprinted within 14 days. The court also orders, pursuant to N.J.S.A. 2C:25-27, that B.S. must enroll and complete a court approved anger management course.

If B.S. violates any of its terms of this final restraining order, she could then be charged with contempt which may result in her arrest, prosecution and possible sentence of a monetary fine, jail, or both.

B.S. has 45 days to file an appeal of this decision.

Pursuant to the Act, ██ may file an application for fees within 45 days after the entry of this opinion.

The parties themselves cannot change the terms of this order on their own. This order may only be changed or dismissed by the court. B.S. cannot have any contact with the ██ without permission of the court. If she wishes to change any of the terms of this order, she must appear before the court for a rehearing.

If there is any criminal action pending related to this matter either in Superior or Municipal court, or any of the other pending civil matters, this ruling today has no effect on those proceeding. Thus, the parties may still be required to appear for those proceedings.

## VI

For the foregoing reasons, authority cited, having reviewed the filings, considered the evidence in this record, and based upon the court's findings and the predicate acts alleged, ████ has proven by a preponderance of credible evidence that B.S. committed the predicate acts of harassment and cyber harassment. Thus, ████ has satisfied the first prong of <u>Silver</u>. The court also finds tha ████ has satisfied the second prong. 387 N.J. Super. at 125-27. Therefore, the court finds that a final restraining order is necessary to protect ████ from an immediate danger and to prevent further abuse. ████'s application for a final restraining order is hereby GRANTED.

The court cannot find that B.S. has carried her burden as to either any of the alleged predicate acts or her need for a final restraining order. Her complaint is dismissed, and the temporary restraining order is dissolved. Her application for fees is likewise DENIED, with the exception of the prior order awarding her fees in relation to the pre-trial motion regarding the subpoena of her private banking information.