UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| John Doe,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Baila Sebrow,<br><br>　　　　Defendant. | Case No. 2:21-cv-20706 |

BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
A JUDGMENT ON THE PLEADINGS

Daniel Szalkiewicz, Esq.
Cali P. Madia, Esq.
Veridian Legal P.C.
23 West 73rd Street, Suite 102
New York, NY 10023
(212) 706-1007
daniel@veridianlegal.com
*Attorneys for Plaintiff*

1

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT & FACTUAL BACKGROUND ..........................4

ARGUMENT

POINT I LEGAL STANDARD ...................................................................................5

POINT II

PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS WITHIN THE APPLICABLE TWO-YEAR STATUTE OF LIMITATIONS .................................................................................................6

POINT III

PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH HIS EMPLOYMENT RELATIONSHIP .13

POINT IV

PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS BECAUSE THE TORT ARISES FROM DEFENDANT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND IS NOT TIME BARRED ..................................15

POINT V

PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT ......................................................................16

# **TABLE OF AUTHORITIES**

**Cases**

Chipola v. Flannery, 261 N.J. 460 (2025)................................................................6

Green v. Olson, No. 21-14144 (RMB-EAP), 2025 U.S. Dist. LEXIS 117444, at *7
    (D.N.J. June 20, 2025) ........................................................................................5

Guidotti v. Legal Helpers Debt Resolution, 716 F.3d 764, 772 (3d Cir. 2013)........5

Rosenblit v. Zimmerman, 166 N.J. 391, 406 (2001)...............................................17

Taffaro v. Taffaro, No. A-3912-12T2, 2015 N.J. Super. Unpub. LEXIS 1321, at *5
    (App. Div. June 5, 2015).....................................................................................6

Tornillo v Paitakis, 2025 US Dist LEXIS 160500, at *5-6 [DNJ Aug. 19, 2025,
    Civil Action No. 23-22629 (ZNQ) (RLS)])..........................................................5

**Statutes**

F.R.C.P. 12(c)............................................................................................................5

## **PRELIMINARY STATEMENT & FACTUAL BACKGROUND**

Defendant Baila Sebrow ("Sebrow" or "Defendant") attempts to minimize her reign of terror by calling this action an effort to "stretch a personal dispute into a sprawling litigation[,]" conveniently overlooking the hundreds of harassing text messages she sent and calls she initiated to Plaintiff John Doe ("Plaintiff") and others; website and social media accounts she caused to be created accusing him of date raping women on a massive scale; and e-mails directed to his workplace stating, among other things, that he raped his own daughter.  Defendant is correct, breakups should remain personal disputes, but she turned this private matter into litigation when she decided to relentlessly harass Plaintiff and make her lies public. Defendant's tortious conduct is the reason this matter is being litigated.

For four years Defendant has actively avoided this litigation and failed to meaningfully participate.  Defendant now brings an action stating that Plaintiff's pleadings must be dismissed.  However, as stated below, based on Sebrow's tortious conduct, Plaintiff has adequately brought claims for intentional infliction of emotional distress, tortious interference, and fraudulent concealment.

# ARGUMENT

## POINT I
## LEGAL STANDARD

F.R.C.P. 12(c) provides that, "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." "[T]to succeed on a motion for judgment on the pleadings, a movant must show 'there are no material issues of facts, and he is entitled to judgment as a matter of law'" and "a court must accept the nonmoving party's factual allegations as true and draw all reasonable inferences in its favor".  Green v. Olson, No. 21-14144 (RMB-EAP), 2025 U.S. Dist. LEXIS 117444, at *7 (D.N.J. June 20, 2025).

On a motion pursuant to F.R.C.P. 12(c)m the court may consider the pleadings, the documents attached thereto as exhibits and matters of public record. Guidotti v. Legal Helpers Debt Resolution, 716 F.3d 764, 772 (3d Cir. 2013). "The Court may look outside the pleadings, however, and also consider 'document[s] integral to or explicitly relied upon in the [pleadings]' or any 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'"  Tornillo v Paitakis, 2025 US Dist LEXIS 160500, at *5-6 [DNJ Aug. 19, 2025, Civil Action No. 23-22629 (ZNQ) (RLS)]).  In the instant action, there can be no dispute that the pleadings, coupled with the Domestic Violence findings against Sebrow demonstrate why the action must not be dismissed.

