Daniel S.  Szalkiewicz, Esq.  (DS2323)
VERIDIAN LEGAL P.C.
23 WEST 73RD STREET
SUITE 102
NEW YORK, NEW YORK 10023
*Attorneys for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| John Doe<br><br>              Plaintiff,<br><br>        v.<br><br>Baila Sebrow,<br><br>              Defendant. | **SECOND AMENDED COMPLAINT**<br><br>Case Action No. 2:21-cv-20706 |

> **Deleted: FIRST**

Plaintiff John Doe ("Plaintiff" or "Doe"), by his attorneys Veridian Legal P.C. and attorneys Borenstein, McConnell & Calpin, P.C., as and for his Second Amended Complaint hereby alleges, upon information and belief, as follows:

> **Formatted:** Line spacing:  single
> **Deleted:** Daniel Szalkiewicz & Associates,
> **Deleted:** First

> **Formatted:** Line spacing:  single

**PRELIMINARY STATEMENT**

1.      Following the death of her husband, defendant Baila Sebrow ("Defendant" or "Sebrow") engaged in a short-term sexual relationship with Plaintiff.  Sebrow was infatuated, sending him text messages professing her love and lobbing paranoid insults at other women she perceived to be threats.  After several months of attempting to navigate Sebrow's petulant displays of love, Plaintiff chose to end the relationship.

2.      Sebrow holds an esteemed role in the Orthodox Jewish Community, as a "shadchan" or matchmaker.  In this capacity, she is tasked with finding compatible couples of all ages and arranging marriages in exchange for a fee.

1

3.      Sebrow's position is considered one of respect and virtue.  It is imperative that her clients feel comfortable telling her their innermost secrets such as their sexual preferences, financial resources, prior relationships, history of sexual abuse and assault, likes and dislikes, and fears – all of which are considered taboo and unspoken about among Orthodox Jewish people.

4.      Either because her ego could not withstand the blow of being rejected by Plaintiff, because she feared her premarital sexual acts would become public so near her husband's death, or because she wanted to turn Plaintiff into a social pariah, Sebrow began a four-year course of conduct to destroy Plaintiff's reputation to his Orthodox Jewish friends, colleagues, and family members as well as anyone who searched for Plaintiff online.

5.      Sebrow started her crusade by privately sending Plaintiff threatening, abusive, and emotionally damaging messages.  When this did not elicit the response she had hoped, she began broadening her abuse, disseminating the same and similar false content to third parties.

6.      Sebrow was aware Plaintiff frequented the same Jewish events she did, having gone on dates with him in the past and previously running into him at these places.  Using her role as shadchan, when Sebrow learned Plaintiff was about to date a new woman, she sent messages or called that individual to disparage Plaintiff.  Sebrow confirmed her ongoing intrusion into Plaintiff's private affairs by taunting him with text messages about dates both real and imagined, sending him derogatory text messages which included "[h]ey, maybe you're gay. [Woman's Name] looks like a tranny" and "[a]t least [Woman's Name] is not a widow.  Her pussy is well used."

2

7.  Sebrow's contact was designed to and did actually make Plaintiff feel as though he would never be free to find love in the Orthodox Jewish community as Sebrow would always be using her position as sadchan to interfere with his prospective relationships.

8.  On a near-daily basis, Plaintiff pleaded with Sebrow to leave him alone, but Sebrow persisted, even making efforts to take her crusade online with the creation of social media profiles and a website which furthered her false claims.

9.  With no end in sight, Plaintiff informed Sebrow that he planned to initiate legal action against her.

10.  In a fleeting moment of self-awareness, Sebrow realized that, with litigation comes discovery, and soon her deranged conduct would become public.  To protect herself and with the intention of interfering with the judicial process, Sebrow not only destroyed all her text messages but also created fabricated emails to support her claims that Plaintiff raped her.

11.  Accordingly, Plaintiff brings this action seeking injunctive, declaratory, and monetary relief against Defendant for intentional infliction of emotional distress, intentional interference with prospective economic advantage, tortious interference with contract/prospective economic advantage, and fraudulent concealment.

**THE PARTIES**

12.  Plaintiff John Doe is a resident of the County of Essex, State of New Jersey.

13.  Plaintiff is a parent of four (4) children and grandfather of numerous grandchildren.

14.  Plaintiff practices Orthodox Judaism and is involved in various activities in that social and religious environment.

3

Deleted: violations of federal privacy laws, 15 U.S.C. § 6851, [c]ivil action relating to disclosure of intimate images, related New York nonconsensual pornography statutes,

Deleted: and

Formatted: Line spacing:  single

15.     Defendant Betty Sebrow, sued here as Baila Sebrow, is a resident of the County of Nassau, State of New York.

16.     Upon information and belief, Sebrow is a well-known media personality in Jewish media, and is a professional matchmaker, with her emphasis in Orthodox Jewish dating and relationships.

17.     Sebrow transacted business in the State of New Jersey, contacted multiple people in the State of New Jersey with the intention of interfering with Plaintiff's employment, was aware that her actions would directly affect a New Jersey resident, and is the subject of this court's long-arm jurisdiction statute.

**JURISDICTION AND VENUE**

18.     This action is brought pursuant to 28 U.S.C. § 1332(a)(1) based upon Diversity of Citizenship because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and it is between a citizen of New Jersey and a citizen or subject of a different state.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as this the Judicial District in which a substantial part of the events forming the basis of the Complaint occurred, where a substantial part of the evidence involved in the subject action is situated, and where the majority of the witnesses to the events forming the basis of the Complaint reside. Furthermore, Defendant meets the requisite minimum contacts for jurisdiction in this District.

4

**Formatted:** Line spacing: single

**Formatted:** Line spacing: single

**FACTUAL ALLEGATIONS**

**The Parties' Relationship**

20.     Plaintiff and Sebrow's former husband met on several occasions when Plaintiff offered his services as a finance professional.  Upon Sebrow's husband's death in May 2017, Plaintiff donated a tree in his honor.

21.     Several months later, Plaintiff noticed that Sebrow was not only actively throwing events for singles in the Orthodox Jewish community, but also appeared to be searching for new men to date as well.

22.     Plaintiff approached Sebrow and the two began speaking on the telephone.

23.     On or about December 23 2017, the parties met in Manhattan at Bemelmans, a bar located within The Carlyle Hotel.  Plaintiff selected the well-known 1940s-era venue out of deference to their shared religion's traditions and the importance for dates to occur in public places.  As the conversation progressed, Sebrow put her hand on Plaintiff's leg and grabbed his genitals.  Sebrow then led Plaintiff to his car, where she performed a sexual act on Plaintiff.

24.     Plaintiff had planned the date under the impression that the two would be following traditional practices of Jewish Orthodox dating and was shocked by Sebrow's overtly sexual behavior.  At no time did Plaintiff solicit or ask for Sebrow to engage in the conduct.  At the conclusion of their date, Sebrow took an Uber home and repeatedly called Plaintiff over the next 24 hours to tell him what a good time she had.

25.     The parties' relationship continued to develop, with Plaintiff taking Sebrow out on several other dates and introducing her to his friends on New Year's Eve.  As with their previous date, the parties' other dates eventually progressed to consensual physical intimacy.

5

26.     Sebrow's words and conduct made clear that she believed and planned for their relationship to lead to marriage.  However, as the weeks passed, Sebrow grew increasingly possessive of Plaintiff, demanding more time and more attention and engaging in outrageous behavior when she did not get it or, worse, a woman in their shared community inquired about Plaintiff's romantic availability.

27.     With the intrigue of Sebrow's spontaneity being rapidly overcome by her toxic jealousy and unpredictable demands, Plaintiff realized the relationship was not a sustainable one and started to distance himself.

28.     Passively extricating himself from his relationship with Sebrow proved a difficult task for Plaintiff, as Sebrow was an involved member of their relatively small religious community and the two ran in many of the same circles.

29.     Plaintiff decided to confront the problem head on, notifying Sebrow that he did not see a long-term future in their relationship and wished for it to discontinue.  Plaintiff explained to Sebrow that he intended to remain friendly, but that he could no longer date her in an intimate manner.

30.     Realizing she had engaged in sexual conduct unbecoming of an Orthodox Jewish woman, Sebrow sought out to so devastate Plaintiff's reputation in the community that no one would ever believe him if he dared repeat the details of their many sexual dalliances.

31.     Suddenly, without warning, and for the very first time, Sebrow began accusing Plaintiff of numerous improprieties.

32.     On February 19, 2018, Sebrow sent the following email to Plaintiff:

> "Did you block my calls? Because if you did, I'm going public with everything you did to me, and the truth about what happened in the past. One of the rabbis in my community did a major search on you. And it seems that [Woman's Name] was quite abused by you. Not only that, but

6

it seems that your daughter [Woman's Name] frequently slept in your bed while she was a teenager. There are plenty of other stories. I was warned to stay away from you. But, I still insisted on dating you, claiming that they are all lies.

Now, I wonder!"

33.    On or about May 17, 2018, Sebrow sent an email to Plaintiff, stating as follows:

"Nope. You tend to bring up [Woman's Name] quite a bit in a positive way. Whether on a date or in bed. She's in your blood. But, you know that if you present her as wife #4 - you will be the laughing stock! She actually makes [Woman's Name]  look good. They're both trash. But, at least [Woman's Name] comes from a good family. [Woman's Name] has faggots and goyim. What a beautiful example for your grandkids, that would be. Lol."

"So, instead you go after a woman who will make you look good."

34.    Plaintiff pleaded with Sebrow to stop contacting him, never stooping to Sebrow's level and instead texting her polite but firm messages such as "[t]his has to stop. My children are coming over . I have to go shopping. Please stop this."  Plaintiff's appeals for peace fell on deaf ears.

35.    The timeline of Sebrow's harassing messages were nearly identical: she would inform Plaintiff of her strong feelings for him and when he did not respond in kind or sometimes at all, she would spread emotionally harmful lies.  Then, after Plaintiff would respond and attempt to calm her, Defendant would apologize for spreading lies.

36.    Knowing Plaintiff is a prominent businessman, Sebrow began to falsely accuse Plaintiff of rape.  For example, on July 8, 2018, Sebrow sent Plaintiff the text message "You're a very cruel man. You admitted that you didn't love me. So, you said all the right things for pussy! Thank you for raping me."  Plaintiff immediately responded "That's a lie and you know it."

7

37.    Sebrow continued to accuse Plaintiff of rape, stating "you used me and then needed new Pussy. You've done this for years. Only G-d will stop you with a major health attack."

38.    On July 10, 2018, Sebrow told Plaintiff by text message that:

> You raped me and you will be brought to justice until G-d gives you painful cancer or a stroke…  I curse you...  You will have a financial downfall… And your daughters will get divorced…  Actually [Plaintiff's daughter's name]'s hubby will leave her…  You've got a widows curse.  Only I can remove it…  Widows have special powers.  Lawyers can't remove curses… You'll need my forgiveness…And I won't forgive you until you fix what you did…Courts can't force me to remove the curse…But you'll see bad things happening…Hashem gave widows special powers…Go rape your daughter again, you sicko…

39.    The same day, Defendant also wrote that:

> Every Rabbi will spit on you for what you did to Baila Sebrow… I curse you with testicular or prostate cancer and financial downfall. You use your penis and money to abuse women. And those will no longer be useable to you. Only I can remove the curse.  Every Rabbi will curse you. And I'm going to the grave sites to pray for your downfall.

40.    Plaintiff begged Sebrow to stop, but Sebrow was unrelenting and, eventually Plaintiff indicated he would be calling an attorney.  Sebrow then threatened to show up at Plaintiff's office to harass him.  After Plaintiff again said he would call his lawyer, Sebrow wrote:

> Call your attorney. And I will go to the press! Perfect! It's about time people find out
>
> Famous journalist raped by [Plaintiff's Employer] executive.
>
> Just contacted [Woman's Name]. I'll be a character reference for her and I'll bring along other women hurt by you.
>
> You need help. And I want to help you. Don't you see what you're doing to yourself? Remember when you said, if you can't make it work with me, you cant make it work with anyone?
> I want to help you. All you're accomplishing by dating other women is a bad reputation. Whether it's [Woman's Name] or someone else. It can't end well with you.

8

> In spite of everything, I still care about you and and want to help you.

41.    When Plaintiff again rejected Sebrow's advances, she started attacking his daughter:

> You used your kids to get back at [Woman's Name]. And your daughter couldn't deal with it, so she cut herself. And [Plaintiff's daughter's name] is mentally unstable because of you. Sadly, her hubby will leave her when you stop shtupping them with money. But, don't worry - I'll help him find a shidduch!

> But in spite of all that, I care about you. That's the humanitarian side of me. You want to be happy, but don't know how.

> You must be desperate to date [Woman's Name]! Now I find the whole thing funny. At first I was angry that you lied to me. Now, I'm amused.

> Next you can bang [Woman's Name]. I hear [Woman's Name] is banging. So you can bang her too. I love this!

> What have you done to your life? G-d gave you one decent chance and you blew it.

> Now you're back in the cesspool dating the rejects.

> "[Plaintiff] and The Trash Bags."

> You fell back in like an addict. Your therapist is not doing a good enough job. She should've prevented this from happening.

> You're gonna be licking and sticking your fingers in a trash bag!!! This is such fun.

42.    Sebrow continued her harassment of Plaintiff into the early morning of July 11, 2018, when she texted him:

> Can't wait to tell Moishe, you're dating [Woman's Name]! He's gonna laugh his head off!

> I'm asking Corinne to call Rabbi Zwickler. She knows what you did to [woman's name], and she knows how you drag women to bed and dump them.

> You opened a can of worms when you got your Rabbi involved.

9

He believed me, because he knows a woman like me is honest. Plus, I have many witnesses backing me.

I might go to Joey this Shabbos. Gonna entertain them with stories about you!

I'm going to patent a new trademark for a singing group and will write a song:
[Plaintiff's name] AND THE TRASHBAGS

I should tell [Woman's Name] how you made fun of her contorted face, voice, and man hands. Guess you're so horny you'll even fuck something like her. Oh, and she thinks you have money! That's why she wants to date you.
Hahahahahaha
You're getting royally screwed like you deserve!
Hahahahahahahahahah

My advice is for you to move to Israel and change your name. Here, you are known as a rapist!
Your poor son in law sees all those beautiful sexy women at work. Then he goes home to his ugly smelly fat mentally unstable wife. I daven that he iy"H dumps her and has some normalcy.
Another example of a bought man. You got him a job and bought him a house. Their house is cursed because they moved in when you dumped me. That house will bring them sorrow and the breakdown of their marriage.

43.    The next day Sebrow apologized for her conduct, stating:

Thank you for meeting with me.  I appreciate it.  I'm very sorry that I said those things about your daughter.  I'm not making any excuses.  Even though I felt attacked, I should have been more in control of my emotions. I'm an adult and should have been able to do that.  I hope you can forgive me.  I will always love you.  You don't have to love me.  All I ask is to be your friend.

44.    Later, Sebrow wrote "I'm very sorry that I said you raped me. I was upset, and not thinking clearly. It's not true. I apologize for the grief it caused you.

45.    Defendant also messaged Plaintiff to say: "Though I still love you, and always will - as real true love never goes away, I received closure."

46.    On or about July 24, 2018, Sebrow sent the following email to Plaintiff:

10

As a relationship expert I totally understand what's going on. You felt compelled to break up with me for whatever reason. And you're scared to run into me (no pun intended) or communicate with me because you still have a thing for me! And when we communicate, it slows down your healing process. Otherwise, I would be like any other person to you.
Even if date or sleep with other women, you will always think about me. Gold always shines through!
Deny it all you like, [Plaintiff], baby. I'm in your blood!

47.    In response, Plaintiff sent the following response to Sebrow:

Baila.

I really need to be clear. With the greatest of respect you are way off base. I'm sorry you feel this way as I probably could have done a better job being clearer.

This is not true. I wish you well and you are an amazing person. I'm sure the right person will be coming along.

Wishing you the Best

48.    Plaintiff followed up the sentiment in a text message to Sebrow:

Baila. I can not speak now as I'm going into a meeting shortly and Ill be tied up till very late this evening. I will always consider you a friend but I believe for our own growth and mental health we should limit our contact . Please respect my wishes and know we are still friends I just feel we need space. Good luck in future endeavors and on your upcoming Weekend

49.    On or about July 24, 2018, Sebrow sent the following response to Plaintiff:

I know that I'm an amazing person. At least we finally agree on something!

And that's why I would be amused to see who will be the next woman after me. Will be funnier than laughing-gas."

50.    The following day, Plaintiff accidently sent Sebrow a text message meant for his

son.

51.    In response, Sebrow sent Plaintiff a string of text messages stating:

11

I have every right to question this from a man who stuck his penis into me, after using such love words with me, and dumped me and then accidentally sends a text meant for someone else.

[Plaintiff], I have the same text from you back in early Dec.

\*\*\*

You overstepped boundaries when you stuck your tongue, fingers and penis into a new vulnerable widow using similar texts. You dump her then she gets a similar accidental text meant for someone else.

Block me. I'll pass this text around.

You are the [Plaintiff] your reputation is known for. You played me, and I now have the proof. I'm definitely over you, but now I have the written proof of what you are. Hashem made this happen so I could share this with others of how you use women and then dump them when you're done. There's a whole string of women, [Plaintiff] who claim you did this.

Sure. You should call your rabbi. He already knows about you anyway. Explain that text to him. And then let's get similar texts from other women. Difference here is that I have the proof so many women claim.

You claim love, fuck and dump. It's a cycle for you.

I swear I have no interest in you. But, this text will be shared and compared. Have a lovely day!

Do what ever u want. I have all the Texst's from you as well. I will no longer be in contact for a few days.

My texts are normal. Your text proves what so many women have fallen your victim. You're a predator and you need to be exposed. You should be banned from women.

Gonna post your text on Facebook without your name and we will get opinions from women!

Hashem is great!

FYI: Reputation Saver only helps you so much. Private Investigators get all the info. It's only a few thousand dollars.

Reputation Defender is an online reputation management company which specializes in removing negative content from a person or business's search engine results.

52.    Sebrow then again threatened to ruin Plaintiff's reputation, texting him:

Glad you called me unbalanced yesterday. Works to my benefit.

12

"Distraught widow taken sexual advantage of by well know predator."
Yup. Wonder what the higher-up people at [Plaintiff's Employer] will think.
I actually have a nice portfolio with _____,
so I know the big players in the field, sweetheart!

53.    On July 25, 2018, Sebrow threatened to send the following email to Plaintiff at his

work email address:

I'm thinking of settling this situation in a Bais Din [Jewish Ritual Court].

Scenario:
Defendant: A 3 times divorced wealthy man who has a reputation for wining
and dining women telling them he loves them, sleeps with them and dumps
them.

Plaintiff: Newly widowed woman who was in a healthy marriage for 28
years, and a known devoted wife. She is an upstanding citizen known for
her endless chesed. She is a respected leader in the Jewish community and
admired by rabbis.
She was seeked out by defendant immediately following her husband's
death by means of an esteemed rabbi and an organization. Defendant
donated money on behalf of her husband's memory to an organization, and
also to her personal charity for singles. Defendant persuaded plaintiff to date
him. In her fragile vulnerable state, he sends her expensive gifts, wines and
dines her, tells her he loves her and wants to marry her. Brings her to a bar.
She drinks. He convinces her to sleep with him all the while talking about
marrying her and where they will live together. He introduces her to his
friends and she believes everything while continuing as a serious couple
including intimacy.
One day, out of the blue, he breaks up with her telling her things that make
no sense. Finally, he admits to never loving her, and that in essence she was
nothing but a sex toy for him.

Witnesses to the character and behavior of defendant will be in attendance.

Plaintiff seeks compensation for emotional damage, and knowledge made
public about the defendant's predatory actions.

What do you think?