# POINT II

## PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
## IS WITHIN THE APPLICABLE TWO-YEAR STATUTE OF LIMITATIONS

### a. Plaintiff's Cause of Action for Intentional Infliction of Emotional Distress is Distinct from his Cause of Action for Defamation and/or Tortious Interference with Prospective Business Relations

The statute of limitations for intentional infliction of emotional distress is two years. Taffaro v. Taffaro, No. A-3912-12T2, 2015 N.J. Super. Unpub. LEXIS 1321, at *5 (App. Div. June 5, 2015). Conversely, the statute of limitations for defamation is just one year. It is Defendant's contention that, because Defendant also defamed Plaintiff, her campaign of infliction of emotional distress – which went far beyond simple defamation – should be confined to a one year statute of limitations. Defendant's support for this is Salve Chipola, III v. Sean Flannery, a New Jersey Supreme Court decision pertaining to a complaint with both defamation and false light claims. Citing to Swan, the Chipola court mused that plaintiffs could use the longer false light tort statute of limitations to "swallow up and engulf the whole law of defamation" Chipola v. Flannery, 261 N.J. 460 (2025). Contrary to Defendant's representations, the defamation cause of action does not "completely comprehend[]" the intentional infliction of emotional distress claim

and, in fact, consists of separate acts and damages than Plaintiff's defamation claim.

While Defendant without a doubt defamed Plaintiff, his First Amended Complaint contains numerous allegations against her – a sampling of which has been placed below – which stand separate and apart from Defendant's defamation:

| ¶ | Text |
|---|------|
| 6 | Sebrow confirmed her ongoing intrusion into Plaintiff's private affairs by taunting him with text messages about dates both real and imagined, sending him derogatory text messages which included "[h]ey, maybe you're gay.[Woman's Name] looks like a tranny" and "[a]t least [Woman's Name] is not a widow. Her pussy is well used." |
| 32 | … Sebrow sent the following email to Plaintiff: "Did you block my calls? Because if you did, I'm going public with everything you did to me, and the truth about what happened in the past. One of the rabbis in my community did a major search on you. And it seems that [Woman's Name] was quite abused by you. Not only that, but it seems that your daughter [Woman's Name] frequently slept in your bed while she was a teenager. There are plenty of other stories. I was warned to stay away from you. But, I still insisted on dating you, claiming that they are all lies…" |
| 33 | … Sebrow sent an email to Plaintiff, stating as follows: "Nope. You tend to bring up [Woman's Name] quite a bit in a positive way. Whether on a date or in bed. She's in your blood. But, you know that if you present her as wife #4 - you will be the laughing stock! She actually makes [Woman's Name] look good. They're both trash. But, at least [Woman's Name] comes from a good family. [Woman's Name] has faggots and goyim. What a beautiful example for your grandkids, that would be. Lol.…" |
| 36 | Knowing Plaintiff is a prominent businessman, Sebrow began to falsely accuse Plaintiff of rape. For example, on July 8, 2018, Sebrow sent Plaintiff the text message "You're a very cruel man. You admitted that you didn't love me. So, you said all the right things for pussy! Thank you for raping me." Plaintiff immediately responded "That's a lie and you know it." |

| 38 | Sebrow told Plaintiff by text message that: "You raped me and you will be brought to justice until G-d gives you painful cancer or a stroke… I curse you... You will have a financial downfall… And your daughters will get divorced… Actually [Plaintiff's daughter's name]'s hubby will leave her… You've got a widows curse. Only I can remove it… Widows have special powers. Lawyers can't remove curses… You'll need my forgiveness…And I won't forgive you until you fix what you did…Courts can't force me to remove the curse…But you'll see bad things happening…Hashem gave widows special powers…Go rape your daughter again, you sicko…" |
|---|---|
| 40 | Plaintiff begged Sebrow to stop, but Sebrow was unrelenting and, eventually Plaintiff indicated he would be calling an attorney. Sebrow then threatened to show up at Plaintiff's office to harass him. After Plaintiff again said he would call his lawyer, Sebrow wrote: "Call your attorney. And I will go to the press! Perfect! It's about time people find out. Famous journalist raped by [Plaintiff's Employer] executive. Just contacted [Woman's Name]. I'll be a character reference for her and I'll bring along other women hurt by you. You need help. And I want to help you. Don't you see what you're doing to yourself? Remember when you said, if you can't make it work with me, you cant make it work with anyone? I want to help you. All you're accomplishing by dating other women is a bad reputation. Whether it's [Woman's Name] or someone else. It can't end well with you. In spite of everything, I still care about you and want to help you." |
| 52 | Sebrow then again threatened to ruin Plaintiff's reputation, texting him: Glad you called me unbalanced yesterday. Works to my benefit. "Distraught widow taken sexual advantage of by well know predator." Yup. Wonder what the higher-up people at [Plaintiff's Employer] will think. I actually have a nice portfolio with _____, so I know the big players in the field, sweetheart! |
| 95 | In addition to emails and text messages, Sebrow at various times would incessantly call Plaintiff an inappropriate number of times. |
| 96 | Sebrow called Plaintiff on or about October 5, 2018, while he was in Israel, and she called him approximately 131 times in a row. |
| 97 | Sebrow called Plaintiff on or about October 10, 2018, approximately 20 times. |