54.    On July 27, 2018, Plaintiff and Sebrow were scheduled to attend the same event.

When Plaintiff stated he needed space from Sebrow, she became enraged and threatened to

spread lies about him:

13

You initially said yes. But, no problem. I will not even acknowledge you.
And I will deny that we dated and will say you're delusional.

Your choice to make it hostile.

\*\*\*

Now were enemies

\*\*\*

I'm not mad. I asked you if you want to sit at the same table. You said no.
I respect your decision. A woman like me doesn't beg for attention. Leave
that to the loser gold digging whores who will chase you.  I'm too good
for this abuse.

55.    In response, Plaintiff pleaded with Defendant, stating: "[l]eave me and my family

alone[,]" "I will never speak again that we went out to anyone[,]" "[p]lease leave me alone[,]"

"I'm sorry we where intimate.  I'm sorry I asked u out.  I'm sorry I ever meet you.  Leave me

and my family alone[,]" "Please.  Leave me alone" and "Respect my wishes[.]"  Defendant then

proceeded to repeatedly beg Plaintiff to attend the event claiming that she "care[d] about [him]"

and "want[ed him] to have a good time."

56.    Sebrow's anger at Plaintiff breaking up with her was evident through her text

messages.  Believing Plaintiff was seeing another woman, on July 28, 2018 she texted Plaintiff

So glad I convinced you to come. Now you have whom to bang. As long
as the lights are off, you'll be fine. Or, you can put a paper bag over her
head!
Hahahahaha

57.    Plaintiff responded, saying "It's not nice to make fun of people. She sat by me not

the other way around. I don't care. I just want to go home to my family . Please leave me alone.

I need to go won't be responding[.]"  Plaintiff's message only enraged Sebrow, who wrote the

following string of messages:

Just teasing you! I'm not making fun of her. I'm making fun of what you
were stuck with since dumping me!
It's called karma!

14

\*\*\*

Not being mean. Telling you the truth based on facts. After dumping me, you will get exactly as you deserve. If you have a problem with that, take it up with G-d

\*\*\*

You will never find love. The next woman will marry you for your money only. And you will be divorced for the 4th time!

It's the truth. G-d you one last chance and you blew it. Now you're going to live with it.
As I said, I'm getting the popcorn to munch watching you screw your life. This Shabbos was a preview!

And when news of your 4th divorce becomes public, I will proudly tell everyone that you dumped me!

It's actually an honor for me to say that you dumped me!

Your kids will like the Peruvian.
She's a convert like them and their mother.
And she's a spic too!
But, [Plaintiff], how can you actually fuck something so ugly?

There's that other woman from Lakewood you were taking to.
Now that one bangs good!
She cheated on her hubby with half the town. Her own family wants nothing to do with her, and she lives in a hotel. She's a charity case.
[Plaintiff], you're getting what you deserve. Karma is great!

As I said, you will never know from love again!
Poor [Plaintiff]!

You defiled me in my year of mourning for my holy husband. Now G-d will defile your life.

Anyway, have a fun trip back and thanks for joining and proving how great G-d is!

FYI: [Woman's name] told me she's on lots of dating sites, and can't get a date!

Desperate Horny [Plaintiff] to the rescue
Hahahahaha

15



Before I forget:
Moishe looked very handsome this Shabbos.  Don't you think?

Oy, just realized......
I was staring in your eyes, and concentrating how you broke my heart.
Wonder if that caused you an ayin hara. If it did, I'm not sure how to remove it from you.
Ask your Rabbi what to do about it 👀

Do you know what money cannot buy? Forgiveness and curse removal. That's the power you gave me.
I hold power over you.

I already had 28 years of love. So, I'm content to spend the rest of my life cursing you for defiling me. I'm a widow. And my tears and curses are very potent.

And may men do to your granddaughters what you did to me. And if your daughters get divorced, may men do to them, what you did to me.

I hope you get a lawyer against me. So, I can counter sue you and make it a class action.
Imagine how your kids would be embarrassed that their father is a pig who abuses women.
My kids know what you did to me. And my daughter knows [Woman's name] and her purchased hubby!

Just sent an email to my relatives to transfer if they have a portfolio with [Plaintiff's Employer]. Let's see you "bang" your way out of that one!

58.    By August 2, 2018, Sebrow was again contacting Plaintiff to ask him if he had "found anyone else yet" to which he responded "…With the greatest of respect please NO more tests or emails.  I need this three nexst week."  But Defendant could not help herself.  On August 3, 2018, Sebrow continued to send Plaintiff harassing messages, even after he asked her numerous times to stop, even at one point asking telling her "Stop.  Stop stop stop stop stop stop[.]"  In response, Sebrow wrote:

I need to speak to you ASAP

16

I thought you can be civil. But, I see you play dirty.

You broke up with me for no reason other than you got bored with my body.
Don't twist it around and tell me that you can't go out with me because of what I said 2 months later after huge arguments.

Are you hooking up with [Woman's Name]? She's planning on moving to Florida, as you just said. Makes sense. You got mad when you found out that she dated Moishe. He dumped that reject. I saw the texts!

I remember how mad you were when I told you that Moishe dated [Woman's Name]! And you were dating me at the time!
You broke up with me for no reason. You tell me you want to marry me and out of the blue you dump me.

                        ***

It's not fair what you did to me. And you know it.

                        ***

You dumped me for no reason.

You treated me like the bimbos you slept with before. You pretended to be serious and I trusted you.

I believe you're fucking [Woman's Name] now. You keep going back to her after you break up.
You deserve that reject. 12 years she's been divorced. Every man laughs at her.

You asked me what I want. I'll tell you. I want you to admit the real reason you broke up with. In person. Not on a noisy street by Starbucks. Not on limited time where you had to run back to the office. Private conversation. No more bullshit.

                        ***

No. I will not leave you be. You will not treat me the way you've treated all your other bimbos. You will learn the difference when you start in with a woman like me.

59.    Sebrow continued to text Plaintiff harassing and vulgar messages.

17

60.    On August 20, 2018, Sebrow wrote Plaintiff the following text:

Do what the hell you want. You're the one who hit on a married woman.
You used a widow. I have those emails.
Stay away from me. I want nothing to do with you.

For once in your life, you have no control. Your money can't buy me or
tell me what to do. I will make whatever decision I choose.
Now go do what you're good at. Hunt for new pussy! Who are you
banging now? [Redacted]?

61.    On August 29, 2018, Sebrow sent an email to Plaintiff at his work account:

"Maybe it's time for [Plaintiff's Employer] to know that you're a sociopath.
Maybe it's time that your predatory activities become public.
Maybe it's time that the hundreds of your female victims come forward with
their stories of sexual abuse.
As a journalist, I will be happy to publish all firsthand account tales.
In fact, why don't we publish how when you don't rape women, or stalk
them - you abuse trust in emotionally vulnerable women in order to have
sex with them?
What did you do to your own daughter, [Plaintiff]?
Shouldn't be too difficult to find a large number of many victims. Isn't that
correct, [Plaintiff]?

62.    On or about August 29, 2018, Sebrow sent another email to Plaintiff at his work

account, this time seemingly conciliatory:

I'm willing to straighten this out

63.    On or about August 29, 2018, Sebrow sent another email to Plaintiff at his work

account, this time in the form of an apology:

[Plaintiff], I am sorry about both emails on August 29.  None of it was
true.  I was upset.  I will not send again.  I am sorry.
Baila Sebrow"

64.    While Sebrow's statement that her previous email was not true is accurate, her

the apology and attempt at reconciliation, were not sincere and were short-lived.

65.    On August 31, 2018, Sebrow sent the following email to Plaintiff:

Not sending by text, in case you're worried about your company seeing it.

18

When you unfriended me from Facebook, it was a tremendous public attack. I did nothing to you on Tuesday to deserve that. And you know it.

People check to see whose friends with whom, and who's unfriended. You publicly attacked me. And then I reacted. Plus, it was on a day that was traumatic to me, and I didn't feel well.

Why did you do that to me?

Do you know how embarrassing it is to me that you unfriended me?

That's a huge attack, and I can't deal with that.

66.    On or about September 7, 2018, Sebrow sent the following email to Plaintiff:

This is not an "impulse control" email, nor do I have that Issue. You're just projecting.
However, crap I take from no one!
All that happened this morning is that at 7:49, I texted you "Good luck with your Dr. appt."
Instead of just saying thank you, you sent me a long email that you cannot communicate with me.
Would you have responded that way to any of your fuckaroos? No.
So, if you act insane towards me, then I respond in the language you understand.
I'm sorry about your ex-father in law, and the troubles that are coming along with it.
Regardless of everything, I was worried about your health and your return visit to the doctor today. And that's why I texted you. But, you can't help yourself turning everything into crazy drama.

Shabbat Shalom

67.    On or about September 7, 2018, Plaintiff sent the following response to Sebrow:

Baila.

I need to deal with a lot. I with u a very happy healthy new year.

68.    On or about September 7, 2018, Sebrow sent the following response to Plaintiff:

Thank you. Same to you.
And if you have sex with anyone else, may you contract a highly contagious incurable lifelong STD!
Amen Amen V'Amen Love and kisses!

19

69.    On or about September 26, 2018, Sebrow sent the following email to Plaintiff:

My reason for wanting to remain friends is so that I don't feel compelled
to take legal and halachic action against you.
You might think that you can get away with saying that we had a
relationship that didn't work out.
But, everyone knows that it's not true. What you did to to me, you have
done to many others in the last 15 years you decided to join the Frum
world. And only G-d knows what kind of havoc you created in the secular
world that will one day hit the media.

What you did to me (and others) is called sexual coercion. That is a form
of rape. I'm not sure if NY would try you criminally for what you did.
But, a class action civil suit against you will definitely hold up.

I don't want to do that to you. My professional standing and reputation in
coming forward with such charges will only ignite others to come forward.
And the damage it will do to your entire life and all that you worked for
will blow up.

I'm a victim. No different than a survivor of any other devious and sinister
attack.

But, I have a soft spot for you. Maybe it's because I'm still a good person.
Or maybe I am suffering from the Stockholm Syndrome. Not uncommon
in such cases.

The bottom line is that I defended you in public. I didn't need to do that. I
could've just kept quiet. And I shared with you what I did in your defense.

Then I opened Facebook, and saw that your account is very much active,
with me still unfriended, while those who talk about you as a dirty joke are
still your friends. And that was quite hurtful.

[Plaintiff], you have not turned over a new leaf just because Yom Kippur
ended. As long as people still have a heavy heart against you, G-d has not
forgiven you. That's a Torah fact.

I have not forgiven you. Nor will I ever. You used sexual coercion, and
then, as your reputation precedes you - you threw me away.

Just so you know, I cry every day, and at every prayer I insert your name
for the pain you caused me.

Again. I don't want to go public and cause you irreparable grief and
embarrassment.

20

70.    On or about October 2, 2018, Plaintiff sent the following email to Sebrow: "I've had enough. Do not email me anymore nor contact me."

71.    On or about October 3, 2018, at 3:05am, Sebrow sent the following email to Plaintiff:

> Hey [Plaintiff],
> How could you have not known this?
> You wrote several times by text and email that you want to marry me. That's a halachic contract by intent. You then consummated the union with intercourse.
> That's Kiddushin!!! [marriage].
> According to Torah law, there are three ways to betroth a woman:
> 1. A money transaction. The man gives to the woman money or any object of value.
> 2. A document.  The man gives the woman a document which states his intention to marry her.
> 3.    Sexual Intercourse
> I'm going to keep quiet about this for now. But, if you ever get involved with another woman - you have my promise that I will take you to Bais Din.
> Baila"

72.    On or about October 3, 2018, at 3:16 am, Sebrow sent the following email to Plaintiff:

> It's not fair that you ruined my life. I didn't ask to date you. I was trying to gain some emotional footing after tragically enduring my husband's long illness and death.
> You forcefully pushed your way into my life using money, charm, and false promises. You took my heart and dignity. Then you dumped me.
> Do you think I'm going to sit on my tuches [buttocks] and suffer silently while you're off finding new pussy to bang?
> You are halachically [Jewish law] bound to answer for your actions!"

73.    On or about October 5, 2018, Sebrow sent an email to Plaintiff stating the following:

> Dear [Plaintiff],
> You have no clue what our relationship did to me.

***

The brutality of the way you dealt with me... This time, I didn't survive. Emotionally, I am finished. The tremendous pain of what happened even caused me to say things to you that I otherwise never would. I'm sorry.
Now, I understand how divorces can turn messy and ugly, even with nice people. You were not fair with me.
I trusted you when everyone begged me to stay away. I never told you this. But, at the FD weekend where it was clear we were together, several people warned me that you would hurt me. I shut them up. That's how secure I was about you.
At the end, all those who warned me, were accurate.
I don't want to be enemies with you. I want to be in your life, even as friends. Not sure why, but I still care about you. To me, love is eternal. Perhaps, that Is the strongest difference between us.
Love,
Baila

74.    On or about October 7, 2018, Sebrow sent the following email to Plaintiff:

You can ignore me all you like. This is a very serious matter. I won't let you ruin my life. You got me into bed many times pledging marriage throughout. You backed out, not caring that you left me defiled.
As it Is you've caused damage in that area, because I could never marry a kohen [priest].
We can solve this quietly. No one has to know our last names. A rabbi writes up a Get [divorce], and it's done.
You don't want this dragged into the streets, because it's going to become a muddy mess for you. You've worked hard to keep your nose clean from your past.
Unfortunately, you couldn't do that in your dating life. But, this will dredge up old stories.
My life has been clean until I allowed you into my life. The worst thing you will find about me is that I called the police on a Muslim cab driver who threatened me and where there is footage of him driving like a maniac to scare me. You already made a fool of yourself when you stated that I bullied him!
You've hurt me enough. I trust that you will do the right thing.

75.    On or about October 10, 2018, at 7:45am, Sebrow sent the following email to

Plaintiff:

Coming soon to a newsstand near you!
"63 Year Old 4 times Divorced Bipolar Sex Addict...Meet [Plaintiff]."
Read a woman's personal account about her nightmarish abusive relationship with this high-powered philanthropic man in finance and politics.

22

West Orange will finally be placed on the map when this story makes the
headlines!"

76. On or about October 10, 2018, at 4:06 pm, Sebrow sent the following email to

Plaintiff:

You can block me. But, I will play back [Woman's Name] voice on your
work phone.

77. Plaintiff responded to that email on or about at 5:16pm, stating:

I will advise them at work that you mentioned this.

78. Sebrow responded to Plaintiff's email on or about at 5:22pm, stating:

You really don't want that played back. And I don't want to hurt or
embarrass you. I never have.

79. On or about October 10, 2018, at 6:42pm, Sebrow emailed Plaintiff again, stating:

Proof that Hashem [God] protects widows is why I found out what
you told that ugly jealous fat woman.

80. On or about October 10, 2018, at 7:30pm, Sebrow sent an email to Plaintiff stating

the following:

May Hashem render your tongue and speech useless. Amen Amen V'amen
Just remember "People in glass houses should not throw stones."
I have a very damaging recording about you that could destroy your family.
I would hate to put it on social media.

81. On or about October 10, 2018, at 8:16pm, Sebrow sent the following email to

Plaintiff:

You will be begging me to forgive you. I will now visit my husband's kever
[grave] every day and cry about what you did to me. The earth will absorb
my tears, as I will beg Hashem to punish you.

I'm not the first widow to cry about what you did to her.

This time Hashem [God] will stop you. All evil men have fallen. And so
will you.

82.    On or about October 10, 2018, at 11:17pm, Sebrow sent the following email to

Plaintiff:

> NORPAC will be hosting a pro-Israel fundraiser for Senator Robert
> Menendez (D-NJ) in Teaneck! October 21st at 12:30 PM.
>
> I have family in Teaneck, and they know what you did to me and other
> women in NJ. Senator Menendez will be informed about your sick ways. I
> might forward [Woman's Name] recording about what she witnessed while
> married to you, along with the testimony of other people."

83.    On or about October 11, 2018, at 4:54am, Sebrow sent the following email to

Plaintiff:

> Your new fat friend whom you spoke to about me will find out the truth
> about who you really are, and what you have done to women.
>
> I'm not obsessed with you, as you want to believe. I'm just not letting you
> get away with what you did to me and others.
>
> Finally, someone is standing up to you!

84.    On or about October 11, 2018, Sebrow sent the following email to Plaintiff at his

work email address:

> [Plaintiff]:
>
> You have threatened me, sent me expensive gifts, and now the truth about
> how you tortured me has gone public. I was previously nice when you
> coached me to apologize to you at your work email to save you at your job.
> As your concern is that everyone is "dispensable."
>
> You are also very clever calling me from various numbers and threatening
> me - leaving me no choice but to call you back as many times for a taste of
> your own medicine.
>
> You want to give the impression that I am obsessed with you, or stalking
> you. But, you know it's not true. I'm just not taking crap from you anymore
> like everyone else.
>
> Your sexual abuse of women is public knowledge, as well as the allegations
> about drugging and raping them. And that includes the allegations made by
> your ex- wives regarding your daughter in bed with you when she was 15.

24

I also have emails from the early days (when you tried to impress me) how you spoke about [Plaintiff's Employer] and your intentions, as you said "to screw them" and take your clients along in your own company when you make Aliya. Your dream, as you said was to move to Israel and start your own company with the clients you-u acquired from [Plaintiff's Employer] and whom you brought along from [Plaintiff's Former Employer].

Not only that, but you were dumb enough to boast how you go to events where the "rich Jewish people are" and convince them to invest with you. You named various investors and how much they invested with you. I was quite uncomfortable with that information, as I know many of them.

Furthermore, you spoke with incessant anger about your son-in-law, [Man's Name] whom you always bitterly complained about having to support and give him a $100,000 a year job with [Plaintiff's Employer] while his family does nothing. Additionally, you raised concern about his anger management issues where he beat up guys.

Oddly, you too, have anger management issues.

To be sure you understand, [Plaintiff]. I am not threatening, nor blackmailing you in any shape or form.

You have repeatedly offered me money and used the word "remuneration". And I have refused. I want NOTHING from you.

You have targeted me for years while I was married, and more so, when my husband was ill. You then went after me in a big way immediately after his death, asking for the assistance of rabbis and organizational leaders to convince me to date and marry you. You donated money to their causes as well as mine. I tried to push you away, but you persisted.

Your claims about unending love for me while I was in deep grief for my husband, and your incessant calls, texts, and emails were overwhelming. So, in my vulnerable state I made the poor judgment of relenting. I should have known better, and listened to what other women have claimed about you for years.

And on that Sat. night in Dec. you drugged me too, as you have done to others. When you realized that I was making too much of a big deal you kept begging me saying you love me and want to marry me. Feeling that I stepped into borders I shouldn't have, and believing your claims of love - in my emotional state as it was at the time - I continued my relationship with you.

25

The relationship became more volatile when you hit me. You apologized each time. Although I am an educated woman and founded an organization for victims of abuse, I should have known better. Yet, I took you back each time. As is common in such cases, the perpetrator eventually gets bored and leaves. But, you weren't content. You were afraid of what I know, my strong connections, and how that will impact your life. So, you made sure to still remain in my life.

Everyone warned me to break up with you. You took major advantage of me, as you have done with other women, including widows before me.

Your abuse of women needs to stop.

My only issue with you at this point is the halachic [Religious Jewish Law] matter that you refuse to address and that will have a huge permanent impact in my life (as well as yours).

I urge you to settle this matter, so that I can move on with my life. As I said, we need to meet with a neutral rabbi and clear the matter ASAP.

You can threaten me with a lawsuit, all you like. Once this story goes public, there will be many people with their own stories of your life-long abuse on them. And your $7,000 payment to Reputation Savers will have gone down the drain. The only advantage will be that it will, at the very least, prevent more victims for you to abuse.

However, I'm not looking to do that to you. I'm also not seeking revenge. Nor, do I want a man with such a dirty record in my family, or in my life.

Please settle the halachic matter, so that I can move on and put this horrific nightmare behind me. That's all I want from you, and as a religious woman I have every right to demand it.