| 101 | Between October 19, 2018 and December 24, 2020, Sebrow sent 44 messages using the SpoofCard, almost all sent directly to Plaintiff and his family members to harass him. |
|---|---|
| 106 | On December 18, 2019 at 11:23 pm, Plaintiff received a text message from an unknown number: "GETT REFUSER[.]"  On January 27, 2020, the same number texted him stating: "RAPIST MOLESTER SODOMIZER[.]" |
| 156 | For example, upon information and belief, Sebrow destroyed all text messages between her and Plaintiff.  Sebrow also destroyed all ESI contained on her devices and refused to turn over her devices for examination. |
| 157 | Sebrow also destroyed emails between her and Plaintiff, altering saved versions of them in a fashion to make it appear Plaintiff was threatening her. |
| 158 | On or about November 2019 Sebrow filed a false police report accusing Plaintiff of rape. |
| 159 | On or about May 17, 2023, Sebrow filed a false police report accusing Plaintiff of violating an order of protection. |

More succinctly, Sebrow did not just spew her lies to third parties, she also relentlessly messaged *Plaintiff* with false and harassing statements, showed up at his workplace, threatened to contact Plaintiff's employer, cursed Plaintiff's children, cursed Plaintiff, repeatedly called Plaintiff for no legitimate reason, messaged Plaintiff using unknown phone numbers, destroyed all ESI that would have been relevant to this litigation, altered and destroyed e-mails, and filed multiple false police reports.  For the purposes of this memorandum, Plaintiff has not included the dozens of vile and verbally abusive messages Plaintiff received from Defendant which, as with the other behavior listed above, does not constitute

9

defamation but rather extreme and outrageous conduct specifically designed to cause Plaintiff intense emotional harm.

Additionally, while Plaintiff was certainly harmed by Defendant's defamation, he also suffered harms from her harassment which are separate and apart from those resulting from her defamatory statements. Defendant relentlessly called Plaintiff 131 times, interrupting a vacation to Israel (FAC, ¶96); she so bombarded him with text messages and e-mails that Plaintiff begged her to stop and give him just a few weeks of peace (FAC ¶58). Defendant intruded on Plaintiff's time with his children (FAC, ¶34). Defendant used her role as a matchmaker to interfere with Plaintiff's ability to meet women from his faith (FAC ¶6-7). Plaintiff proactively informed his employer about communications being directed to his work e-mail account by Defendant, which then resulted in him being required to meet with a compliance team (FAC, ¶¶93-94). Plaintiff spent months attempting to appease Defendant for fear of the repercussions he would face if he was not responsive (FAC ¶35). Finally, Sebrow's last message to Plaintiff was on December 23, 2020.

Such behavior and the consequences flowing from that behavior is not "swallowed up" by defamation; in fact, the gross majority of the statements are not and could never be defamatory because they were directed solely toward Plaintiff and were designed to cause Plaintiff deep emotional anguish rather than cause third

10

parties to view him in a false light or harm his reputation. Defendant used her role as a matchmaker to make Plaintiff feel powerless and hopeless and as though he would never be able to find love within his religious community because she would always find out and interfere. She tirelessly harassed Plaintiff for months, belittling his family and romantic pursuits, calling him and texting him despite Plaintiff begging her to stop, and showing up at his workplace to further harass him. Plaintiff's behavior toward Plaintiff alone was so disruptive and so threatening that Plaintiff was forced to self-report to his employer not because he knew Defendant had relayed her claims to them but rather because he feared what she might say and do. Such conduct does not evince a cause of action for defamation, but rather one for intentional infliction of emotional distress.