It is my hope that you will settle this matter quietly, swiftly, and most importantly peacefully.
Sincerely, Sebrow

85.    In addition to personal text messages, and unreasonable and excessive phone calls, emails were sent by Sebrow to Plaintiff personally as well as to Plaintiff's work email address at his employer, a major financial institution.

86.    Plaintiff's employer has an internal policy of scrutinizing both randomized and targeted incoming (and outgoing) emails.

87.    Upon information and belief, Sebrow knew full well that Plaintiff's employer had access to his emails, and she sent the email to that specific address with the purpose that they would, in fact, read it.

88.    Upon information and belief, as a matter of business practice, Plaintiff's employer tracks the various email accounts of their employees.

89.    The email sent to Plaintiff at his work email address, accused Plaintiff of "sexual abuse[,]" claimed that he "drug[s]" and rape[s]" women, made an accusation that Plaintiff molested his daughter when she was a teenager, stated that he broke confidentiality rules by disseminating private client information, claimed that his son-in-law has anger management issues as does Plaintiff, stated that Plaintiff "drugged" her (Sebrow) "on that Sat. night in Dec." and frequently hit her.  Sebrow further claimed in such email that Plaintiff "took major advantage of [her] as [he has] done with other women, including widows" and generally abuses women.

90.    The email further states that in order for the harassment to stop, "we need to meet with a neutral rabbi" so Plaintiff would sign a "get," i.e., a Jewish Divorce Document.

91.    The demand for a Get was extortion by Sebrow.

92.    Finally, the email directly addressed Sebrow's intention to disseminate her lies about Plaintiff on the internet as she stated "[o]nce this story goes public, there will be many people with their own stories…" "and your $7,000 payment to Reputation Savers will have gone down the drain."

93.    Sebrow's decision to include false assertions about Plaintiff's business practices in an email that she sent to Plaintiff's monitored work email address – including that he planned to leave his employer and steal clients, that he disclosed confidential client information to her,

27

and that he induced his employer to hire his son-in-law who was violent and abusive – was no coincidence.

94.    After Plaintiff's employer became aware of these communications, Plaintiff was compelled to meet with a compliance team to discuss the nature of Sebrow's emails.

95.    In addition to emails and text messages, Sebrow at various times would incessantly call Plaintiff an inappropriate number of times.

96.    Sebrow called Plaintiff on or about October 5, 2018, while he was in Israel, and she called him approximately 131 times in a row.

97.    Sebrow called Plaintiff on or about October 10, 2018, approximately 20 times.

98.    Sebrow finally stopped directly texting Plaintiff from her true number on October 10, 2018.  However, this would not be the last time Defendant communicated with Plaintiff.

**The SpoofCard Messages**

99.    On October 19, 2018 at 2:32 AM Sebrow created a SpoofCard account.

100.    SpoofCard is a web based program and iPhone app that allows users to send text messages from anonymous numbers.

101.    Between October 19, 2018 and December 24, 2020, Sebrow sent 44 messages using the SpoofCard, almost all sent directly to Plaintiff and his family members to harass him.

102.    On October 22, 2018, Plaintiff received the following text message from the phone number (646) 343-9602: "GIVE THE GETT[.]"  Later, the same phone number texted him another message: "ANEMAL[.]"

103.    On November 3, 2018, Plaintiff received the following text message from the phone number (305) 396-8338: "RAPIST[.]"  Later, the same phone number texted him another message: "GET GET GET[.]"

28

**Formatted:** Line spacing:  single

104.    On November 8, 2018, Sebrow sent Plaintiff the anonymous text messages stating "GIVE THE GET" and "UNCHAIN HER FROM YOU."

105.    On October 3, 2019 at 5:41 pm, Plaintiff received a text message from an unknown number stating: "chaim zelig a halachic annulment is being arranged by bais din you raped her but you won't keep her chained[.]"

106.    On December 18, 2019 at 11:23 pm, Plaintiff received a text message from an unknown number: "GETT REFUSER[.]"  On January 27, 2020, the same number texted him stating: "RAPIST MOLESTER SODOMIZER[.]"

107.    On January 24, 2020 at 4:26 pm, Plaintiff received a text message from an unknown number stating: "RAPIST[.]"

108.    On January 29, 2020 at 7:44 am, Plaintiff received a text message from an unknown number stating "The Rape, Abuse & Incest National Network is an American nonprofit anti-sexual assault organization, the largest in the United States[.]"

109.    On February 19, 2020 at 5:18 pm, Plaintiff received a text message from an unknown number stating "[PLAINTIFF] IS A RAPIST[.]"

110.    On March 6, 2020 at 4:45 am, Plaintiff received a text message from an unknown number stating "BUMBLE HELPING YOU FIND MORE RAPE VICTIMS?"

111.    On April 13, 2020 at 7:04 pm, Plaintiff received a text message from an unknown number stating "EVIL RAPIST[.]"

112.    On April 30, 2020 at 12:50 pm, Plaintiff received a text message from an unknown number stating "Still within statute of limitation for Rape Your atrocities will be brought to justice[.]"

29

113.    On December 23, 2020, at 12:21 am, Plaintiff received a text message from an unknown number stating "Victims never forget the date of their rape[.]" Notably, and mentioned for the sole purpose of tying Sebrow to the anonymous text messages, an earlier email from Sebrow had also referenced a date in December as the alleged date of her alleged rape.

114.    Sebrow also texted Plaintiff's family using the account.

**Defendant's Scheme to Publicly Defame and Harass Plaintiff**

115.    In or about October 2019, Sebrow organized a scheme complained of here (Sebrow Internet Plan) to damage harass and defame Plaintiff on the Internet.

116.    Sebrow manipulated other individuals to effectuate the Sebrow Internet Plan.

117.    Sebrow has maliciously damaged Plaintiff by causing to be posted on various major media outlets the allegation that Plaintiff is a "date rapist," has date raped more than 100 women, has violated his own daughter, and, in general, is a very bad and evil man.

118.    Sebrow has accomplished this by causing postings to the effect described in the above paragraph to be displayed prominently on Google.

119.    Sebrow's malicious actions arise out of a former social relationship between Plaintiff and Sebrow, which, after an attempt by Plaintiff to break off the relationship, Sebrow became threatening, abusive, and legally and emotionally damaging crusade of torment and intimidation of Plaintiff culminating in the Google postings described above.

120.    Plaintiff discovered the Google postings mase under the Sebrow Internet Plan in July 2021, by simply "googling" his own name and seeing them there.

121.    When engaged in the Sebrow Internet Plan, Sebrow has attempted to mask her identity and responsibility for the Sebrow Internet Plan in multiple respects, including through the use of two individuals, who she engaged and encouraged to create defamatory and harassing

30

**Formatted:** Line spacing:  single

social media content on sites such as Twitter and at least one website concerning Plaintiff designed to appear on Google under Plaintiff's name.

122.   The two individuals Sebrow engaged for her Sebrow Internet Plan are NK, a resident of Manhattan, New York, and MK, a resident of Langhorne, Pennsylvania.

123.   NK and MK became co-conspirators of Sebrow in her Sebrow Internet Plan to damage Plaintiff.

124.   At all times relevant herein, NK and MK acted on behalf of Sebrow in furtherance of the Sebrow Internet Plan.

125.   In or about July 2019 three websites were created concerning Plaintiff in furtherance of the Sebrow Internet Plan.

126.   The first was a Twitter account entitled "[Plaintiff] and the Issues of Date Rape" and located at the Twitter handle @[Plaintiff]DateRape and url https://twitter.com/[Plaintiff]DateRape (the "Twitter Account").

127.   The second account website was also created in July 2020 and located at the url www.instagram.com/[Plaintiff]_daterape with the account handle "@[Plaintiff]__daterape" (the "Instagram Account").

128.   Both the Twitter Account and Instagram Account directed the readers to the third website, www.real[Plaintiff]_.com (the "Website").

129.   The Twitter Account falsely stated: "[Plaintiff], a 64 year old financial advisor in West Orange, NJ is accused by police of incapacitating 100s of victims by plying them with date rape drugs."

130.   The Twitter Account contained 11 "Tweets," 10 of which directed the viewer to the Website.

31

131.    Notably, the false statement includes Plaintiff's name, age, job description, and city and state, leaving no question that the man described by the account is, in fact, Plaintiff.

132.    The account also provides that Plaintiff had been "accused by police of incapacitating 100s of victims by plying them with date rape drugs." This allegation is unequivocally false.

133.    The false and defamatory Twitter account has plagued a Google search of Plaintiff's name, sometimes appearing as the first result, and remained on the first page when searching his name and location as of the time of the filing of this action.

134.    The Website was registered to Wild West Domains. Following receipt of a subpoena seeking account information, Wild West Domains identified to Plaintiff several individuals responsible for creating the website.

135.    The first person listed was Mr. Solomon of 20 E. Sunrise Highway Valley Stream, NY 11581 with a work phone listed as (908) 420-6530. The email provided for Mr. Solomon was mike@yidefender.com; the response indicates that the individual had been "Verified by Fraud Dept – Customer OK[.]"

136.    Mr. Solomon is Facebook friends with Sebrow.

137.    The second person listed was MK, who is identified as the Registrant Contact, Technical Contact, Administrative Contact, and Billing Contact.

138.    On July 14, 2021 a Visa card ending in 2452 in MK's wife's name paid $24.16 for domain name renewal and privacy and protection and on July 13, 2021 an American Express ending in -1090 which was also in MK's wife's name paid the same amount for the registration and one year of privacy and protection.

139.   MK is also named in the document provided by Wild West Domains by way of his email address – mike@yidefender.com, which is listed under Shopper Info, Shipping Information, and Billing Information for the domain.

140.   At all relevant times, Sebrow knew of, encouraged and fomented the Sebrow Internet Plan and was aware of the repercussions of posting falsities online.

141.   Sebrow nevertheless engaged NK and MK to implement the Sebrow Internet Plan in an effort to hide her true identity while she posted and/or caused to be posted false and defamatory statements concerning Plaintiff with impunity.

142.   NK and MK, working in concert and for Sebrow, created the three websites at the same time and posted on a continuing basis in an effort to ensure their postings would be highly ranked in Google search results.

143.   To facilitate the Sebrow Internet Plan, Sebrow encouraged NK and MK to use a method which is called "search engine optimization" or "SEO" to have the benefit of publishing the false statements across multiple platforms using specific keywords to promote her lies.

144.   Sebrow implemented, encouraged and fomented NK and MK to create the Sebrow Internet Plan with the knowledge of the falsity of the statements in the Sebrow Internet Plan and the implications therefrom, with the reckless disregard for the truth, and/or with malicious intent, both presumed and actual, in knowingly publishing, posting, and widely disseminating such false statements to third parties.

145.   Plaintiff did not learn of the Sebrow Internet Plan until July 2021.

146.   The social media accounts and website created at the behest of Sebrow via the Sebrow Internet Plan have appeared highly in Plaintiff's Google Search results, often above his own work and personal accounts and, as a result, Sebrow's false claims that Plaintiff was under

33

investigation for raping hundreds of women was visible to third parties before Plaintiff's own true professional accomplishments.

147.    Sebrow's sole purpose of implementing the Sebrow Internet Plan was to harass and/or embarrass Plaintiff and publish for the whole world to see falsities about Plaintiff.

148.    Sebrow has undertaken implementing the Sebrow Internet Plan for the sole purpose of harming Plaintiff, a task which she has accomplished.

149.    Sebrow's statements in the Sebrow Internet Plan have caused immense friction with Plaintiff and members of his family, including his children, who discovered the false statements about their father and, upon information and belief, confronted him about it.

150.    Sebrow's statements in the Sebrow Internet Plan have also affected Plaintiff's work life and, upon information and belief, have caused Plaintiff to lose at least one client.

151.    Sebrow's statements in the Sebrow Internet Plan have affected Plaintiff's romantic life as they led to the end of a long-term relationship between Plaintiff and another woman.

152.    These known impacts of the Sebrow Internet Plan, as well as knowing these false and defamatory statements were online and being disseminated to the world at large have caused Plaintiff to experience immense and severe emotional distress.

153.    Plaintiff has spent numerous sleepless nights tortured by feelings of humiliation and embarrassment that third parties who Sebrow knows and as well as those who found the product of the Sebrow Internet Plan online read Defendants' statements and believe them to be true.

154.    Plaintiff was also forced to retain the services of an online reputation management company to suppress the fruits of the Sebrow Internet Plan.

155.    Plaintiff spent approximately $80,500 on reputation management services, separate and apart from what he has spent on attorneys to remove the content from the internet, investigate and confirm Defendant's responsibility, and pursue a lawsuit against her.

156.    On June 4, 2025, Plaintiff was issued a Final Restraining Order which provides that "defendant has committed an act of domestic violence" against him (Exhibit 1).

157.    The same day, Defendant's restraining order against Plaintiff was dismissed, with the court deciding her allegations had "not been substantiated" (*Id.*).

158.    Judge Sanders, who decided the cases, found Plaintiff's testimony to be "credible and truthful…consistent and forthright…candid, reasonable, and…not evasive in any way" (*Id.*, p. 15). Judge Sanders found Defendant Sebrow's testimony to be "less credible, if not wholly incredible in some regards" (*Id.*, p. 11).

**The Destruction and Concealment of Evidence**

159.    Plaintiff was desperate to have Sebrow stop her conduct. After weeks and months of pleading, he contacted an attorney and threatened legal action if she continued to harass him.

160.    Knowing that she was about to be sued, Sebrow began altering and destroying key pieces of evidence that would show her guilt.

161.    For example, upon information and belief, Sebrow destroyed all text messages between her and Plaintiff. Sebrow also destroyed all ESI contained on her devices and refused to turn over her devices for examination.

162.    Sebrow also destroyed emails between her and Plaintiff, altering saved versions of them in a fashion to make it appear Plaintiff was threatening her.

**Formatted:** Line spacing: single

35

**Defendant Files False Police Reports**

163. On or about November 2019 Sebrow filed a false police report accusing Plaintiff of rape.

164. On or about May 17, 2023, Sebrow filed a false police report accusing Plaintiff of violating an order of protection.

165. Both reports were false and actions were not taken by the police.

**FIRST CAUSE OF ACTION**

166. Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

167. Sebrow engaged in the intentional, extreme and outrageous conduct of cyber harassing via the Sebrow Internet Plan in an effort to destroy Plaintiff's good name.

168. Sebrow engaged in and undertook all actions knowing the statements they were making about Plaintiff were false and knowing that Plaintiff was not the one publishing the statements about date rape in his own name.

169. Sebrow' conduct has been so extreme in degree and so outrageous in character that it goes beyond all possible bounds of decency.

170. Sebrow intended to cause severe, emotional distress or recklessly disregarded the likelihood that such conduct would tend to cause severe emotional distress.

171. Such outrageous behavior is beyond the limits of decency and intolerable in a civilized society.

172. As a direct and proximate result of Sebrow's conduct, Plaintiff suffered severe emotional distress.

**Deleted:** <#>The numerous emails and text communications from Sebrow to Plaintiff which include WhatsApp and standard text messages, as well as Facebook messages, in addition to engendering civil liability, are harassment which violate N.J. Stat. § 2C:33-4 and § 2C:33-4 1343, 18 USCS § 1343 and violates New York Penal Law § 240.21 - 240.32, which give rise to a civil cause of action by Plaintiff against Sebrow. ¶

That by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, but not less than $10,000,000.00¶

¶

**SECOND CAUSE OF ACTION**¶

Plaintiff repeats and realleges the allegations stated above as if fully set forth herein. ¶

The information Sebrow caused to be posted, disseminated, or caused to have disseminated on the internet in furtherance of the Sebrow Internet Plan knowing that such publication about Plaintiff is false and defamatory, not the subject of any privilege, and is viewable by many third parties.¶

Sebrow had actual knowledge that the information they published, or caused to be published, by means of the Sebrow Internet Plan about Plaintiff was false and knew or should have known that the information published about Plaintiff was false and defamatory.¶

Sebrow acted with knowledge of the falsity of these statements and the implications therefrom, reckless disregard for the truth, and/or with malicious intent, both presumed and actual, in knowingly implementing, encouraging and fomenting the Sebrow Internet Plan using NK and Mk for the purpose, thereby publishing, posting, and widely disseminating such false statements to third parties.¶

These statements defame and otherwise impugn Plaintiff's character, integrity and reputation. ¶

The statements go on to charge Plaintiff with serious crimes and ethical violations, and Defendant disparages the Plaintiff in his profession, trade and/or business. Such actions are libelous per se.¶

The statements are libelous per se, so that general damages may be presumed as a matter of law.¶

The published false comments were made with the intent to harm Plaintiff and with actual malice.¶

The Defendant's unlawful conduct has caused and will continue to cause Plaintiff imminent, irreparable injuries for which there are no adequate legal remedies. Accordingly, Plaintiff is entitled to permanent injunctive relief.¶

Because Defendant has placed Plaintiff's personal character and reputation publicly at issue, Plaintiff is entitled to a declaratory judgment that Defendant's statements are false.¶

As a consequence of the Defendant's conduct, Plaintiff's reputation has been injured, and the Plaintiff has suffered economic loss.¶

That by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would have otherwise have jurisdiction of this matter, but not less than $10,000,000.00. ¶

¶

**THIRD CAUSE OF ACTION**¶   ... [1]

36

173.    Plaintiff has visited a psychologist weekly since Defendant's campaign against him began.

174.    As a result of Defendant's campaign against him and concomitant devastation of his reputation and standing in the community, Plaintiff has been diagnosed with depression and post-traumatic stress disorder.

175.    Plaintiff has further sought guidance from multiple rabbis, in whom he has also confided regarding the extreme emotional distress he has been forced to endure at the hands of Defendant.

176.    Plaintiff has been devastated by Defendant's behavior – blacklisted from attending religious events at which he had previously and would have otherwise been welcomed. Plaintiff's receipt of a restraining order against Defendant following an extensive trial has made little difference, as Defendant's sway over their once-shared community has resulted in his ostracization.

177.    Defendant's role as a matchmaker has made Plaintiff hopeless that he will ever again find a partner who has not had their views of him tainted by Defendant Sebrow.  He enters every new relationship – personal, professional, or romantic – with the knowledge that they have likely heard Defendant's false claims about him and that he may never be able to convince them that her claims are false.

178.    Plaintiff has been made to feel utterly and completely hopeless that he will be viewed and judged by new people for who he truly is rather than what Sebrow has falsely portrayed him to be.

179.    Defendant's conduct has forever impacted his relationships with his religion and new people, a fact which weighs heavily on Plaintiff, who once found great joy in both.

37

180.    Sebrow acted with the intent to cause severe emotional distress, or alternatively, disregarded the substantial probability that their actions would cause severe emotional distress.

181.    Here, the acts of Sebrow were so egregious and were done so clearly with malice and/or reckless indifference in the face of a perceived risk that their actions would harm Plaintiff's reputation and mental wellbeing, that, in addition to all the damages inflicted upon Plaintiff and in addition to all the measure of relief to which Plaintiff may properly be entitled herein, Sebrow should also be required to pay punitive damages to punish them for their reckless conduct in the further amount greater than the jurisdictional limit of all lower courts to be determined by the trier of fact, in order to deter them and others similarly situated from engaging in such conduct in the future.

182.    Plaintiff demands judgment against Sebrow in an amount to be determined upon the trial of this action; said amount being sufficient to compensate Plaintiff for his severe injuries as well as an amount sufficient to punish Sebrow for her willful, wanton, reckless and unlawful conduct constituting a complete and reckless disregard for Plaintiff, together with interest, attorneys' fees, costs and disbursements in this action; and said amount exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction, but not less than $10,000,000.00.