      Finally, further evidencing Defendant's intentional conduct towards Plaintiff is the decision in the Family Court case. The decision, a matter of public record, can be replied upon to oppose a motion to dismiss. In the decision, Judge Sanders noted:

> In this case, given the content of the messages and the numerosity of those communications, [Sebrow]'s purpose was to harass under subsections (a) and (c).
>
> \*\*\*
>
> Relatedly, the court finds that other content of the messages, including the anonymous Spoofcard messages, as sent to [Plaintiff] was intended to cause him alarm and/or serious

11

> annoyance. Under subsection (a), which generally focuses on the mode of speech employed, and not a statement's content, the court is satisfied that [SEBROW] engaged in harassing behavior by virtue of the anonymized messages sent via Spoofcard… The intent to harass is readily gleaned from the totality of the circumstances and the content of those message is such to cause annoyance or alarm. As such, the court finds by a preponderance of the credible evidence that [SEBROW] engaged in the predicate act of harassment under subsection (a) as well as section (c).
>
> Continuing, it is even more clear that [SEBROW]'s threat get revenge as to [PLAINTIFF] was also intended to harass him. Similarly, [SEBROW]'s threats to publicly humiliate [PLAINTIFF] were also intended to be a mechanism of harassment. The same is true as to the either false allegation or "gaslighting" manner in which she communicated about her alleged pregnancy. Given these findings, there can be no non-harassing purpose in the multiple communications to [PLAINTIFF] perpetuating this allegation. Therefore, this is yet another example of harassing conduct by [SEBROW].

Thus, it is the direct line of communication to Plaintiff that can form the basis of intentional infliction of emotional distress, a course of conduct a court has already found to be a form of domestic violence and "continued campaign of harassment".

### b. Plaintiff is Within the Applicable Two-Year Statute of Limitations for Intentional Infliction of Emotional Distress

Plaintiff brought the instant lawsuit on December 23, 2021. While the allegations contained within the Complaint and First Amended Complaint date back to 2017, when the parties first began an intimate relationship, the harassive

12

conduct did not begin until 2018 and continued through the end of 2020. Paragraph 101 of the First Amended Complaint provides that "[b]etweem October 19, 2018 and December 24, 2020, Sebrow sent 44 messages using the SpoofCard, almost all sent directly to Plaintiff and his family members to harass him." Paragraph 127 provides that Defendant caused a social media account in Plaintiff's name to be created in July 2020.

## POINT III
## PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH HIS EMPLOYMENT RELATIONSHIP

Defendant claims that Plaintiff has failed to identify financial loss suffered due to Defendant's interference; this is simply not true. Plaintiff's First Amended Complaint alleges that Plaintiff is a prominent financial advisor with a valid business agreement with his employer whereby he produces a certain amount of gross production on an annual basis (FAC, ¶¶203-204). The First Amended Complaint continued that, to remain employed by his employer, Plaintiff must not retain current clients and also bring in new clientele (FAC, ¶¶204-206). Plaintiff's pleadings allege that Defendant's conduct "caused Plaintiff to lose at least one client" (FAC, ¶150), thus jeopardizing Plaintiff's continued employment. It further

13

alleges that, once Plaintiff's employer became aware of Defendant's communications, Plaintiff was forced to meet with a compliance team (FAC, ¶94).

Additionally, the First Amended Complaint alleges that Defendant's behavior harmed his relationships with his employer as well as clients (FAC, ¶207). Also detailed within the First Amended Complaint are various actions Defendant undertook to harm Plaintiff at work, including sending emails to a monitored account stating that: 1) Plaintiff informed her he was going to leave his employer and take all his clients with him (¶84); Plaintiff was a sociopath, predatory, sexually abused women, raped and stalked women, and committed crimes against his own daughter (¶61); and Plaintiff threatened her, tortured her, sexually abused women, drugged and raped women, slept with his minor daughter, shared confidential company information, hired his son-in-law despite knowing he was violent, attempted to pay for her silence, drugged her, and physically abused her by striking her (¶84). In one e-mail sent to Plaintiff's monitored account, Defendant admitted she knew these e-mails would cause him issues at work, stating "I was previously nice when you coached me to apologize to you at your work email to save you at your job. As your concern is that everyone is 'dispensable'" the e-mail then went on to accuse Plaintiff of a multitude of improprieties.

14

On top of all the above allegations, Defendant routinely threatened to contact Plaintiff's employer and otherwise deprive Plaintiff's employer of business, claiming she had a portfolio with Plaintiff's employer (FAC, ¶52) and that she had sent an e-mail to her "relatives to transfer if they have a portfolio with" Plaintiff's employer, suggesting he try to "bang" his "way out of that one!"