## SECOND CAUSE OF ACTION

183.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

184.    Plaintiff is a prominent financial advisor employed by a major financial institution.  In this capacity, Plaintiff manages investment portfolios and provides financial

38

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

**Deleted:** ¶

**Deleted:** FOURTH CAUSE OF ACTION¶
Plaintiff repeats and realleges the allegations stated above as if fully set forth herein. ¶
On or about August 12, 2021, in a Certification signed by Sebrow (Called herein the "Sebrow Certification") in connection with an ongoing New Jersey Domestic Violence claim pending in the New Jersey Superior Court, Chancery Division, Family Part, Essex County, Docket # FV-07-487-22. Sebrow certified as follows:¶
"I have seen the internet postings which are the subject of Plaintiff's TRO Complaint, and I have absolutely no knowledge whatsoever as to who might be responsible for posting them."¶
"For whatever reason, Plaintiff seems either to be convinced that I am responsible for the postings, or he is trying to use me as a scapegoat so he can have someone to blame."¶
"However, I am hereby unequivocally asserting in this Certification, under penalty of perjury, that I have nothing to do with those internet posts, nor do I have any idea who might be responsible for them." ¶
The foregoing statements in the Sebrow Certification are false, and each statement is an act of perjury.¶
The Sebrow Certification was filed in the Superior Court of New Jersey electronically, over the wire system in New Jersey, New York, and the United States.¶
This electronic filing violates N.J. Stat. § 2C:28-1 and N.J. Stat. § 2C:28-2.¶
The Sebrow Certification was knowingly false when made and when submitted to the New Jersey Superior Court. ¶

**Deleted:** FIFTH

**Formatted:** List Paragraph, Left, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

**Deleted:** ¶
Sebrow is guilty of tortious interference because she has interfered with Plaintiff's business relationship with his employer.¶
As alleged above, Plaintiff asserts a claim for interference with his contractual relationship with his employer because:¶
Plaintiff has a valid agreement between at least two parties;¶
Sebrow had knowledge of the agreement;¶
The interference alleged herein caused employment stress and loss of reputation;¶
Sebrow's interference was intentional; and¶
Sebrow's, interference caused Plaintiff to suffer damages. ¶
Upon information and belief, Sebrow had unequivocal knowledge that Plaintiff is a prominent financial advisor, that his reputation has a long-lasting effect with regard to his professional success, and that if they were to damage his reputation, that could cause Plaintiff irreparable damages to his professional career and personal life.¶
More particularly, Plaintiff has a valid business agreement with his employer, in which he produces a certain amo... [2]

**Deleted:** Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

planning services to numerous clients.  Plaintiff's livelihood depends on his ability to retain existing clients and attract new ones – both of which requires that current and prospective clients trust him with their financial assets.

185.    Plaintiff had a reasonable expectation of economic advantage from prospective business relationships with new clients, including but not limited to, Nancy Lenorah Meyers, who was actively considering entering into a professional relationship with Plaintiff for the management of her financial assets until she received a call from Defendant warning her that Plaintiff was a rapist and pedophile who would steal her money.

186.    Plaintiff further had a reasonable expectation of economic advantage from the continued referral of new clients through his professional reputation, community standing, and online presence – all of which are essential to a financial advisor's ability to generate new business.

187.    At all relevant times, Plaintiff's name, professional credentials, and employer were publicly associated with his financial advisory practice, and prospective clients routinely searched for Plaintiff online before deciding whether to entrust him with their assets.

188.    Sebrow knew that Plaintiff is a prominent financial advisor, that his professional reputation is essential to his livelihood, and that if she were to damage that reputation, it would cause Plaintiff irreparable harm to his ability to retain existing clients and attract new ones.

189.    With this knowledge, and motivated solely by personal animus arising from Plaintiff's decision to end their romantic relationship, Sebrow embarked on a deliberate, sustained, and escalating campaign to destroy Plaintiff's professional reputation and interfere with his prospective business relationships through The Sebrow Internet Plan, direct

communications to Plaintiff's monitored work email, direct interference with prospective clients, and threats to contact Plaintiff's clients and business associates.

190.    Defendant's conduct was intentional, without any justification or excuse, and went beyond generally accepted standards of common morality and of law.

191.    Defendant's statements were fraudulent because they were knowingly false, were dishonest because she engaged in this behavior anonymously and through the use of co-conspirators and services designed to hide her true identity, and illegal because it constituted harassment, defamation, and other torts and crimes in violation of federal and state law.

192.    Sebrow had no legitimate business justification, competitive interest, or lawful excuse for any of her conduct.  Her sole purpose was to destroy Plaintiff's reputation and livelihood as retribution for his decision to end their relationship.

193.    Sebrow's malicious interference caused Plaintiff to lose prospective business relationships and the economic advantages that would have flowed from them.

194.    Specifically, upon information and belief, Nancy Lenorah Meyers was considering entering into a professional relationship with Plaintiff for the management of her financial assets.

195.    Ms. Meyers ultimately decided against doing so, however, because she received a phone call from Defendant indicating that Plaintiff was a pedophile and rapist who would steal her money and, when she went online, she saw the information uploaded as part of the Sebrow Internet Plan which only confirmed Sebrow's representations.

196.    Later, once Ms. Meyers began to doubt Defendant's representations, she still declined to invest with Plaintiff due to fear of what Sebrow would do to retaliate against her if she decided to engage with Plaintiff professionally.

197. But for Sebrow's malicious interference, there was a reasonable probability that Plaintiff would have been retained by Ms. Meyers and would have received the anticipated economic benefits of that professional relationship.

198. Beyond the specific loss of Ms. Meyers as a prospective client, Sebrow's campaign has caused Plaintiff to lose additional prospective clients and business opportunities that he would have otherwise obtained through his professional reputation and online presence.

199. Unfortunately, the content created in the Sebrow Internet Plan ensured that virtually every prospective client who conducted even a cursory online search would encounter false accusations of serial rape before finding Plaintiff's true professional credentials.

200. For a financial advisor whose business depends entirely on the trust and confidence of clients and prospective clients, the publication of false accusations of rape, drugging, and sexual predation in the most prominent positions of an internet search is devastating and has caused, and continues to cause, the loss of prospective business relationships.

201. Sebrow's interference with Plaintiff's employer — through the deliberate transmission of false and inflammatory emails to Plaintiff's monitored work email address — further compounded the damage by forcing Plaintiff to meet with his employer's compliance team, undermining his standing within his own firm, and jeopardizing his ability to service existing clients and attract new ones through his employer's platform.

202. As a direct and proximate result of Sebrow's tortious interference with Plaintiff's prospective business relations, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to:

    a. Loss of the prospective professional relationship with Nancy Leorah Meyers and the fees and commissions that would have been generated therefrom;

**Formatted:** Line spacing: single

41

b. Loss of additional prospective clients who, upon searching Plaintiff's name online, encountered the false and defamatory content created pursuant to the Sebrow Internet Plan and declined to engage Plaintiff's services;

c. Diminished ability to attract new clients and generate new business due to the ongoing presence of defamatory content in Plaintiff's online search results;

d. Damage to Plaintiff's professional standing within his employer and the financial services industry;

e. Loss of prospective income, fees, and commissions; and

f. Such other economic losses as will be proven at trial.

203. That by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter, but not less than $10,000,000.00.

**THIRD CAUSE OF ACTION**

204. Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

205. Sebrow is guilty of tortious interference because she has interfered with Plaintiff's business relationship with his employer.

206. As alleged above, Plaintiff asserts a claim for interference with his contractual relationship with his employer because:

207. Plaintiff has a valid agreement between at least two parties;

208. Sebrow had knowledge of the agreement;

209. The interference alleged herein caused employment stress and loss of reputation;

210. Sebrow's interference was intentional; and

211. Sebrow's, interference caused Plaintiff to suffer damages.

212. Upon information and belief, Sebrow had unequivocal knowledge that Plaintiff is a prominent financial advisor, that his reputation has a long-lasting effect with regard to his

42

professional success, and that if they were to damage his reputation, that could cause Plaintiff irreparable damages to his professional career and personal life.

213.    More particularly, Plaintiff has a valid business agreement with his employer, in which he produces a certain amount of gross production for his employer on an annual basis, through his investing and financial planning with his numerous clients.

214.    In order to maintain his standing with his employer, Plaintiff must retain all of his current clients, and given that this may not always be possible, then through bringing new clientele into his business with his employer.

215.    In order for Plaintiff to continue to retain his current client base, and bring in new clientele, his clients and prospective clients must trust him to let him manage their financial assets.

216.    Upon information and belief, by intentionally and/or grossly negligently sending the emails to Plaintiff at Plaintiff's work email account and publishing real[Plaintiff].com, Sebrow knew that they were potentially irreparably harming Plaintiff with regard to his business relationships not just with clients, but also with his employer.

217.    Defendant's conduct was designed to and did actually cause harm to Plaintiff's professional reputation at work as Plaintiff is aware that numerous co-workers have seen the online conduct and/or viewed or heard about the emails Defendant directed to Plaintiff and, in Plaintiff's estimation, have changed how they interact with him as a result.

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0"

218.    Sebrow has engaged in tortious interference against Plaintiff.

219.    That, by reason of the foregoing, Plaintiff has been damaged in a sum of money having a present value which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter, but not less than $10,000,000.00.

## FOURTH CAUSE OF ACTION

220.    Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

221.    Sebrow knew she was going to be sued by Plaintiff for her harassing, defamatory, and fraudulent conduct.

222.    Sebrow had a legal obligation to engage in ESI discovery and turn over electronically stored information relating to the current litigation and her lies about Plaintiff.

223.    This obligation arose from the moment she was served with the New Jersey Domestic Violence Civil Complaint and Temporary Restraining Order dated July 15, 2021 and continued through the filing of this action thereafter.

224.    The ESI discovery, including the text messages and emails were material to the case.  Sebrow is alleging that her phone was "spoofed" and therefore is in sole possession of the information.

225.    Defendant has also concealed the fake police report she filed, and Plaintiff is unable to access the report.

226.    Defendant has refused to turn over a single text message or email between her and third parties, including her named witnesses, concerning Plaintiff.

227.    Plaintiff cannot reasonably have access to the evidence from another source.

228.    Defendant intentionally withheld, altered, and destroyed the evidence with the purpose to disrupt the litigation.

229.    Plaintiff is damaged by the concealment of information.  The information would show that Sebrow committed perjury, created the SpoofCard account, and engaged in harassing, defamatory conduct towards Plaintiff.

44

230. The information further would have revealed a more complete picture of Defendant Sebrow's harassment, showing who Sebrow directly contacted with false claims about Plaintiff and what, exactly, she said.

231. That by reason of the foregoing, Plaintiff has sustained damages, both general and special.

232. Defendant's refusal to produce her electronic devices – despite court orders directing her to do so – forced Plaintiff to incur additional litigation costs.

## FIFTH CAUSE OF ACTION

233. Plaintiff repeats and realleges the allegations stated above as if fully set forth herein.

234. Because Sebrow's conduct is malicious and oppressive, Plaintiff is entitled to be awarded punitive damages to punish Defendant for her wrongful conduct.

235. That by reason of the foregoing, Plaintiff has sustained damages, both general and special.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:

A. injunctive relief against Sebrow in the form of a restraining order from this court against her preliminarily and permanently restraining Sebrow from:
   a. Maintaining the Sebrow Internet Plan;
   b. sending emails, text messages, WhatsApp messages, or any communication via electronic, fax, telephone or any other means, to Plaintiff, his children, his employer, or colleagues;
   c. posting or disseminating information relating to Plaintiff via the media or any form of social media, or print media, or electronic or air media, including but not

limited to Facebook, Instagram, google apps, The Jewish Press, or Sebrow's blog(s);

B. Damages for acts of harassment, defamation, and tortious interference committed by Sebrow; compensatory damages for acts of harassment, defamation, and tortious interference committed by Sebrow, in an amount to be determined at trial, in the amount of $10,000,000; compensatory damage in an appropriate amount, for injury resulting from loss of current and prospective income, emotional distress, and loss of reputation from Sebrow; punitive damages in an appropriate amount, for the intentional, reckless, and negligent nature of Sebrow's conduct, to deter her from further such conduct; interest, costs, and reasonable attorneys' fees incurred by Plaintiff in commencement of this action from Sebrow; any other such further relief as the court deems just and proper.

Dated: New York, New York
April 28, 2026

Respectfully submitted,

Veridian Legal **P.C.**

_/s/ Daniel Szalkiewicz_____
By:     Daniel S. Szalkiewicz, Esq.
        Cali P. Madia, Esq.
23 West 73rd Street, Suite 102
New York, NY 10023
Telephone: (212) 706-1007
Facsimile: (646) 849-0033
daniel@veridianlegal.com
*Attorneys for Plaintiff*

Of Counsel:
BORENSTEIN, MCCONNELL & CALPIN, P.C.
155 MORRIS AVENUE
SUITE 201
SPRINGFIELD, NJ 07081
TEL: (973) 379-2444
FAX: (973) 788-8600
*Counsel for Plaintiff*
Abraham Borenstein, Esq.: NJ ID # 019651979

**Formatted:** Indent: Left: 1", No bullets or numbering

**Deleted:** April 23, 2026April 22, 2026

**Deleted: Daniel Szalkiewicz & Associates,**

**Deleted:** lawdss

**Deleted:** ¶

**Deleted:** ¶ ... [5]

| Page 36: [1] Deleted | Cali Madia | 4/22/26 10:44:00 AM |
|---|---|---|

| Page 38: [2] Deleted | Cali Madia | 4/22/26 12:40:00 PM |
|---|---|---|

| Page 42: [3] Deleted | Cali Madia | 4/22/26 12:59:00 PM |
|---|---|---|

| Page 45: [4] Deleted | Cali Madia | 4/22/26 12:30:00 PM |
|---|---|---|

| Page 46: [5] Deleted | Cali Madia | 4/22/26 1:15:00 PM |
|---|---|---|

**State of New Jersey**
# Prevention of Domestic Violence Act
**ESSEX    County, Superior Court, Chancery Division, Family Part**

☑ **Final Restraining Order (FRO)**          ☐ **Amended Final Restraining Order**

| | |
|---|---|
| **Docket Number** <br> **FV-07-000265-22** | |

of Birth
Defendant's Social Security Number

| Hispanic or Latino? | Defendant's Race |
|---|---|
| ☐ Yes    ☐ No <br> ☑ Unknown | WHITE |

| Defendant's Sex <br> F | Eye Color <br> HAZEL | Hair Color |
|---|---|---|

| Date of Birth <br> 02/01/1964 | Height <br> 5    02 | Weight |
|---|---|---|

Distinguishing Features (Scars, Facial Hair, Etc.)

Driver's License Number

State          Driver's License Expiration Date

**Defendant**
**SEBROW BETTY**
Home Phone Number
(516)849-5863          Work Phone Number
Home Address
ADDRESS UNKNOWN  UNKNOWN NY
Work Address
   NJ

The Court having considered plaintiff's Complaint dated    07/15/2021    seeking an ORDER under the Prevention of Domestic Violence Act, having established jurisdiction over the subject matter and the parties pursuant to *N.J.S.A.* 2C:25-17 et seq., and having found that defendant has committed an act of domestic violence, and all other statutory requirements having been satisfied:

It is on this   04   day of   June      2025   , ORDERED that:

**Sought    Granted**                          **Part I - Relief**

**DEFENDANT:**

1. ☑ ☑ You are prohibited against future acts of domestic violence.
2. ☑ ☑ You are barred from the following locations:
   - ☑ **Residence(s) of Plaintiff**        ☑ **Place(s) of employment of Plaintiff**
   - ☐ Other

3. You are prohibited from having **any** oral, written, personal, electronic, or other form of contact or communication with:
   - ☑ ☑ Plaintiff
   - ☑ ☑ Other(s) (List names & relationship to Plaintiff):

4. You are prohibited from making or causing anyone else to make harassing communications to:
   - ☑ ☑ Plaintiff
   - ☑ ☑ Other(s) (Same as above or list names & relationship to Plaintiff):

5. You are prohibited from stalking, following, or threatening to harm, to stalk or to follow:
   - ☑ ☑ Plaintiff
   - ☑ ☑ Other(s) (Same as above or list names & relationship to Plaintiff):

6. You must pay emergent monetary relief (describe amount and method):
   - ☐ ☐ Plaintiff: $                                    Effective:
   - ☐ ☐ Dependents: $                                   Effective:

7. ☐ ☐ Other appropriate relief:
   Defendant (including substance abuse, mental health or other evaluations and subsequent treatment):

8. ☐ ☐ Psychiatric evaluation:

9. ☐ ☐ Intake monitoring of conditions and restraints (specify):

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Revised: 09/2024, CN: 10211 (DVFRO)

| ✓ | **Final Restraining Order (FRO)** | ☐ | **Amended Final Restraining Order** | **FV-07-000265-22** |

| **Sought** | **Granted** | **Part I - Relief** continued |

**DEFENDANT:**

10. ✓ | ✓ | **PROHIBITIONS AGAINST POSSESSION OF WEAPONS**: You are prohibited from possessing **any and all fire-arms or other weapons** and must immediately surrender these firearms, weapons, permits to carry, applications to purchase firearms and firearms purchaser ID card to the officer serving this court Order. Failure to do so can result in your arrest and incarceration.

Other Weapon(s) (describe)   ANY AND ALL WEAPONS

**PLAINTIFF:**

11. ☐ | ☐ | You are granted exclusive possession of (residence or alternate housing, list address only if specifically known to defendant):

12. ☐ | ☐ | Plaintiff is granted temporary custody of (specify name(s)):

13. ☐ | ☐ | Other appropriate relief:
Plaintiff (describe)

Child(ren) (describe)

**LAW ENFORCEMENT OFFICER**
You are to accompany to scene, residence, shared place of business, other (indicate address, time, duration & purpose):

☐ | ☐ | Plaintiff:

☐ | ☐ | Defendant:

**WARRANT TO SEARCH FOR AND TO SEIZE WEAPONS FOR SAFEKEEPING**

☐ **To any law enforcement officer having jurisdiction -** this Order shall serve as a warrant to search for and seize any issued permit to carry a firearm, application to purchase a firearm and firearms purchaser identification card issued to the defendant and the following firearm(s) or weapon(s).

1. **You are hereby commanded to** search the premises for the above described weapons and/or permits to carry a firearm, application to purchase a firearm and firearms purchaser ID card and to serve a copy of this Order upon the person at the premises or location described as:

2. **You are hereby ordered** in the event you seize any of the above described weapons, to give a receipt for the property so seized to the person from whom they were taken or in whose possession they were found, or in the absence of such person to have a copy of this Order together with such receipt in or upon the said structure from which the property was taken.

3. **You are** to execute this Order immediately or as soon thereafter as is practicable.
   ☐ Anytime   ☐ Other: _____

4. **You are further ordered,** after the execution of this Order, to promptly provide the Court with a written inventory of the property seized per this Order.