Finally, once again the Domestic Violence court amplifies Sebrow's tortious interference. As Judge Sanders noted:

> For example, there is no legitimate reason for [Sebrow] to send an alarming email to [Plaintiff]'s work email knowing that he would have to report the receipt of that email to human resources. [Sebrow]knew [Plaintiff]'s personal email address but chose to send that message to his work address. The court can only conclude, based upon the lack [Sebrow]'s credibility, that her intent was harass by causing alarm or seriously annoyance to [Plaintiff] by virtue of sending this email to his work email address.

Defendant used wrongful means to harm Plaintiff's business and the cause of action should not be dismissed.

## POINT IV

**PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS BECAUSE THE TORT ARISES FROM DEFENDANT'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND IS NOT TIME BARRED**

15

Defendant argues for dismissal of Plaintiff's tortious interference with prospective economic advantage cause of action based on claims the tortious acts stem from defamatory statements, therefore making it time barred.  Respectfully, Defendant's tortious interference with prospective economic advantage stems from her broader pattern of attempting to cause Plaintiff serious emotional distress.  Defendant admitted to messaging individuals stating that *if* they had accounts with Plaintiff's employer, they should transfer portfolios to other financial services companies; Defendant did not elaborate as to how she induced them to transfer their portfolios or whether she stated any false facts to them.  More so, she did not target only those who had contracts with Plaintiff's employer, but rather various members of her family to induce them not to do business with Plaintiff's employer.  Indeed, it is likely that Defendant did not disseminate false claims to friends or family members in this way as she has told Plaintiff that "I will deny that we dated and say you're delusional" (FAC, ¶54), instead simply urging them to keep their portfolio elsewhere.

## POINT V
## PLAINTIFF HAS PROPERLY PLEADED A CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT

Defendant argues that Plaintiff's fraudulent concealment cause of action must fail because "the evidence that Plaintiff claims was spoliated could not be

16

material to his case because he has no case" (Memorandum, p. 20). Defendant aptly set forth the elements for fraudulent concealment:

> (1) that defendants had a legal obligation to disclose the evidence to plaintiff; (2) that the evidence was material to plaintiff's case; (3) that plaintiff could not have readily learned of the concealed information without defendant disclosing it; (4) that defendant *intentionally* failed to disclose the evidence to plaintiff; and (5) that plaintiff was harmed by relying on the nondisclosure.
> Rosenblit v. Zimmerman, 166 N.J. 391, 406 (2001)

Plaintiff's First Amended Complaint addresses, in detail, each and every element. First, by virtue of this litigation, Defendant had a legal obligation to engage in ESI discovery, produce ESI relating to the litigation, produce messages she sent to third parties about Plaintiff, produce her false police report, and produce her phone and other electronic devices for discovery (FAC, ¶¶224-226). Second, the pleadings state, rightfully so, that the evidence is material to the case because of Sebrow's claims that her phone was "spoofed" and she did not actually send the messages contained in the pleadings and has also produced paper versions of emails which have been altered to make it appear as though Plaintiff was threatening her (FAC, ¶¶225, 157). Third, Plaintiff is not able to gather this information without Defendant's assistance because it exists on her devices and accounts and/or is accessible solely to her. Fourth, that Defendant's failure to disclose is intentional is evident through her deleting of emails on her accounts and introduction of altered versions of those same emails (FAC ¶157) and has refused to produce a

17

single text message between her and third parties (FAC, ¶227).  Finally, the First Amended Complaint addresses Plaintiff's harm by stating that the destruction of the evidence and refusal to cooperate with discovery has harmed him in that production of the information would demonstrate that Sebrow had committed perjury, created the SpoofCard account, and engaged in harassing conduct (FAC, ¶230).

Plaintiff has repeatedly requested the ability to conduct a forensic analysis of Defendant's electronic devices but Defendant has refused, claiming her devices were in the possession of her forensic expert and unable to be accessed due to damage.  Defendant also failed to turn over her computer and email accounts that contained the true copies of the emails Plaintiff alleges were fraudulent.  It should be noted that the cause of actions was suggested as a remedy by this Court in response to Plaintiff's assertions that Defendant presented fraudulent documents as part of discovery.  As such, Plaintiff's cause of action should not be dismissed.

Dated:     September 22, 2025
           New York, New York

                                             *Daniel S. Szalkiewicz, Esq.*
                                             Daniel S. Szalkiewicz, Esq.

18