Case 2:21-cv-20706-EP-ESA Document 150-1 Filed 06/06/25 Page 402 of 109 PageID: 18333

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Prevention of Domestic Violence Act

| ☑ | **Final Restraining Order (FRO)** | ☐ | **Amended Final Restraining Order** | **FV-07-000265-22** |

**Sought   Granted**                                          **Part II - Relief**

**DEFENDANT:**

1. ☐ ☐ You acknowledge parentage of: _____
2. ☐ ☐ You must submit to genetic testing: _____
3. ☐ ☐ No parenting time (visitation) until further order; _____
4. ☐ ☐ Parenting time (visitation) pursuant to (prior FV, FM, or FD Order) # -- _____ is
         suspended, a hearing is scheduled for: _____
5. ☐ ☐ Parenting time (visitation) is ordered as follows: (specify drop-off and pick-up times and locations, participation of
         or supervision by designated third party):

6. ☐ ☐ Risk assessment ordered (specify by whom): _____
                                                   Return Date: _____

7. ☐ ☐ You must provide compensation as follows: (Appropriate notices have been attached as part of this Order):
   ☐ ☐ Emergent support - Plaintiff: $ _____
   ☐ ☐ Emergent support - Dependent(s): $ _____
   ☐ ☐ Interim support - Plaintiff: $ _____
   ☐ ☐ Interim support - Dependent(s): $ _____
   ☐ ☐ Ongoing Plaintiff support: $ _____ Effective: _____
         Paid via income withholding through the: _____ Probation Div. _____
   ☐ ☐ Other: _____
   ☐ ☐ Ongoing child support: $ _____ Effective: _____
         Paid via income withholding through the: _____ Probation Div. _____
   ☐ ☐ Other: _____
8. ☐ ☐ Medical coverage for plaintiff: _____
9. ☐ ☐ Medical coverage for dependent(s): _____
10. ☐ ☐ Compensatory damages to plaintiff: $ _____
11. ☐ ☐ Punitive damages (describe): $ _____
12. ☐ ☐ You must pay compensation to (specify third party and/or VCCO, and describe):

13. ☐ ☐ You must participate in a batterers' intervention program (specify):

14. ☐ ☐ You must make ☐ rent ☐ mortgage payments (specify amount(s) due date(s) and payment manner):

15. ☐ ☐ Defendant is granted temporary possession of the following personal property (describe):

16. ☐ ☐ Defendant is granted temporary custody of (specify name(s)):

---

☑ **You must submit to fingerprinting and other identification procedures as required by law pursuant to *N.J.S.A.* 53:1-15.**

☑ You must pay a civil penalty of $ 250 ($50.00 to $500.00 per *N.J.S.A.* 2C:25-29) to:
   PAY THROUGH PROBATION within 30 days. You will be charged a $2.00 transaction fee for each
   payment or partial payment that you make.

☐ Waived due to extreme financial hardship because: _____

---

**Sought   Granted**

**PLAINTIFF:**

17. ☐ ☐ Plaintiff is granted temporary possession of the following personal property (describe):

---

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence.
**Only a court can modify any of the terms or conditions of this court order.**

Revised: 09/2024, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

Page 4 of 4

| ☑ Final Restraining Order (FRO) | ☐ Amended Final Restraining Order | **FV-07-000265-22** |

**Comments:**
06/04/25- FRO GRANTED ON THE GROUNDS OF HARASSMENT AND CYBER HARASSMENT. DEFT. B. S. IS RESTRAINED AND MUST STAY AT LEAST 1000 FEET AWAY FROM PLTF ▓▓ . DEFT. B.S. IS ORDERED TO BE FINGERPRINTED WITHIN 14 DAYS OF BEING SERVED WITH THIS ORDER. REPORT 212 WASHINGTON ST. NWK, NJ. DEFT. B. S. IS ORDERED TO PAY CIVIL PENALTY $ 250.00. REPORT TO SAME LOCATION 9TH FL. #951. DEFT B.S. HAS 45 DAYS TO FILE AN APPEAL OF THIS DECISION. ALL RESTRAINTS REMAIN IN FULL FORCE AND EFFECT.

**Addendum:**
6/4/25- DEFT. B.S. B.S MUST COMPLETE ANGER MANAGEMENT INDEPENDENTLY AND PROVIDE REPORT TO THE COURT.

*This Order is to become effective immediately and shall remain in effect until further Order of the Superior Court, Chancery Division, Family Part.*

06/04/2025   03:00 PM          s/ JOSHUA SANDERS
Date                            Honorable

## All Law Enforcement Officers Will Serve and Fully Enforce This Order.
## The Plaintiff Shall Not Be Arrested for a Violation of This Restraining Order.

- **This Final Restraining Order Was Issued After Defendant Was Provided with Notice and the Opportunity to Be Heard and Should Be Given Full Faith and Credit Pursuant to the Violence Against Women Act of 1991, Sec. 40221, Codified at 18 U.S.C.A. S2265(A) and S2266.**

- **If Ordered, Sufficient Grounds Have Been Found By This Court for the Search and Seizure of Firearms and Other Weapons as Indicated in This Court Order.**

- **Defendant Shall Not Be Permitted to Possess any Weapon, ID Card or Purchase Permit While This Order Is in Effect, or for Two Years, Whichever Is Greater.**

### Notice to Plaintiff and Defendant

**IMPORTANT:** The parties cannot themselves change the terms of this Order on their own. This Order may only be changed or dismissed by the Family Court. The named defendant **cannot** have any contact with the plaintiff without permission of the court. If you wish to change the terms of this Order and/or you resume living together, you **must** appear before this court for a rehearing.

### Notice to Defendant

A violation of any of the provisions listed in this Order or a failure to comply with the directive to surrender all weapons, firearm permits, application or identification cards may constitute criminal contempt pursuant to *N.J.S.A.* 2C:29-9(b), and may also constitute violations of other state and federal laws which can result in your arrest and/or criminal prosecution. This may result in a jail sentence.

### Return of Service

☑ Plaintiff was given a copy of the Order by:
SERVED IN COURT EMAIL          12:52 PM  06/06/2025          ESSEX COUNTY SUPERIOR COURT
Print Name                     Time and Date                Signature / Badge Number / Department

☑ I hereby certify that I served the within Order by delivering a copy to the defendant personally:
SERVED IN COURT EMAIL          12:03 PM  06/05/2025          ESSEX COUNTY SUPERIOR COURT
Print Name                     Time and Date                Signature / Badge Number / Department

☐ I hereby certify that I served the within Order by use of substituted service as follows:

Print Name                     Time and Date                Signature / Badge Number / Department

☐ Defendant could not be served (explain):

Print Name                     Time and Date                Signature / Badge Number / Department

**The Courthouse is accessible to those with disabilities. Please notify the Court if you require assistance.**

Distribution:   Family Part,   Plaintiff,   Defendant,   Sheriff,   Other

Revised: 09/2024, CN: 10211 (DVFRO)

Superior Court of New Jersey
**Chancery Division - Family Part**
**ESSEX County**
**Docket Number: FV-07-000487-22**

BETTY     SEBROW
Plaintiff,

vs.

XXXXXXXX
Defendant.

# Order of Dismissal
### Temporary Restraining Order

**THE COURT** having considered the testimony and/or certification at this hearing and the Court having determined that:

1. The Plaintiff having requested dismissal of the matter; and

  ☐ Having read "What Dissolving a Restraining Order Means"

  ☐ Having read and signed "Certification for Dissolution of Restraining Order"

  ☐ Having not been coerced or placed under duress to withdraw the complaint and dissolve the Order;

  ☐ Having been advised of the cycle of domestic violence, and of the protective resources available through the Court and the local domestic violence program(s), especially with regard to housing and Court-ordered emergency custody and support;

  ☐ Understanding that withdrawal of the complaint and dismissal of the Restraining Order will eliminate the protection that had been issued under this Order;

  ☐ Being aware that such withdrawals are **not prejudicial** and if (s)he may need protection in the future, (s)he may apply for a new restraining order;

  ☐ Understanding that if criminal charges were filed by me or the police, dismissal of the restraining order does not dismiss the criminal charges.

2. The Plaintiff failing to appear for Final Hearing; and

  ☐ The Court having been unable to contact the plaintiff via telephone numbers/address given; OR

  ☐ The Court having determined that plaintiff was contacted by the court and/or law enforcement and that coercion or duress did not cause the plaintiff's non-appearance; OR

3. ☑ The Court having determined that the plaintiff's allegation of domestic violence has not been substantiated.

4. ☐ The Municipal Court having denied the TRO application.

5. ☐ The Court having determined on appeal of the Temporary Restraining Order that the required burden of proof has not been met.

6. ☐ The defendant's motion to dismiss is hereby granted.

7. ☐ The Appellate Division entered a decision on _____ stating that the Final Restraining order dated _____ be vacated and case is Dismissed.

**IT IS HEREBY ORDERED** on this 4th day of June, 2025, that the Domestic Violence Complaint, dated 08/05/2021 is **DISMISSED** and the ☑ TEMPORARY RESTRAINING ORDER    **OR** ☐ FINAL RESTRAINING ORDER dated 03/27/2025 is/are vacated, and

**IT IS FURTHER ORDERED THAT:**

  ☐ The complaint is dismissed and present support order under this docket is terminated and any arrears are vacated. Probation to terminate their interest and close case.

  ☐ The complaint is dismissed. Continue present support order and/or arrears to be:

    ☐ transferred to docket _____ **and** ☐ paid through **Probation IV-D**

    or ☐ paid directly to **Plaintiff (obligee)**.

  ☑ Other: DOMESTIC VIOLENCE COMPLAINT IS HEREBY DISMISSED AND TRO IS VACATED AFTER TRIAL.

**s/JOSHUA SANDERS**
Honorable

## Return of Service

☑ **Defendant** was given a copy of the Order by:

EMAIL SERVED IN COURT
print name

12:44 PM     06/06/2025        ESSEX COUNTY SUPERIOR COURT
time and date                  signature / badge number / dept

☑ **Plaintiff** was given a copy of the Order by:

EMAIL SERVED IN COURT
print name

12:44 PM     06/06/2025        ESSEX COUNTY SUPERIOR COURT
time and date                  signature / badge number / dept

Revised:10/2019, CN: 10213 (DV DO)                                        page 1 of 1

## NOT TO BE PUBLISHED WITHOUT
## THE APPROVAL OF THE COMMITTEE ON OPINIONS

 Plaintiff,

v.

B.S.,
 Defendant.

SUPERIOR COURT OF NEW JERSEY
ESSEX VICINAGE
CHANCERY DIVISION, FAMILY PART
DOCKET NO. FV-07-265-22

**OPINION**

B.S,
 Plaintiff,

v.


 Defendant.

SUPERIOR COURT OF NEW JERSEY
ESSEX VICINAGE
CHANCERY DIVISION, FAMILY PART
DOCKET NO. FV-07-487-22

**OPINION**

Decided: June 4, 2025

Abraham Borenstein, Esq., attorney for Plaintiff/Cross-Defendant .
(Borenstein, McConnell, & Calpin, P.C.)

Ira W. Heller, Esq., attorney for Defendant/Cross-Plaintiff B.S. (Ira Heller Law, LLC)

SANDERS, J.S.C.

---

[1] The Court uses initials to identify the parties to protect the identity of the victim. See R. 1:38-3(d)(10).

Page 1 of 57

# I

These matters came before the Court by way of a temporary restraining order, under docket number FV-07-265-22, filed by ⬛. against B.S. for predicate acts including harassment and, in the amended application, contempt of a domestic violence order. The cross-complaint, FV-07-487-22, filed by B.S. against ⬛, alleges predicate acts of criminal coercion, sexual assault, criminal sexual contact, and harassment. Trial in this domestic violence matter commenced in earnest on March 15, 2022, and concluded on March 27, 2025.

The court notes that the trial in this matter was conducted over more than 50 trial days, with hundreds of individual pieces of evidence, including thousands of message transcripts, email chains, call logs, Apple device data, screenshots, and other evidence. The court heard from numerous fact and multiple expert witnesses. The court has also incorporated into this trial record, with the consent of the parties, the testimony adduced during several pre-trial R. 104 hearings.

With the exception of B.S., the court considered all testimony and evidence through both direct and cross-examination. However, in light of the court's prior ruling curtailing cross-examination, the court has refrained from considering any evidence offered by B.S. during cross-examination in light of the fact that she was denied redirect examination. As such, the court has only considered her testimony offered in direct examination.

After the conclusion of the trial on March 26, 2025, the parties submitted written summations, which have been reviewed by this court.

For the reasons that follow, the court hereby GRANTS the final restraining order in favor of ⊠ and DENIES the final restraining order in favor of B.S.

## II

In ⊠'s application, it is alleged that, in the fall of 2018, he began a dating relationship with B.S. After approximately six to eight weeks of dating, ⊠ advised B.S. that he wished to end the relationship. Shortly afterwards, B.S. began to send numerous text messages, which contained vulgar and sexually explicit language. ⊠ informed B.S, that he no longer desired to have any further communication between the two.

Since 2018, on numerous occasions, B.S. has sent text messages and emails that purportedly falsely accuse ⊠ of being a rapist with multiple female victims. B.S. then threatened to inform ⊠'s employer of these false allegations. B.S. contacted ⊠'s female friends and associates, in an attempt to gather information regarding his past sexual history. All of these messages have been entered into evidence. ⊠ has seen B.S. present at the same religious events he attends. ⊠ states that B.S. would typically not take part in these gatherings but believes she does so because she is aware he will be in attendance.

Page 3 of 57

█. states that contact with B.S. has been sparse and infrequent since that time, but he has received text messages from unknown phone numbers, containing similar content to the messages left by B.S. He believes B.S. is using these unknown phone numbers to continue the harassing communication. At a pre-trial R. 104 hearing, it was determined that B.S.'s credit card was used to pay for the Spoofcard account which funded the anonymization of those messages.

█. also often searches his name on Google to see if anything has been written about him. Through Google's search engine, █. discovered a Twitter account titled "[██] and the issues of date rape" with the twitter handle named "@h*****daterape". In the description of the account, the following is written: "[██.], a 64-year-old financial advisor in [omitted] is accused by police of incapacitating 100s of victims by plying them with date rape drugs." █ is fearful that his reputation is being slandered due to these constant false allegations.

█. amended his complaint to include contempt of domestic violence order that, on August 2, 2021, at 9:25:54 AM, B.S. "tweeted" ██

█., in the middle of trial, further amended his application to include the following allegations:

> IN THE FALL OF 2017, [██.], THE VICTIM OF DOMESTIC VIOLENCE, BEGAN A DATING RELATIONSHIP UNDER N.J.S.A. § 2C:25-19(d) WITH [B.S.]. AFTER [██] ADVISED [B.S.] THAT HE WISHED TO END THE RELATIONSHIP, FROM FEBRUARY THROUGH OCTOBER 2018, [B.S.]

Page 4 of 57

BEGAN TO REPEATEDLY SEND [▨.] NUMEROUS THREATENING, LEWD, HARASSING, VULGER, DISPARAGING TEXT MESSAGES TO [▮.] IN THE FORM OF WHATS APP AND IMESSAGES (APPLE), WHICH WERE HARRASSING AND THREATENING, AND WERE DESIGNED TO ANNOY AND PUT [▨.] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [▮.]'S REASONABLE EXPECTATION OF PRIVACY. THESE WERE FOR THE PURPOSE OF HARASSING AND THREATENING [▮.]. [▮.] ADVISED [B.S.] OVER AND OVER TO CEASE, BUT SHE CONTINUED TO DO SO. SUCH MESSAGES CONSTITUTE CYBER HARASSMENT AS DEFINED IN 2C:334.1. SUCH MESSAGES CONTAINED VULGAR AND SEXUALLY EXPLICIT AND COARSE LANGUAGE. THE MESSAGES DISPARAGED [▮.] DIRECTLY AND THIRD PARTIES, AND [▮.]'S FAMILY MEMBERS, ALL WITH THE INTENT OF HARASSING AND THREATENING [▮.]. [▮.] STATES HE REPEATEDLY INFORMED [B.S.] THAT HE NO LONGER DESIRED TO HAVE ANY FURTHER COMMUNICATION BETWEEN THE TWO, THAT HE REGARDED THE MESSAGES AS HARASSMENT AND THREATENING. [B.S.] IN SUCH MESSAGES ALSO THREATENED [▮.]'S STANDING IN THE JEWISH COMMUNITY, AND JEWISH SINGLES WORLD. [B.S.] THREATENED [▮.]'S FINANCIAL STATE. [B.S.] DISPARAGED [▮.]'S SON-IN-LAW, DAUGHTER AND OTHERS REPEATEDLY ALL WITH THE INTENT TO HARASS AND THREATEN [▨.]. [B.S.] ACCUSED [▮] OF RAPE AND ABUSE ALL WITH THE INTENT TO HARASS AND THREATEN [▮.]. [B.S.] THREATENED TO DESTROY [▮]'S LIFE AND REPUTATION ORALLY AND IN SUCH MESSAGES ALL WITH THE INTENT TO HARASS AND THREATEN [▮] AND WERE DESIGNED TO ANNOY AND PUT [▮] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED

Page 5 of 57

WITH [██]'S REASONABLE EXPECTATION OF PRIVACY. [B.S.], A MEDIA PERSONALITY, THREATENED TO EXPOSE [██] PUBLICLY, THEREBY TO RUIN HIM AND HIS LIFE ALL WITH THE INTENT TO HARASS AND THREATEN [██]. [B.S.] ACCUSED [██] OF VIOLATING HIS TEENAGED DAUGHTER. [B.S.] PRESSURED [██] TO GIVE HER A JEWISH DIVORCE DOCUMENT CALLED A "GET." IN THAT REGARD, [B.S.] CONTACTED VARIOUS RABBINIC AUTHORITIES, AND COMMUNITY LEADERS, ALL TO HARASS AND THREATEN [██]. [B.S.] ALSO TELEPHONED [██] REPEATEDLY AND EXCESSIVELY FOR HARASSMENT PURPOSES AND WERE DESIGNED TO ANNOY AND PUT [██] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [██]'S REASONABLE EXPECTATION OF PRIVACY. SINCE 2018, [██] STATES THAT ON NUMEROUS OCCASIONS, [B.S.] HAS CONTINUED TO SEND TEXT MESSAGES AND EMAILS IN WHICH SHE FALSELY ACCUSES [██] AS BEING A RAPIST WITH MULTIPLE FEMALE VICTIMS AND SUCH ACTS WERE DESIGNED TO ANNOY AND PUT [██] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [██]'S REASONABLE EXPECTATION OF PRIVACY. [B.S.] HAS THREATENED TO INFORM [██]'S EMPLOYER OF THESE FALSE ALLEGATIONS AND HAS SENT ABUSIVE EMAILS TO [██] AT WORK, KNOWING HIS EMPLOYER WOULD LEARN OF THE EMAILS ALL WITH THE INTENT TO HARASS AND THREATEN [██] STATES [B.S.] HAS CONTACTED HIS FEMALE FRIENDS AND ASSOCIATES, IN AN ATTEMPT TO GATHER INFORMATION REGARDING HIS PAST SEXUAL HISTORY. [██] ALSO STATES THAT HE HAS SEEN [B.S.] PRESENT AT THE SAME RELIGIOUS EVENTS HE ATTENDS. HE STATES THAT [B.S.] WOULD TYPICALLY NOT TAKE PART IN THESE GATHERINGS, BUT BELIEVES SHE

Page 6 of 57

DOES SO BECAUSE SHE IS AWARE HE WILL BE IN ATTENDANCE. [B.S.] ACCOSTED ▨ AT VARIOUS PUBLIC EVENTS INCLUDING AIPAC, ZOA, SHABBAT NACHAMU AND OTHERS. RECENTLY, [▬]'S IN PERSON CONTACT WITH [B.S.] HAS BEEN SPARSE AND INFREQUENT. BUT THE HARASSMENT CONTINUES AS HE HAS RECEIVED TEXT MESSAGES FROM UNKNOWN PHONE NUMBERS, CONTAINING SIMILAR CONTENT TO THE MESSAGES LEFT BY [B.S.]. [▬] BELIEVES [B.S.] IS USING THESE UNKNOWN PHONE NUMBERS TO CONTINUE THE HARASSING COMMUNICATION. [▬]'S EMPLOYMENT REQUIRES HIM TO CONSTANTLY SEARCH SOCIAL MEDIA AND GOOGLE. [▬] THUS OFTEN SEARCHES HIS NAME ON GOOGLE TO SEE IF ANYTHING HAS BEEN WRITTEN ABOUT HIM. RECENTLY THROUGH GOOGLE'S SEARCH ENGINE, [▬] DISCOVERED A TWITTER ACCOUNT TITLED "[▬] AND THE ISSUES OF DATE RAPE" WITH THE TWITTER HANDLE NAMED "@[▬]DATERAPE". IN THE DESCRIPTION OF THE ACCOUNT, THE FOLLOWING IS WRITTEN: "[▬], A 64 YEAR OLD FINANCIAL ADVISOR IN [OMITTED], NJ IS ACCUSED BY POLICE OF INCAPACITATING 100+ VICTIMS OF RAPE BY PLYING THEM WITH DATE RAPE DRUGS" AND THIS WAS KNOWN BY THE POLICE. [▬.] WAS ACCUSED IN THOSE POSTINGS OF BEING A PEDOPHILE, ALL POSTED AT THE BEHEST OF [B.S.], TO HARASS, THREATEN AND DAMAGE [▬] AND WERE DESIGNED TO ANNOY AND PUT [▬.] IN FEAR FOR HIS SAFETY AND SECURITY AND INTOLERABLY INTERFERED WITH [▬]'S REASONABLE EXPECTATION OF PRIVACY. THOSE POSTINGS WERE BEING READIED OVER A TWO YEAR PERIOD, FROM 2019, UNTIL DISCOVERED BY [▬.] IN JULY 2021. [▬] HAS A CONSIDERED AND REALISTIC FEAR AND CONCERN THAT [B.S.] WILL CONTINUE TO

Page 7 of 57

ENGAGE IN SUCH CONDUCT IN THAT SHE HAS THE WILL, WHEREWITHAL, COMMUNITY STANDING, MOTIVATION AND EVIL INTENT TO DO SO. JUST AS SHE PLANNED AND SUCCEEDED IN FILING THE MEDIA NOTICES FROM 2019 TO 2021, SHE COULD EASILY DO SO AGAIN. BECAUSE OF ALL OF THIS, [XX]'S LIFE HAS BEEN SINCE 2018, CONTINUING TO DATE, AN EXISTENCE OF FEAR, HARASSMENT, THREATS, FINANCIAL DISRUPTION, AND SOCIAL DISRUPTION. [XX] HAS BECOME MORE INTROVERTED, RECLUSIVE, STAYS HOME, PARTICIPATES IN FEWER EVENTS OR EVEN PRAYER SESSIONS. IN GENERAL HIS LIFE HAS BEEN IRREPARABLY DISRUPTED DUE TO SUCH HARASSMENT AN ONGOING THREAT OF HARASSMENT BY [B.S.]. [XX] IS FEARFUL THAT HIS REPUTATION IS BEING SLANDERED DUE TO THESE CONSTANT FALSE ALLEGATIONS.

In B.S.'s application, it is alleged that [XX] falsely accused plaintiff of sending a Twitter message to him. B.S. stated that she obtained the above information due to [XX] monitoring her on twitter. She alleges that the parties had a dating relationship that ended some time prior to the filing of the restraining orders. [XX] has been sending unwanted messages to B.S. in an attempt to rekindle the relationship. B.S. alleges that the [XX] showed up places the plaintiff was located without invitation and unannounced.

B.S.'s application was amended to include predicate acts of criminal coercion, sexual assault, and criminal sexual contact. On a prior date, B.S. visited the [XX] at a hotel. Upon arrival, [XX] gave B.S. a drink. After B.S. consumed the drink, she

became unconscious. She alleges that ▨ then took lewd photographs of her. ▨ then used the lewd photographs to coerce her into performing sex acts with him. ▨ forced B.S. to perform vaginal and oral sex acts.

**III**

In deciding what testimony to believe, the court must determine the credibility of witnesses who testify before it.  The court may consider: (1) the witness' interest, if any in the outcome of this case; (2) the accuracy of the witness' recollection; (3) the witness' ability to know what he/she is talking about; (4) the reasonableness of the testimony; (5) the witness' demeanor on the stand; (6) the witness' candor or evasion; (7) the witness' willingness or reluctance to answer; (8) the inherent believability of the testimony; (9) the presence of any inconsistent or contradictory statements.  Model Jury Charge (Civil), 1.12K, "Credibility" (approved Nov. 1998). The court is further guided by the Model Jury Charge entitled "False In One – False In All," wherein factfinders are instructed that, "[i]f you believe that any witness or party willfully or knowingly testified falsely to any material facts in the case, with intent to deceive you, you may give such weight to his or her testimony as you may deem it is entitled.  You may believe some of it, or you may, in your discretion, disregard all of it."  Model Jury Charge (Criminal), "False in One – False in All" (rev. Jan. 14, 2013).

Page 9 of 57

Throughout this hearing, the court had the opportunity to consider and watch the witnesses' demeanor as they testified. Further, the court had the opportunity to assess their credibility, their truthfulness, and the manner in which they comported themselves. Overall, the court finds that the testimony of ▨ was credible and truthful. His testimony was consistent and forthright. His recollection was candid, reasonable, and he was not evasive in any way. His testimony was believable.

Moreover, his testimony was largely corroborated by the evidence adduced during this trial. The court notes that it is well established a party is not limited to offering direct evidence and may prove its case in whole or in part through circumstantial evidence, provided that evidence "is so clear and strong" as to demonstrate guilt by the requisite standard. State v. Donohue, 2 N.J. 381, 389 (1949); see also State v. Phelps, 96 N.J. 500, 511 (1984). Indeed, circumstantial evidence is often "more certain, satisfying and persuasive than direct evidence." State v. O'Connor, 134 N.J.L. 536, 539 (Sup. Ct. 1946); see also State v. Dancyger, 29 N.J. 76, 84 (1959). Here, the court need look only to the exhibits entered into evidence as circumstantially supporting ▨'s contentions. For example, given the message chains as between the parties, the court notes that B.S. denied authorship, in part and or in whole, of many of the messages. However, the messages themselves have a continuity of thought and conversation which repudiates B.S.'s position that some messages were wholesale fabricated by ▨ at the time that they were sent. In

looking to the content of these messages, they largely corroborate ▨'s testimony

at trial. Therefore, the court finds ▨ to be entirely credible as to his testimony in

this trial.

By comparison, the court finds B.S. to be less credible, if not wholly

incredible in some regards, than ▨ particularly in light of the court's ability to

view and interpret the evidence of the subject incident and how it comported with

her testimony.

By way of example, B.S. testified that various messages were fabricated in

content, chronology, or both. However, she offers only her testimony in contrast to

that of the three experts who testified about the accuracy and reliability of the

Cellebrite extraction process. Their expert opinions, which the court adopts as

unrebutted, provides that the messages entered into evidence in this trial were

authentic and reliable. B.S. argues that, despite the use of the Cellebrite extractions,

that these messages are somehow fraudulent.

Here, the court pauses to comment on the accuracy and reliability of Cellebrite

extractions. Distilling the experts' testimony, Cellebrite UFED tool is a software

program which, when the Cellebrite UFED tool is connected to a device such as a

cellular telephone, creates a copy of the data located on that device and transfers that

data to another medium for storage and examination. Based upon the unrebutted

testimony of the experts, the court finds that the Cellebrite reports were properly

authenticated under N.J.R.E. 702 and 901. The defendant was able to, but did not, challenge the testimony of ██'s experts in this regard. This court has no basis, other than B.S.'s testimony, to conclude that the messages are indeed fraudulent.

For example, assuming as the court must given the state of the record through the lens of the experts, the messages extracted from ██'s phone, are authentic as to being from his phone. These messages are combinations of iMessages, WhatsApp messages, and emails. B.S.'s position is that these messages have been altered to insert language that she herself did not draft, to alter the dates and times when certain message had been sent, and to otherwise modify those messages. Based upon the unrebutted testimony of the experts, there does not appear to be any modality upon which these types of modifications could occur pre- or post-extraction, or, at least, B.S. has not proffered by compelling theory as to how these messages were purportedly modified. As such, the court accepts that the exhibits in the record are accurate insofar as they were removed from ██'s telephone.

That does not end the inquiry as B.S. alleged that ██ both had her passwords and access to her cellular telephone. As such, to find B.S.'s allegations credible in that ██, or some other person, authored the challenged messages, the court would have start with the fact that the messages were sent in "real time" as reflected in the time and date stamps on those messages given the experts' testimony. The court again pauses to note that this does not corroborate B.S.'s testimony that she authored

Page 12 of 57

some messages, but that they were sent at times in contravention of the time and date stamps on those messages. This further impairs the credibility of B.S.

Continuing, the court cannot find as credible B.S.'s implied testimony that ▨ himself sent the offensive messages to himself in real time. Preliminarily, the court accepts as credible ▨'s testimony that any questionable emails received by him at his workplace email address must be reported to human resources. Emails attributed to B.S. were sent to ▨ at his work email accusing him of rape and abuse of his daughter. By virtue of ▨'s testimony that these emails must be reported to human resources, to accept B.S.'s implied testimony that these messages were sent at the behest of ▨▨ would have chosen to send emails that specifically endangered his employment. The court cannot find any basis to accept this as the ground truth reality. Given ▨'s position with his employer, the court is hard pressed to find it more likely than not that ▨, at the time that the messages were sent, elected to have messages sent to his employment accusing him of molesting his daughter. The court cannot discern a plausible reason for ▨ to engage in an electronic version of reputational Russian roulette to frame B.S. The court simply cannot find that this is credible given the totality of the circumstances as ▨ had less professionally dangerous modalities to frame B.S. rather than those that imperiled his employment.

As such, the court finds that B.S.'s denials as to the drafting and sending of the emails are wholly incredible. In evaluating this factual conclusion through the lens of "False In One – False In All," the court finds that B.S. is generally incredible on this basis in light of her fabricated testimony as to the authorship of the messages.

Independently, the court also finds that B.S. is incredible on other bases. Moving past the unsupported allegations that others modified the various messages, the court also notes the demeanor of B.S. on the stand. While the court again focuses only upon her direct examination, the court finds that her testimony about the alleged sexual assault and her conduct thereafter likewise strains credulity. Her testimony vacillated and was both internally and externally inconsistent.

Her testimony about Kiderman's and Kogan's unsolicited conspiracy to post the offensive statements about ▪▪, in light of their entirely credibly testimony is simply not reasonable. She alleges that Kiderman and Kogan, unsolicited by B.S., created and posted the various internet content in relation to ▪▪. However, the court has no basis to find either Kiderman or Kogan incredible as to the central issues surrounding the internet postings. The court cannot credit B.S.'s testimony that Kiderman and Kogan perpetrated these internet postings of their own volition in the absence of B.S.'s involvement. B.S.'s testimony in this regard simply does not ring true even before the court assigns substantial credibility to both Kiderman and Kogan. Combining the implausible nature of B.S.'s allegations with the credibility

findings as to Kogan and Kiderman is yet another death knell to B.S.'s credibility. As such, independent of other bases, this serves to substantially undermine B.S.'s credibility.

Further, B.S.'s demeanor on the stand on direct examination further independently erodes any confidence that the court has in relation to the accuracy and reliability of her testimony. Her facial expressions on direct and her reactions to various evidence causes the court to question her veracity. Her body language and reactions were such as to render silent any ring of truth that could be associated with the words contained in her testimony. Simply put, B.S.'s testimony lacked objective indications associated with candor and honesty by failing to demonstrate a modicum of understanding as to the severity and solemnity of the proceedings. This is in stark contrast to ▨▨who answered all of the questions carefully, thoughtfully, and deliberately, unlike B.S. even during direct. There was no indication that ▨▨ was exaggerating or embellishing his answers, again unlike B.S.

Damning is the issue of her Chase Credit card that was used to pay for the electronic communications made via Spoofcard. The court held a pre-trial R. 104 hearing as to this issue relegated, <u>inter alia</u>, as to the subpoenas for her banking information. At trial, B.S. expressly and impliedly denied that she intentionally used her credit card, instead proclaiming that ▨▨ had access to all of her accounts and devices. Yet, again, it remains illogical and unreasonable that ▨▨ would create

Page 15 of 57

these electronic communications, at that time, for a purpose that cannot be readily gleaned by the court other than to frame B.S. for some undetermined goal. Where this breaks down for the court is, if the goal is framing B.S., ▨ possesses substantially greater financial resources than B.S. as the court understands. As such, there is no readily apparent financial motive fo ▨ to frame B.S. No other motive has been proffered or established. The court, considering all of the evidence in this matter, simply cannot find B.S.'s denials and explanations as to the reason that her credit card was used to pay for some of the electronic communications as credible.

Moreover, B.S.'s testimony as to the Verizon telephone records was also incredible. Her denials as to making repeated telephone calls to ▨ simply fall flat. The records are in evidence and were properly authenticated, despite B.S.'s vehement objections as to the source of these records being unrelated litigation. There is no evidence to challenge the accuracy and reliability of these records. The locations of the outgoing caller when the calls were made are accepted by this court as accurate and reliable. B.S.'s denials as to making these telephone calls are neither accurate nor reliable in the face of this compelling evidence that a supermajority of these calls were made to ▨ near his home from near B.S.'s home. As such, this is yet another independent basis for the court to find B.S. incredible.

Overall, and combining all of the aforementioned issues, the court believes that B.S. cumulatively willfully or knowingly testified falsely to many material facts

Page 16 of 57

in the case, with intent to deceive the court, and, as such, the court disregards the supermajority of her testimony as being incredible.

Given that the standard of proof in domestic violence cases is by a preponderance of the evidence, and based upon the entirety of this record, the court finds that it is more likely than not that B.S. did, in fact, author all of the disputed communications, including the Spoofcard calls, made all of the related telephone calls to ▨., and was responsible for the various internet postings.

## IV

New Jersey's Prevention of Domestic Violence statute is found in N.J.S.A. 2C:25-17 to -35 ("the Act"). The Legislature intended to provide emergency and long-term protection to domestic violence victims whose criminal complaints had traditionally been treated cavalierly by law enforcement because they arose in a domestic violence context. Corrente v. Corrente, 281 N.J. Super 254 (App. Div. 1985). The Act is intended to assure victims of domestic violence the maximum protection from abuse that the law can provide. New Jersey law has a strong policy against domestic violence. Because the Act is remedial in nature, it is to be construed liberally to achieve its salutary purpose. Cesare v. Cesare, 154 N.J. 394 (1998). The Legislature encourages broad application of the act to confront the problem of domestic violence. State v. Harris, 211 NJ 566, 579 (2012).

There is no such thing as an act of domestic violence that is not serious. Brennan v. Orlan, 145 N.J. 282, 298 (1996). The fears of a domestic violence victim and the turmoil he/she has experienced should not be trivialized. State v. Hoffman, 149 N.J. 564 (1997). Accordingly, the New Jersey Legislature has expressly found and declared that domestic violence is a serious crime against society. N.J.S.A. 2C:25-18.

However, the Act is not a primer for social etiquette and should not be used as a sword to wield against every unpleasant encounter or annoying interaction that occurs between household members, or former household members. Besocnik v. Gallegos, 367 N.J. Super. 253 (App. Div. 2004). There are inherent dangers in overextending the criminal definitions of the predicate acts. Even when one's conduct is less than model, it is not automatically in every case, domestic violence. Peranio v. Peranio, 280 N.J. Super. 47 (App. Div. 1995).

The Domestic Violence Act was intended to address matters of consequence as relating to violence, not ordinary domestic contretemps. Corrente, 281 N.J. Super at 243. Applying the Act to ordinary domestic contretemps can trivialize the plight of true victims of domestic violence and potentially misuses the legislative vehicle designed to protect them. The Act should not be distorted or trivialized by misuse. N.B. V. T.B., 297 N.J. Super 35 (App. Div. 1997). The Supreme Court has emphasized the care a trial court must exercise to distinguish between ordinary

Page 18 of 57

disputes and disagreements and those acts that cross the line into domestic violence. J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). A plaintiff's assertion he or she felt harassed is insufficient to satisfy the statutory element. Id. at 484. As the Court held, a "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487.

To secure a final restraining order ("FRO") under the Prevention of Domestic Violence Act, a party must establish that the other party committed a predicate act of domestic violence, as defined in N.J.S.A. 2C:25-19(a), and that a restraining order is required to protect her from further acts of domestic violence. Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Here, the predicate acts alleged are:

- Harassment under N.J.S.A. 2C:33-4;

- Cyber Harassment under N.J.S.A. 2C:33-4.1;

- Contempt under N.J.S.A. 2C:29-9(b);

- Sexual assault under N.J.S.A. N.J.S.2C:14-2;

- Criminal sexual contact under N.J.S.2C:14-3; and

- Criminal coercion N.J.S.2C:13-5.

By way of jurisdiction, the court finds that the parties have satisfied the jurisdictional requirements of the Act as the incidents (the receipt of the messages) occurred in Essex County and ▨ resides in Essex County. Additionally, the court finds that both ▨ and B.S. have satisfied the definition of, and qualifies as,

Page 19 of 57

a victim for domestic violence purposes, as they both alleged she has been subjected to domestic violence by a person with whom they had a dating relationship.

## A

The court starts with B.S.'s allegations of harassment, criminal coercion, criminal sexual contact, and sexual assault. Importantly, the court does not find B.S.'s allegations of prior domestic violence, to wit the alleged incidents including threats to kill and to publicly humiliate B.S. to be credible.

Criminal coercion is defined as follows:

> A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to:
>
> **(1)** Inflict bodily injury on anyone or commit any other offense, regardless of the immediacy of the threat;
>
> **(2)** Accuse anyone of an offense;
>
> **(3)** Expose any secret which would tend to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;
>
> **(4)** Take or withhold action as an official, or cause an official to take or withhold action;
>
> **(5)** Bring about or continue a strike, boycott or other collective action, except that such a threat shall not be deemed coercive when the restriction compelled is demanded in the course of negotiation for the benefit of the group in whose interest the actor acts;

Page 20 of 57

**(6)** Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

**(7)** Perform any other act which would not in itself substantially benefit the actor but which is calculated to substantially harm another person with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.

N.J.S.A. 2C:13-5a.

At core, B.S. alleged that

> THE PARTIES HAVE AN ACTIVE TRO WITHIN FV-07-000265-22 IN WHICH THIS PLAINTIFF ([B.S.]) IS THE LISTED DEFENDANT. WITHIN THIS TRO, PLAINTIFF ALLEGES THAT THE DEFENDANT FALSELY ACCUSED PLAINTIFF OF SENDING A TWITTER MESSAGE TO DEFENDANT. PLAINTIFF STATED THAT OBTAINED THE ABOVE INFORMATION DUE TO DEFENDANT MONITORS PLAINTIFF ON TWITTER. PLAINTIFF ALLEGES THAT THE PARTIES HAD A DATING RELATIONSHIP THAT ENDED SOMETIME AGO. DEFENDANT HAS BEEN SENDING UNWANTED MESSAGES TO PLAINTIFF IN AN ATTEMPT TO REKINDLE THE RELATIONSHIP. PLAINTIFF ALLEGES THAT THE DEFENDANT SHOWED UP PLACES THE PLAINTIFF WAS LOCATED WITHOUT INVITATION AND UNANNOUNCED.
>
> ORDER AMENDED ON 8/6/2021 TO INCLUDE PREDICATE ACTS OF CRIMINAL COERCION, SEXUAL ASSAULT, AND CRIMINAL SEXUAL CONTACT. THE FOLLOWING IS ALSO INCLUDED:
>
> ON A PRIOR DATE, PLAINTIFF VISITED THE DEFENDANT AT A HOTEL. UPON ARRIVAL,

Page 21 of 57

> DEFENDANT GAVE PLAINTIFF A DRINK. AFTER PLAINTIFF CONSUMED THE DRINK, PLAINTIFF BECAME UNCONSCIOUS. PLAINTIFF ALLEGES THAT THE DEFENDANT THEN TOOK LUDE PHOTOGRAPHS OF PLAINTIFF. DEFENDANT THEN USED THE LUDE PHOTOGRAPHS OF PLAINTIFF TO COERCE PLAINTIFF INTO PERFORMING SEX ACTS WITH DEFENDANT. DEFENDANT FORCED PLAINTIFF TO PERFORM VAGINAL AND ORAL SEX ACTS. DEFENDANT SEXUALLY ASSAULTED PLAINTIFF.

Thus, the court evaluates her allegations under N.J.S.A. 2C:13-5a(3).

Based upon the court's credibility findings <u>supra</u>, the court cannot find by a preponderance of the evidence that ▓▓. threatened to expose any secret which would tend to subject B.S. to hatred, contempt or ridicule, or to impair her credit or business repute. The court cannot find any credible evidence in the record supporting B.S.'s allegations tha ▓▓ took photographs of her whilst she was unconscious and then coerced her into maintaining a sexual relationship with him thereafter. Therefore, the court dismisses her application for a final restraining order alleging criminal coercion.

Next, the court moves to B.S.'s allegation of criminal sexual contact. Under N.J.S.A. 2C:14-3, in pertinent part,

> **a.** An actor is guilty of aggravated criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in 2C:14-2 a.(2) through (7).

Page 22 of 57

    **b.** An actor is guilty of criminal sexual contact if he commits an act of sexual contact with the victim under any of the circumstances set forth in section 2C:14-2 c.(1) through (5).

Here, the court again need not pause long to resolve this issue. Similar to the court's findings as to criminal coercion, there is simply no credible evidence in this record to establish that ▉▉▉ committed any act of criminal sexual contact as against B.S. The court cannot find B.S.'s allegations to have any credibility considering the totality of the circumstances. Therefore, the court dismisses that part of her application for a final restraining order alleging criminal sexual contact.

    As for sexual assault, under N.J.S.A. 2C:14-2c,

> An actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:
>
>     (1) The actor commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury;
>
>     (2) The victim is on probation or parole, or is detained in a hospital, prison or other institution and the actor has supervisory or disciplinary power over the victim by virtue of the actor's legal, professional or occupational status;
>
>     (3) The victim is at least 16 but less than 18 years old and:

> (a) The actor is related to the victim by blood or affinity to the third degree; or
>
> (b) The actor has supervisory or disciplinary power of any nature or in any capacity over the victim; or
>
> (c) The actor is a resource family parent, a guardian, or stands in loco parentis within the household;
>
> (4) The victim is at least 13 but less than 16 years old and the actor is at least four years older than the victim;
>
> (5) The victim is a pupil at least 18 but less than 22 years old and has not received a high school diploma and the actor is a teaching staff member or substitute teacher, school bus driver, other school employee, contracted service provider, or volunteer and the actor has supervisory or disciplinary power of any nature or in any capacity over the victim. As used in this paragraph, "teaching staff member" has the meaning set forth in N.J.S.18A:1-1.

Here, again, the court incorporates its prior findings and denies the application for a final restraining order on the basis of sexual assault as there is no credible evidence in support of B.S.'s allegations.

As for B.S.'s final allegation of harassment, "[h]arassment is the most frequently reported predicate offense among those statutorily recognized in N.J.S.A. 2C:25-19 as a basis for a finding of domestic violence." L.M.F. v. J.A.F.,

Jr., 421 N.J. Super. 523, 533-34 (App. Div. 2011) (citing J.D., 207 N.J. at 476). The Supreme Court has emphasized the care a trial court must exercise to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence. J.D., 207 N.J. at 475-76. A plaintiff's assertion he or she felt harassed is insufficient to satisfy the statutory element. Id. As the Court held, a "victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose." Id. at 487. Vulgar name-calling alone is not domestic violence. E.M.B. v. R.F.B., 419 N.J. Super. 177, 182-83 (App. Div. 2011).

A fundamental element making a communication criminal harassment is the purpose to harass. "'[P]urpose to harass' is critical to the constitutionality of the harassment offense." State v. Castagna, 387 N.J. Super. 598 (App. Div.), certif. denied, 188 N.J. 577 (2006); see also State v. L.C., 283 N.J. Super. 441, 450 (App. Div. 1995) (holding the harassment statute was not enacted to "proscribe mere speech, use of language, or other forms of expression"), certif. denied, 143 N.J. 325 (1996). Because direct proof of intent is often absent, "purpose may and often must be inferred from what is said and done and the surrounding circumstances[,]" and "[p]rior conduct and statements may be relevant to and support an inference of purpose." Castagna, supra, 387 N.J. Super. at 606 (citations omitted); see also H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (the purpose to harass may be inferred from "common sense and experience."). However, "mere awareness that someone might

Page 25 of 57

be alarmed or annoyed is insufficient." J.D., supra, 207 N.J. at 487 (citing State v.

Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). That is, a plaintiff's subjective

reaction to the conduct, standing alone, is insufficient to establish a defendant acted

with improper purpose. Ibid.

The petty disorderly persons offense of harassment requires a person,

> if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

N.J.S.A. 2C:33-4.

The Court pauses briefly to address subsection (a) as to the non-anonymous

messages. As for these messages, sent at various hours as between the parties, that

appears to have been the modality of the parties' communications with each other.

Setting aside the numerosity of B.S.'s communications, which shall be addressed

infra, the court finds no harassment insofar as ████'s communications as to B.S.

under (a). Given the factual backdrop, the court cannot conclude that ████'s

Page 26 of 57

communications were made at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm.

Moving to subsection (b), the court, again incorporating the prior findings of fact and conclusions of law, cannot find that there is a preponderance of credible evidence that ▨, while intending to harass S.B., subjected her to striking, kicking, shoving, or other offensive touching, or threatened to do so. As such, there is no basis to find a predicate act of harassment under subsection (b).

As to subsection (c), there is no dispute that ▨ authored and sent the various messages to B.S. However, a review of the record reveals no evidence to support that these messages were sent with the intent to harass as required by N.J.S.A. 2C:33-4. Cesare, 154 N.J. at 412. Even if some of ▨'s communications could be considered "off color," isolating these comments in a vacuum to establish harassment, without reviewing the surrounding context, including B.S.'s preceding communications, would not provide the full picture and serves to distort the ground truth reality. See L.M.F., supra, 421 N.J. Super. at 534 ("Our ability to instantaneously and effortlessly send electronic messages has created a gateway unfettered by reflection and open to rash, emotionally driven decisions."). The same applies to the number of messages sent by the ▨

In this matter, there is simply no evidence of an intent to harass by ▨. The Act "is not designed to interdict all forms of unpleasant exchanges between

Page 27 of 57

parties." <u>Bresocnik</u>, 367 N.J. Super. at 181. A mere expression of anger or frustration between persons in a requisite relationship is not an act of harassment. The court must "[d]raw[] the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of 'ordinary domestic contretemps.'" <u>See</u> <u>J.D.</u>, <u>supra</u>, 207 N.J. at 475 (quoting <u>Corrente</u>, <u>supra</u>, 281 N.J. Super. at 249-50).

The context of ▨'s statements matters. Excising portions of his statements without weighing the entirety of the comments, as well as whether they are responsive to an ongoing dispute or conversation, leads to an unsupportable result. The Court concludes the evidence in the record is insufficient to show ▨ acted with a purpose to harass plaintiff. N.J.S.A. 2C:33-4(c). A finding of harassment cannot be sustained as the Court cannot find, by a preponderance of the credible evidence that a predicate act of domestic violence occurred.

As such, and given the foregoing, the court cannot find that any of the alleged predicate acts by ▨ are supported by a preponderance of credible evidence. Therefore, the court hereby dismisses her application for a final restraining order and the temporary restraining order previously issued is hereby vacated.

The opposite result is compelled in relation to ▨'s allegations as against B.S.

**B**

First, the court shall address the internet postings made at the behest of B.S. For the reasons that follow, the court cannot make a finding of harassment as to B.S.'s public postings in relation to ▰▰

Under N.J.S.A. 2C:33-4(c), a person who, with the purpose to seriously annoy another, does seriously annoy or alarm another is guilty of harassment. Speech, however, cannot be transformed into criminal conduct merely because it annoys, disturbs, or arouses contempt. The First Amendment protects offensive discourse, hateful ideas, and crude language because freedom of expression needs breathing room and, in the long run, leads to a more enlightened society best prepared for the Locke-ian social contract upon which our constitutional republic is predicated. Outside of the category of obscenity, courts should not play the role of censor by engaging in a weighing of an expression's value or relative social costs and benefits. Speech cannot be criminalized merely because others see no value in it.

Nonetheless, neither the First Amendment of the United States Constitution nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. The First Amendment also

does not bar states from enacting laws that punish expressive activity when substantial privacy interests are being invaded in an essentially intolerable manner.

This constitutional dichotomy as between harassment and protected speech was addressed by the New Jersey Supreme Court in State v. Burkert, 231 N.J. 257 (2017). The Court juxtaposed a citizen's right to free speech with the Legislature's right to proscribe unprotected speech by limiting the harassment statute. First, the Court recognized that

> [l]aws may "not transgress the boundaries fixed by the Constitution for freedom of expression." Winters v. New York, 333 U.S. 507, 515 (1948). Accordingly, "the scrutiny to be accorded legislation that trenches upon first amendment liberties must be especially scrupulous." State v. Cameron, 100 N.J. 586, 592 (1985). The constitutional guarantee of free speech, moreover, imposes higher "standards of certainty" on criminal laws than civil laws. Winters, 333 U.S. at 515. "Penal laws . . . are subjected to sharper scrutiny and given more exacting and critical assessment under the vagueness doctrine than civil enactments." Cameron, 100 N.J. at 592.

Burkert, 231 N.J. at 275-76. The Court then taught that

> neither the First Amendment nor Article I, Paragraph 6 of our State Constitution prohibits the State from criminalizing certain limited categories of speech, such as speech that is integral to criminal conduct, speech that physically threatens or terrorizes another, or speech that is intended to incite imminent unlawful conduct. See United States v. Alvarez, 567 U.S. 709, 717 (2012); cf. Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264 (1998).

Id. at 281-82.

As detailed supra, N.J.S.A. 2C:33-4 provides: "[A] person commits a petty disorderly person offense if, with purpose to harass another, he: . . . (c) [e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." The Court held that, "[i]n cases based on pure expressive activity, the amorphous terms 'alarming conduct' and 'acts with purpose to alarm or seriously annoy' must be defined in more concrete terms consonant with the dictates of the free-speech clauses of our Federal and State Constitutions." Burkert, 231 N.J. at 284-85. The Court clarified that "[n]arrowly reading the terms alarm and annoy—as we have done in past cases involving subsection (a) of N.J.S.A. 2C:33-4—will save the statute from constitutional infirmity." Id. (citing Cesare, 154 N.J. at 404).

Therefore, for constitutional reasons, the meaning of the terms "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" as repeated communications directed at a person must reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy. To be clear, this standard applies only in those cases where the alleged harassing conduct is based on pure expressive activity. Under that standard, repeated threats or menacing communications that reasonably place a person in fear for his safety or security are not protected expressive activities.

Page 31 of 57

Likewise, a person who repeatedly makes unwanted communications to a subject, thereby intolerably interfering with his reasonable expectation of privacy, will not find shelter behind the First Amendment. Thus, a person who every day, over the course of a week, either repeatedly yells outside an ex-partner's house during the night or repeatedly follows closely next to a woman importuning her for a date or making other unwanted comments, despite constant demands to stop, would violate subsection (c). However, subsection (c) was never intended to protect against the common stresses, shocks, and insults of life that come from exposure to crude remarks and offensive expressions, teasing and rumor mongering, and general inappropriate behavior. The aim of subsection (c) is not to enforce a code of civil behavior or proper manners. The mere venting of frustration or irritation at a situation is insufficient by itself to constitute harassment under the statute. State v. Duncan, 376 N.J. Super. 253, 264 (App. Div. 2005).

In S.B.B. v. L.B.B., 476 N.J. Super. 575, 584 (App. Div. 2023), certif. denied, 256 N.J. 434 (2024), the Appellate Division recently held as follows:

> [d]efendant L.B.B. appeal[ed] from the entry of a final restraining order (FRO) entered against her in favor of her estranged husband, plaintiff S.B.B., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to - 35.3 The FRO was based on the predicate act of harassment. The communication underlying the trial judge's finding of harassment was defendant's creation and dissemination of a video accusing her estranged husband of improperly withholding a get, a

Page 32 of 57

> Jewish bill of divorce, and asking community members to "press" her husband to deliver the get. Because defendant's communication constituted constitutionally protected free speech, we reverse.

Id. at 584. Thus, even if a communication is objectively harassing, that communication, if made in the public milieu, may find constitutional protection as expressive conduct.

Here, the statements made at B.S.'s behest were publicly posted on the internet. These statements include:

- "████] and The Issues of Date Rape" with the twitter handle named "@h*****daterape";

- "[██.], a 64 year old financial advisor in [omitted], NJ is accused by police of incapacitating 100+ victims of rape by plying them with date rape drugs" and this was known by the police;

- ██. was also accused in those postings of being a pedophile;

- Similar posting was made on an Instagram account utilizing the username "h********_daterape" and the name "[██.] and Date Rape" and added the website "realh*********.com" into its profile; and

- [██.], a 64-year-old financial advisor who lives in [omitted], New Jersey has been accused by police of incapacitating hundreds of victims by plying them with date rape drugs before raping and filming them. Through a score of accusations [███] has stayed one step ahead of a rape conviction by blackmailing his victims that he will release their naked photos. He was

> also accused of child molestation including that of his
> daughter when he singled her out for custody."

As detailed supra, the court finds that these postings were done at the behest of B.S. and involved Kiderman and Kogan, who actually posted this material on the internet.

Ultimately, the court finds that these messages and postings are constitutionally protected despite their harassing nature under N.J.S.A. 2C:33-4(c). Even when the court evaluates all of the messages in conjunction through the lens of the unequivocal finding of S.B.B. and that case's similarity to this matter, the court cannot find that there was a violation of subsection (c) uncovered by the umbrella of the right to free speech. For all intents and purposes, B.S. was making factual allegations against ██. There is nothing in these statements that the court can find that establishes that these messages objectively physically threatened or terrorized ██, or that B.S.'s speech that was intended to incite imminent unlawful conduct as against ██ as required by Burkert and S.B.B. under the harassment statute at N.J.S.A. 2C:33-4(c)

To be certain, the ██ may have other civil remedies in tort for slander, libel, or defamation and the Court offers no opinion on the resolution of those potential causes of action. It is the court's understanding that there are already matters pending in Nassau County, New York, and the District of New Jersey as between these

Page 34 of 57

parties on this very issue. This court must adhere to the delicate balance between the First Amendment and Article I, Paragraph 6 of our State Constitution and conduct which constitutes harassment under N.J.S.A. 2C:33-4(c) as domestic violence. Because the posts by the B.S. were publicly made, the Court is constrained to find that this was purely expressive conduct under <u>Burkert</u> and <u>S.B.B.</u> Under the exacting standard enunciated in those cases, the court cannot find by a preponderance of the credible evidence that the B.S. committed harassment under N.J.S.A. 2C:33-4.

Additionally, the court must decline ⊠.'s invitation to find, under the facts and circumstances of this matter, that B.S.'s public internet postings constituted an unreasonable invasion of privacy. To be clear, ⊠ firmly and forcefully denied the substance of the allegations made by B.S. Moreover, there was no public broadcasting of any <u>accurate</u> personal information that would normally be kept private given ⊠.'s vehement denials. There is no legal basis for this court to extend the metes and bounds of the standard definitions to which this court must hew. Here, to avoid double counting as to these communications, the court must separate the public communications making allegations about ⊠ from the private communications as between B.S. and ⊠ Under <u>Burkert</u> and <u>S.B.B.</u>, the court

cannot make the legal finding that those public communications run afoul of the First Amendment.[2]

Continuing, given that none of these public messages were sent to ▨, and there is no evidence in this record that they were directed to ▨, the court cannot find that they are harassing under N.J.S.A. 2C:33-4. As such, for the <u>public</u> postings, the court cannot find by a preponderance of the evidence that B.S. engaged in harassing conduct.

Next, the court moves to the allegation of contempt. Contempt, pursuant to N.J.S.A. 2C:29-9b(1), provides that

> Except as provided in paragraph (2) of this subsection, a person is guilty of a crime of the fourth degree if that person purposely or knowingly violates any provision in an order entered under the provisions of the "Prevention of Domestic Violence Act of 1991," P.L.1991, c.261 (C.2C:25-17 et al.)

Here, while there was a "tweet" to ▨ from B.S., after the entry of the temporary restraining order, the court cannot find, by a preponderance of the credible evidence, that B.S. intended to "tweet" ▨ As such, in the absence of any purposeful conduct by B.S., the court cannot find that B.S. engaged in contumacious conduct in violation of N.J.S.A. 2C:29-9b(1). Therefore, this aspect of the application for a final restraining order is hereby dismissed.

---

[2] The private communications shall be addressed <u>infra</u>.

Page 36 of 57

The court now moves to the other allegations of harassment made by ██. The text messages between B.S. and ██ as detailed in Exhibit P20, contain 198 printed pages of messages. The WhatsApp messages in Exhibit P21, contain 140 printed pages of messages. The Verizon telephone records are equally voluminous. The messages sent via Spoofcard contain similar content but are less voluminous. For purposes of brevity, rather than restate them all herein, the court incorporates all of these messages by reference, and highlights the following categories of conduct and messages contained therein:

- Numerous messages alleging that ██ raped his daughter;
- Messages sent to ██s work email alleging that he raped his daughter;
- B.S threatened get revenge as to ██;
- B.S. threatened to publicly humiliate ██
- B.S. made false allegations that she was pregnant with ██'s child;
- October 5, 2018, B.S., using WhatsApp, made 78 consecutive calls followed by an additional 51 more calls, totaling 129 calls;
- On October 10, 2018, B.S. called ██ 46 times, admitting at trial she did so to induce ██ to give her a get;

As detailed <u>supra</u>, the court finds that this conduct and these messages were authored by B.S.

Page 37 of 57

In looking at this compendium of messages and conduct, the court is convinced by more than a preponderance of the evidence that B.S. engaged in a long, continued campaign of harassment as against ▮. Here, we have hundreds of calls and other messages to ▮, multiple times after ▮ had requested B.S. to cease her unrelenting conduct. This is not L.M.F. v J.A.F., 421 N.J. Super. 523 (App Div. 2011). In that case, the Appellate Division reversed a finding of harassment when the trial court failed to find that the defendant's former spouse had a purpose to harass. Id. at 534-36. He repeatedly sent text messages to his former wife in order to obtain information about their daughter's welfare and academic performance. Ibid. In this case, given the content of the messages and the numerosity of those communications, B.S.'s purpose was to harass under subsections (a) and (c).

For example, there is no legitimate reason for B.S to send an alarming email to ▮.'s work email knowing that he would have to report the receipt of that email to human resources. B.S. knew ▮.'s personal email address but chose to send that message to his work address. The court can only conclude, based upon the lack B.S.'s credibility, that her intent was harass by causing alarm or seriously annoyance to ▮ by virtue of sending this email to his work email address.

Relatedly, the court finds that other content of the messages, including the anonymous Spoofcard messages, as sent to ▮ was intended to cause him alarm and/or serious annoyance. Under subsection (a), which generally focuses on the

mode of speech employed, and not a statement's content, <u>State v. Hoffman</u>, 149 N.J. 564, 583-84 (1997), the court is satisfied that B.S. engaged in harassing behavior by virtue of the anonymized messages sent via Spoofcard. The court finds no credibility to B.S.'s allegations that ✖. did, in fact, sexually assault his daughter. There has been no credible evidence offered into this record to substantiate any reasonable basis for B.S.'s allegation that ✖ did assault his daughter. The intent to harass is readily gleaned from the totality of the circumstances and the content of those message is such to cause annoyance or alarm. As such, the court finds by a preponderance of the credible evidence that B.S. engaged in the predicate act of harassment under subsection (a) as well as section (c).

Continuing, it is even more clear that B.S.'s threat get revenge as to ✖. was also intended to harass him. Similarly, B.S.'s threats to publicly humiliate ✖. were also intended to be a mechanism of harassment. The same is true as to the either false allegation or "gaslighting" manner in which she communicated about her alleged pregnancy. Given these findings, there can be no non-harassing purpose in the multiple communications to ✖. perpetuating this allegation. Therefore, this is yet another example of harassing conduct by B.S.

The court has carefully engaged in the task of "[d]rawing the line between acts that constitute harassment for purposes of issuing a domestic violence restraining order and those that fall instead into the category of 'ordinary domestic

Page 39 of 57

contretemps.'" <u>J.D.</u>, <u>supra</u>, 207 N.J. at 475 (quoting <u>Corrente</u>, 281 N.J. Super. at 249-50). While some of the other communications, outside of those categories identified <u>supra</u>, may reasonably be found to be part of the communication styles as between the parties, the categories identified <u>supra</u> cannot be reasonably found by this court to be domestic contretemps.

As such, the court finds by more than a preponderance of the evidence that B.S. engaged in the predicate act of harassment as against ▨ in relation to her campaign of harassing communications as detailed <u>supra</u>.

Next the court moves to the final alleged predicate act of cyber-harassment. N.J.S.A. 2C:33-4.1(a) establishes the elements of cyber-harassment:

> A person commits the crime of cyber-harassment if, while making a communication in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, the person:
>
> 1. threatens to inflict injury or physical harm to any person or the property of any person;
>
> 2. knowingly sends, posts, comments, requests, suggests, or proposes any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person; or
>
> 3. to commit any crime against the person or the person's property.

"The cyber-harassment statute limits the [regulation] of speech mostly to those communications that threaten to cause physical or emotional harm or damage." Burkert, 231 N.J. at 274.

In order to determine whether a communication constitutes harassment, a court does "not measure the effect of the speech upon the victim; [it] look[s] to the purpose of the actor in making the communication," even if the communication was "understandably upsetting to [the recipient]." E.M.B. v. R.F.B., 419 N.J. Super. 177, 182 (App. Div. 2011). A finding of purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). A fact finder's common sense and experience may also color the analysis. Hoffman, 149 N.J. at 577.

Here, it is clear that, notwithstanding the harassing nature of her electronic communications, there are no communications where she "threaten[ed] to inflict injury or physical harm to any person or the property of any person." Therefore, the court cannot find a violation of N.J.S.A. 2C:33-4.1(a)(1). Likewise, as there was no threat "to commit any crime against the person or the person's property," subsection (3) similarly cannot be the basis for a predicate act. That leaves subsection (2).

Page 41 of 57

Under subsection (2), it is prohibited to "knowingly send[], post[], comment[], request[], suggest[], or propose[] any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to his person." Breaking this into the requisite parts, there are three essential elements: the content, the publication, and intent. Assuming arguendo, that the posts, tweets, texts, and emails, fall under the umbrella of lewd, indecent, or obscene material, the next question is as to intent. As there is no evidence in this record that B.S. acted with the intent to place a reasonable person in fear of physical harm to his person, the court assumes arguendo that the intent was to cause emotional harm. The record establishes that the public postings made at B.S.'s behest were purposefully geared towards threatening and inflicting fear and pain on ██'s personal and professional reputation. Accordingly, the record from the trial establishes, by a preponderance of the credible evidence, cyber harassment as an additional predicate act under N.J.S.A. 2C:33-4.1(a)(1).

That does not end the inquiry. This court must still harmonize the constitutional rights of expression with the need to protect individuals from speech-related injury. Critically, "[l]aws may 'not transgress the boundaries fixed by the Constitution for freedom of expression.' " Burkert, 231 N.J. at 275 (quoting Winters v. New York, 333 U.S. 507, 515 (1948)). Thus, as with any speech-regulating

statute, the reach of N.J.S.A. 2C:33-4.1 is cabined by the federal and state

constitutions. The First Amendment to the United States Constitution provides in

part that "Congress shall make no law . . . abridging the freedom of speech, or of the

press; or the right of the people peaceably to assemble." Similarly, Article I,

Paragraph 6, of the New Jersey Constitution proclaims in part that "[e]very person

may freely speak, write and publish his sentiments on all subjects, being responsible

for the abuse of that right. No law shall be passed to restrain or abridge the liberty

of speech or of the press."

> So greatly do we in New Jersey cherish our rights of free
> speech that our Constitution provides even broader
> protections than the familiar ones found in its federal
> counterpart. In preserving and advancing those broad
> constitutional commands, we have been vigilant, jealously
> guarding the rights of the people to exercise their right to
> "freely speak," although their message may be one that is
> offensive to some, or even to many, of us.

Borough of Sayreville v. 35 Club L.L.C., 208 N.J. 491, 494 (2012) (citation omitted)

(quoting N.J. Const. art. I, par. 6).

As such, "[t]here is no categorical 'harassment exception' to the First

Amendment's free speech clause." Burkert, 231 N.J. at 281 (quoting Saxe v. State

Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001)). "Speech . . . cannot be

transformed into criminal conduct merely because it annoys, disturbs, or arouses

contempt." Ibid. "The First Amendment protects offensive discourse, hateful ideas,

and crude language because freedom of expression needs breathing room and in the

long run leads to a more enlightened society." Ibid. To that end, the right to free speech also includes the right to exhort others to take action upon that speech. "It extends to more than abstract discussion, unrelated to action." Thomas v. Collins, 323 U.S. 516, 537 (1945) ("'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts."). In fact, "[t]he First Amendment protects the right to coerce action by 'threats of vilification or social ostracism.' " State v. Carroll, 456 N.J. Super. 520, 537 (App. Div. 2018) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 926 (1982)).

In Claiborne Hardware Co., black activists in Claiborne County, Mississippi, organized a boycott of white-owned businesses when local civic and business leaders refused to assent to demands for equality and racial justice. 458 U.S. at 899-900. "The boycott was supported by speeches and nonviolent picketing." Id. at 907. Additionally, "store watchers" stood outside the targeted businesses and took down the names of those who violated the boycott. Id. at 903-04. Those names were then "read at meetings of the Claiborne County NAACP and published in a mimeographed paper entitled the 'Black Times.' . . . [T]hose persons were branded as traitors to the [B]lack cause, called demeaning names, and socially ostracized." Ibid. In very public speeches, an organizer stated that violators would be "disciplined," and warned: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." Id. at 902. The boycott went on for years, during

which several decentralized acts of violence occurred, including shots fired into the homes of boycott violators, beatings, property damage, and threatening phone calls. Id. at 904-06.

The Supreme Court ruled that the speech, both identifying and castigating boycott violators and promising retribution, was protected by the First Amendment. Id. at 915, 929. The Court explained that even speech designed to prompt others to act through "social pressure and the 'threat' of social ostracism . . . does not lose its protected character . . . simply because it may embarrass others or coerce them into action." Id. at 910. Even the organizer's speech, which invoked the spectre of violence and "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence," was protected because "mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." Id. at 927-29. The Court noted that no actual violence occurred directly following the statements, and there was "no evidence—apart from the speeches themselves—that [the organizer] authorized, ratified, or directly threatened acts of violence." Id. at 929. The Court cautioned that if such acts of violence did occur, there might be a question of whether the organizer was derivatively liable, but until then, the speech retained its protected status. Id. at 928-29.

Similarly, in <u>Organization for a Better Austin v. Keefe</u>, 402 U.S. 415, 415-16 (1971), the Court addressed "a racially-integrated community organization['s]" actions "to 'stabilize' the racial ratio in the . . . area" by influencing a real estate broker who allegedly engaged in "blockbusting" or "panic peddling" tactics to scare white owners out of Chicago's Austin neighborhood. <u>Id.</u> at 415-16. The broker acted as the fleeing sellers' agent to profit from the transactions. <u>Ibid.</u> In an effort to curtail the practice, the organization began a campaign against the broker. <u>Id.</u> at 417. The organization traveled to the broker's hometown, some seven miles from Austin, and began distributing leaflets that were critical of the broker's practices. <u>Id.</u> at 415-17. Some leaflets "requested recipients to call [the broker] at his home phone number and urge him" to sign an agreement to stop his real estate practices. <u>Id.</u> at 417. One leaflet promised to stop the campaign once he signed the agreement. <u>Ibid.</u> The organization distributed the leaflets at a shopping center, passed them to parishioners on their way home from the broker's church, and left them at the homes of the broker's neighbors. <u>Ibid.</u>

Finding that the organization's activities were an "invasion of privacy," the state courts enjoined the organization from distributing the leaflets or picketing in the broker's hometown. <u>Ibid.</u> The appellate court reasoned that the activities were "coercive and intimidating, rather than informative and therefore . . . not entitled to First Amendment protection." <u>Id.</u> at 418. The Supreme Court reversed, concluding

Page 46 of 57

that the organization's activities were protected by the First Amendment. Id. at 419-20. The Court emphasized that the fact that the organization's intent was "to exercise a coercive impact on [the broker] does not remove" the First Amendment's protections. Id. at 419. Additionally, since the injunction was "not attempting to stop the flow of information into [the broker's] household, but to the public," the invocation of the broker's right to privacy was unavailing. Id. at 419-20.

In general, "[t]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." Ashcroft v. Free Speech Coal., 535 U.S. 234, 253 (2002). "The government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' " Ibid. (quoting Hess v. Indiana, 414 U.S. 105, 108 (1973)). Thus, "[w]here a call to others to act neither conveys a plan to act nor is likely to produce imminent danger, it may not be criminalized, despite its unsettling message." Carroll, 456 N.J. Super. at 543. Although there is a narrow exception for speech that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action," Brandenburg v. Ohio, 395 U.S. 444, 447 (1969), the Appellate Division has acknowledged that "[e]ven urging others to violence is shielded unless the statement is designed and likely to produce immediate action." Carroll, 456 N.J. Super. at 545.

In Brandenburg, the Supreme Court reversed the conviction of a Ku Klux Klan leader for statements made at a rally. 395 U.S. at 444-45. At the rally, a group

Page 47 of 57

of hooded Klansmen, several carrying firearms, gathered around a burning cross. Id. at 445-47. Following a series of anti-Black and antisemitic remarks and slurs from the group, a single individual began to speak. Id. at 446. Among other things, he said: "[I]f our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic] taken." Ibid. He promised to march on Congress and elsewhere on July Fourth. Ibid.

The speaker was convicted of violating a statute which proscribed "advocat[ing] . . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." Id. at 445 (alteration in original). The Supreme Court summarily invalidated the statute, explaining that the "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447. "[C]onviction for mere advocacy, unrelated to its tendency to produce forcible action," is unconstitutional because it "intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments." Id. at 447 n.2.

In United States v. Carmichael, 326 F. Supp. 2d 1267, 1285 (M.D. Ala. 2004), the court explained that even a "general history" of violence was insufficient to

vitiate First Amendment protections. In that case, a criminal defendant facing drug distribution charges published a website with the putative goal of spreading awareness of his case and seeking information about individuals involved. Id. at 1271-72. The website displayed names and photographs of individuals labeled as "Agents" and "Informants" beneath a caption reading, "Wanted," in large, red letters. Id. at 1272. The government sought a protective order requiring the defendant to remove the website from the internet on the ground that the website constituted harassment of the government's witnesses or served to intimidate or threaten the witnesses. Id. at 1274. At an evidentiary hearing, a witness called by the government testified that the terms "wanted" and "informant" were "threatening" because the term "informant" had a "bad connotation among criminals and is equivalent to 'snitch.' " Id. at 1275. The witness also suggested that "the website [was] meant to encourage others to inflict harm" on informants and agents. Id. at 1286.

Specifically citing four cases decided by federal circuit courts in the prior two years for context, the court acknowledged "numerous cases involving the murder of informants in drug-conspiracy cases." Id. at 1284. Nevertheless, the court explained that the proper focus of the inquiry was defendant's website itself, "not whether the site calls to mind other cases in which harm has come." Id. at 1285. Thus, while the court acknowledged that the "broad social context ma[de] the case closer," the "background facts" relied upon by the government were too "general" to rob the

website of its First Amendment protections, particularly since the court could not find that the website served "no legitimate purpose" or "cross[ed] the line separating insults from 'true threats.' " Id. at 1278, 1282.

As to the latter, the court acknowledged that " 'true threats' are not protected by the First Amendment." Id. at 1280 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)); see also Watts v. United States, 394 U.S. 705, 707 (1969) (originating the true threats doctrine). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. "The 'prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur.' " Carmichael, 326 F. Supp. 2d at 1280 (quoting Black, 538 U.S. at 360). However, "evidence of an atmosphere of general intimidation is not enough to find . . . a 'true threat.' " Id. at 1285.

Applying these principles, the court is convinced that the public internet postings and tweets, whether viewed on their own or in the context in which they were disseminated, does not fall outside the First Amendment's protection. There was not a proverbial "call to arms" in relation to ▨▨. There was not active intent to incite. The only geographical information provided was for "[omitted], New Jersey." One could view this akin to a "public service announcement" warning others of the

Page 50 of 57

alleged predilections of ░░░ Again, the court must underscore that ░░░ has remedies for these false allegations outside the realm of domestic violence. These were not true threats or an imminent danger to satisfy the incitement requirement.

Critically, the First Amendment "does not prohibit name[-]calling" and "protects 'vehement, caustic, and sometimes unpleasantly sharp attacks' as well as language that is 'vituperative, abusive, and inexact.' " <u>Carmichael</u>, 326 F. Supp. 2d at 1282 (quoting <u>Watts</u>, 394 U.S. at 708). Similarly, "threats of vilification or social ostracism" do not lose their protected status. <u>Claiborne Hardware Co.</u>, 458 U.S. at 910. If the literal threat "to break . . . necks" in <u>Claiborne</u>, against a backdrop of actual acts of retaliation and violence committed by boycott supporters against boycott violators, was not outside the First Amendment's protection, it is hard to see how B.S.'s public postings could be unprotected. <u>Id.</u> at 902.

The court quickly adds that even the acts of identifying an individual, encouraging others to call them and urge them to change their behavior, and picketing in their hometown are protected activities under <u>Keefe</u>, 402 U.S. at 417.

While the public postings have constitutional refuge, the private messages do not. Therefore, as the private messages clearly constitute cyber harassment, the court is convinced by more than a preponderance of the evidence that B.S. committed the predicate act of cyber harassment.

In sum, the court finds that ▨ has carried his burden of proof, production, and persuasion as to the private communications identified <u>supra</u> and the court is satisfied that B.S. committed the predicate acts of harassment and cyber harassment.

<strong>C</strong>

Next, the court must determine whether there is a need for a final restraining order considering all of the credible evidence in this record. <u>See</u> <u>Silver</u>, 387 N.J. Super. at 125-27. If the court finds the defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." <u>Silver</u>, 387 N.J. Super. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to - 29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." <u>Id.</u> at 127.

The court shall now address the statutory factors under <u>N.J.S.A.</u> 2C:25-29(a) <u>seriatim</u>.

As for any previous history of domestic violence between ▨ and B.S., including threats, harassment and physical abuse, there is no evidence of such in this record. The parties dated for a very brief period of time. This factor weighs against the entry of a final restraining order.

Page 52 of 57

Next, the court looks to the existence of immediate danger to person or property. Here, B.S. engaged the services of confederates to post the information on the internet. While not a predicate act, this conduct speaks directly to the fact that B.S. continues to harbor ill feelings toward ██, feelings that certainly will be exacerbated upon the finding that she committed a predicate act. Moreover, B.S. was willing to not only take her revenge as to ██, publicly, but she employed proxies to accomplish her goal, despite the fact that the relationship had already ended. Additionally, B.S. maintained her attacks on ██ for months. She refused to honor ██.'s request that she cease her conduct as is clear from even a cursory review of the written communications. Simply put, she was undeterred until the entry of the temporary restraining order. Based on the totality of this record, and the incessant campaign of harassment engaged in by B.S., this court is convinced that B.S. represents a continuing and ongoing danger to ██.'s person and property. This factor weighs in favor of granting of a final restraining order.

The court only briefly pauses to address the financial circumstances of ██. and B.S. While there is evidence in this case as to a large disparity as between ██.'s resources and B.S.'s resources, there is not in this case the type of intertwined and interconnected finances that would cause the court to find that ██. needs a final restraining order to equalize any imbalance. There is simply insufficient evidence in this record for this factor to support the entry of a final restraining order.

Page 53 of 57

With regard to the best interests of the victim and any child, the court notes that there are no children born of the social relationship as between ██ and B.S. The court also notes the short nature of the parties' relationship, however, that short duration is eclipsed by the saga that followed based upon B.S.'s conduct. It is clear to this court that, for whatever reason, B.S. is vindictive as exemplified by her reaction to ██'s termination of the relationship. Moreover, as a published author and advice columnist, B.S. remains armed with the power of her pen to exact future revenge upon ██, as was seen through her barrage of communications. Therefore, this factor favors the entry of a final restraining order.

The court need not address any evidence as to determining custody and parenting time and the protection of the victim's safety, given the factual underpinnings of this case. Therefore, the court cannot find that this factor favors the entry of a final restraining order.

Finally, there is no evidence as to the existence of a verifiable order of protection from any another jurisdiction. This likewise does not favor the entry of a final restraining order.

Given the totality of these findings under the second prong of <u>Silver</u>, the court finds that ██ has met his burden of proof as to a continuing need for a restraining order.

**V**

As the court has found that both prongs of <u>Silver</u> have been proven by a preponderance of the evidence as to ███'s application for a final restraining order, until further order of the court, a final restraining order is hereby GRANTED and B.S. is hereby enjoined and restrained as follows:

- B.S. is prohibited from returning to the scene of violence;

- B.S. is prohibited from future acts of domestic violence;

- B.S. is barred from the residence(s) and place(s) employment o ███;

- B.S. is prohibited from having any oral, written, personal, electronic, or other form of contact or communication with ███████████████████;

- B.S. is prohibited from making or causing anyone else to make harassing communications to ███████████████████

- B.S. is prohibited from stalking, following or threatening to harm, stalk or follow ███████████████████

- B.S. is prohibited from possessing any and all firearms or other weapons and must immediately surrender these firearms, weapons, permit(s) to carry, application(s) to

purchase firearms and firearms purchaser ID card to the officer serving this Court Order. Failure to do so may result in your arrest and incarceration.

Pursuant to N.J.S.A. 2C:25-29.1, the court enters a civil penalty against B.S. of $250.00, to be paid within 30 days.

B.S. is restrained and must stay at least 1,000 feet away from ▮▮ o contact means no calling, personal visit, text, email, social media by you or someone on her behalf. B.S. must be fingerprinted within 14 days. The court also orders, pursuant to N.J.S.A. 2C:25-27, that B.S. must enroll and complete a court approved anger management course.

If B.S. violates any of its terms of this final restraining order, she could then be charged with contempt which may result in her arrest, prosecution and possible sentence of a monetary fine, jail, or both.

B.S. has 45 days to file an appeal of this decision.

Pursuant to the Act, ▮▮ may file an application for fees within 45 days after the entry of this opinion.

The parties themselves cannot change the terms of this order on their own. This order may only be changed or dismissed by the court. B.S. cannot have any contact with the ▮▮ without permission of the court. If she wishes to change any of the terms of this order, she must appear before the court for a rehearing.

If there is any criminal action pending related to this matter either in Superior or Municipal court, or any of the other pending civil matters, this ruling today has no effect on those proceeding. Thus, the parties may still be required to appear for those proceedings.

## VI

For the foregoing reasons, authority cited, having reviewed the filings, considered the evidence in this record, and based upon the court's findings and the predicate acts alleged, ▨ has proven by a preponderance of credible evidence that B.S. committed the predicate acts of harassment and cyber harassment. Thus, ▨. has satisfied the first prong of <u>Silver</u>. The court also finds tha ▨ has satisfied the second prong. 387 N.J. Super. at 125-27. Therefore, the court finds that a final restraining order is necessary to protect ▨ from an immediate danger and to prevent further abuse. ▨.'s application for a final restraining order is hereby GRANTED.

The court cannot find that B.S. has carried her burden as to either any of the alleged predicate acts or her need for a final restraining order. Her complaint is dismissed, and the temporary restraining order is dissolved. Her application for fees is likewise DENIED, with the exception of the prior order awarding her fees in relation to the pre-trial motion regarding the subpoena of her private banking information.

Page 57 of 57